**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OH.io Ventures Holding, Inc. | : | |
| c/o FBT Gibbons | : | |
| 10 West Broad Street | : | Case No. |
| Columbus, Ohio 43215, | : | |
| | : | |
| Plaintiff, | : | Judge |
| | : | |
| v. | : | Magistrate Judge |
| | : | |
| J. Seth Metcalf | : | |
| 1050 Glendale Avenue | : | **COMPLAINT** |
| Columbus, OH 43212 | : | |
| and | : | |
| | : | |
| Jeff Schumann | : | |
| 797 N Wall Street, Apt | : | |
| 600 Columbus, OH | : | |
| 43215  and | : | |
| | : | |
| Kevin Colón | : | |
| 501 Harbor Gate Way | : | |
| Longboat Key, FL 34228 | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

For its Complaint against Defendants Jeff Schumann ("Schumann"), Seth Metcalf ("Metcalf"), and Kevin Colón ("Colón," and with Schumann and Metcalf, "Defendants"), Plaintiff OH.io Ventures Holding, Inc. ("OH.io" or the "Company"), states as follows:

**NATURE OF ACTION**

1. This action stems from three corporate executives' malfeasance, waste, and deliberate exploitation of a company they were entrusted to build. Defendants were hired as executives in a new business venture – OH.io – created to bring next-generation artificial

intelligence companies to Columbus and position Central Ohio as a leading technology hub.  Rather than working to build up the Company, however, they used their positions to enrich themselves, in violation of their fiduciary and contractual obligations.

2. In public, and to the Company's investors, those executives – Defendants, here – portrayed themselves as committed leaders dedicated to making Columbus one of the "greatest tech capitals in America."

3. In reality, Defendants used the Company's resources for their own benefit and engaged in extraordinary and unjustified spending, including excessive expenditures on entertainment, luxury travel, and other non-essential expenses such as bottle service, private helicopter rides, and luxury hotel stays - all to their own benefit.

4. Defendants also caused the Company to incur substantial and unsustainable costs by hiring employees at inflated compensation levels and expanding operations at a rate that far outpaced the Company's growth, without regard to reasonable business practices, financial realities, or the Company's strategic objectives.  In short, they squandered the Company funds entrusted to them.

5. Defendants were supposed to act as the Company's fiduciaries; instead, they treated the Company like their personal slush fund, disregarding their fiduciary obligations and the Company's long-term viability.

6. Eventually, the Company uncovered the extent of Defendants' conduct and intervened to implement necessary cost controls and operational discipline in an effort to stabilize the business and align its operations with its strategic vision.

7. Rather than accept accountability, Defendants resisted those efforts, challenged the Company's corrective measures, and began plotting a self-serving attack on the Company.

2

8.      The Company terminated Defendants' at-will employment.

9.      On the way out the door, Defendants took steps to destroy evidence of their conduct and retain Company property and information without authorization.

10.     The destruction began immediately. The Company terminated Defendant Schumann via letter sent to him at 2:10 PM on April 13, 2026. *Twenty-eight minutes later*, Metcalf erased Schumann's Company-owned computer completely. The computer, after Metcalf wiped it, was returned to a factory-reset state, rendering the data on that device unrecoverable.

11.     Nor does the Company know how Metcalf even learned of the termination; Metcalf was not included on the communication terminating Schumann. Metcalf also failed to respond to communications from Company management and a board member on April 13, 2026. Upon information and belief, either Schumann or Colón (at Schumann's directive) told Metcalf of the termination and directed him to wipe Schumann's computer.

12.     The sabotage did not end there. Metcalf and Colón were terminated approximately nine hours after Schumann. When a Company employee went to remotely deactivate Metcalf's devices, they were no longer on the mobile device management system – they had already been removed. Upon information and belief, Metcalf removed his devices from the mobile device management system.

13.     Further, Metcalf's and Colón's user profiles, too, were fully erased shortly after their termination, and upon information and belief, at one or more of the Defendants' actions or direction.

14.     As a result of these actions, Company data and records were destroyed or rendered inaccessible.

3

15. Despite receiving his termination letter at 10:45PM the previous night, Metcalf continued to remotely access the Company's systems, including but not limited to Slack and Google.

16. On the morning of April 14, following his termination of employment, Metcalf was active on the Company's Slack account and Google account without authority.

17. Upon information and belief, Metcalf also accessed other Company computer systems, including the mobile device management system, Google, Slack, and other applications after his termination of employment.

18. Metcalf had no authority to access the Company's systems whatsoever following his termination of employment.

19. At the same time, Defendants retained Company property and information without authorization.

20. Unbeknownst to the Company, Defendants had, during the course of their employment, been recording numerous meetings and telephone conversations with many stakeholders in the Company.

21. These recordings were made using Company-issued devices and stored using Company-paid applications.

22. Indeed, Defendants, through counsel, have acknowledged that they possess recordings and transcripts of meetings held in their capacities as the Company's employees.

23. These recordings and transcripts include Company meetings, conversations and communications constituting and conducting Company business, and information regarding the Company's business, operations, and strategy.

24. Those recordings contain the Company's confidential information and trade secrets.

25.     Those recordings – and any other Company property still in Defendants' possession – constitute the Company's property and are even more vital to the Company given Defendants' intentional destruction of the contents of their Company-owned computers.

26.     Despite the Company's demands, Defendants have refused to return those recordings and continue to retain them.

27.     Defendants were entrusted with building the Company but instead misused its resources for their own benefit and, when confronted, took deliberate steps to destroy evidence and retain Company property to the Company's detriment.

**EMERGENCY RELIEF**

28.     This Complaint is brought in conjunction with a Motion for Temporary Restraining Order and Motion for Preliminary Injunction because of the nature of the recordings that counsel for Defendants have admitted are in their possession.

29.     Upon information and belief, and as further described below, Defendants continue to possess and review confidential, proprietary, and/or trade secret information contained in recordings of meetings, calls, communications, and conversations held while Defendants were acting in their capacity as executives of the Company.

30.     This information consists of, upon information and belief, communications regarding future business strategy, potential customers, and financial planning for the Company.

31.     Counsel for the Company learned of the nature of these recordings in a telephone call with counsel for Defendants held on May 6, 2026.

32.     The Company demanded the return of all such recordings and related materials in a letter to Defendants' counsel dated May 7, 2026. A true and correct copy of this letter is attached hereto as Exhibit "A".  The Company further demanded that counsel for Defendants immediately

cease all review of such recordings until such time as the Company could determine whether trade secret or proprietary information was contained in them.

33. Defendants responded in a letter dated May 8, 2026. A true and correct copy of that response is attached hereto as Exhibit "B." In that response, Defendants wrote:

> As we have discussed, our clients possess recordings and transcripts of numerous conversations. Our clients were parties to any recordings or transcripts of any conversations that any of them may have. Their reviewing these recordings or transcripts and sharing them with their counsel *is not materially different than a person telling their counsel about a conversation they remember or a person reviewing their notes of a conversation or sharing them with counsel.* We will preserve and provide copies of these materials as we stated on our call, *but we decline your new request not to review them.*

[Exh. B, at 2 (emphasis added).]

34. While Defendants have not shared or disclosed the content of these recordings, and the Company and its counsel have thus not yet had an opportunity to review them, these recordings were made in the course of Defendants' employment at the Company and in Defendants' capacity as employees of the Company, and they include recordings of Company meetings and communications. Thus, the recordings are the Company's property.

35. The Company seeks emergency injunctive relief from the Court to ensure that Defendants and their counsel (a) cease reviewing any such recordings immediately; (b) account for all such recordings made in the course of Defendants' employment; (c) account for all such recordings that they have reviewed in the time since Defendants' terminations, (d) return all such recordings from their internal systems and/or servers, and (e) delete all copies of all such recordings from their internal systems and/or servers.

## **PARTIES, JURISDICTION, AND VENUE**

36. Plaintiff OH.io Ventures Holding, Inc., is a for-profit corporation incorporated in Ohio with its principal place of business in Franklin County, Ohio.

37. Upon information and belief, Defendant Jeff Schumann is an individual and resident of Ohio.

38. Upon information and belief, Defendant Seth Metcalf is an individual and resident of Ohio.

39. Upon information and belief, Defendant Kevin Colón is an individual and resident of Florida.

40. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the cause of action arises under the laws of the United States.

41. The Court has personal jurisdiction over Schumann because, upon information and belief, he is a resident of this District and has caused injury by act or omission in this District.

42. The Court has personal jurisdiction over Metcalf because, upon information and belief, he is a resident of this District and has caused injury by act or omission in this District.

43. The Court has personal jurisdiction over Colón because he has caused injury by act or omission in this District. Colón further contractually agreed to submit himself to this jurisdiction in connection with his Agreement Regarding Competition and Protection of Proprietary Interests. ("CPPI Agreement".)  A true and accurate copy of the CPPI Agreement is attached hereto as Exhibit "D".  [Exh. D § 15.]

44. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### OH.io

45. OH.io is an AI-native performance venture platform founded with the mission of identifying up-and-coming AI enterprises from around the world, and helping them scale their businesses in a way they would not be able to achieve on their own.

46. The Company's business model includes multiple steps. First, OH.io identifies and partners with new AI enterprises, with the goal of partnering with such enterprises from OH.io's base here in Columbus.

47. Once a new enterprise is onboarded, OH.io assigns the enterprise a dedicated team to understand the enterprise's business model and growth strategy.

48. The OH.io team dedicated to the new enterprise then continues to support the enterprise in sales, marketing, and demand generation, among other functions.

49. With the team fully in place, OH.io then assists the enterprise by developing a pipeline for its business to increase its revenue.

50. Once scaled, OH.io then prepares to hand off the scaled-up enterprise back to its founders, complete with clear procedures and a Go-to-Market plan in place for continued future development.

51. Through this process, OH.io hopes to bring numerous new AI-based businesses to Columbus and Central Ohio, and in doing so, develop Columbus into a new hub for American technological development and innovation.

### **OH.io Hires Defendants**

52. In the spring of 2025, OH.io began to search for a leadership team to execute the company's vision and spearhead the development of a pipeline of new AI enterprises to bring on to the OH.io platform.

53. The Company contacted Defendant Schumann, who had previously led a startup in Columbus that was eventually sold to Mimecast.

54. The Company sent Schumann an offer letter to serve as its Chief Executive Officer on July 7, 2025, with an anticipated start date for his employment of August 16, 2025.

55. Schumann executed that offer letter on July 10, 2025.

56. Also on that day, Schumann executed a Confidentiality, Non-Competition, Non-Solicitation and Inventions Assignment Agreement (the "CNNI Agreement"). A true and correct copy of the CNNI Agreement is attached hereto as Exhibit "C."

57. The CNNI Agreement required, as relevant for this Complaint, the following:

Upon the termination of Employee's affiliation with the Company for any reason or for no reason, or if the Company otherwise requests, (a) Employee *will return to the Company* all tangible Confidential Information and copies thereof (regardless how such Confidential Information or copies are maintained), and (b) Employee will deliver to the Company any property of the Company which may be in Employee's possession, including, but not limited to, notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, PDAs, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in Employee's possession, custody or control (whether prepared by Employee or others).

[Exh. C, § 2.1.]

58. The CNNI Agreement further defined "Confidential Information" as:

[C]onfidential and proprietary information of the Company (including its subsidiaries, parents, affiliates, successors and assigns), whether in written, oral, electronic or other form, including but not limited to, information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to Employee or the Company . . . The phrase, "trade secrets," as used in this Agreement, will be given its broadest possible interpretation under the law of the state of Ohio and the Defend Trade Secrets Act of 2016 ("DTSA") and will include, without limitation, anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records any secret scientific, technical, merchandising, production or management information, or any design, process, procedure, formula, invention, improvement or other confidential or proprietary information or documents.

9

[Exh. C, § 1.1.4.]

59.     Also in the spring of 2025, the Company began to engage with Defendant Metcalf, whom Schumann recruited and brought to the Company.

60.     Metcalf had previously served as the Deputy Treasurer of Ohio, as appointed by then-Treasurer Josh Mandel. He was later part of the leadership of a company called QED Technologies.

61.     At some time during August 2025, Metcalf accepted an offer of employment as a General Partner of Global Operations.

62.     Upon joining OH.io, Metcalf effectively appointed himself to oversee the Company's information technology functions, despite not being assigned or qualified for those responsibilities.

63.     Unbeknownst to the Company, Metcalf used that control to centralize access to key Company systems and information in himself, including by restricting others' visibility into the Company's reimbursement systems, payroll-related information, and other technology platforms.

64.     Upon information and belief, through these actions, Metcalf exercised outsized control over Company operations beyond the scope of his formal role.

65.     With Schumann and Metcalf in place, the Company then sought out Colón to join the leadership team.

66.     The Company issued Colón his offer letter on September 8, 2025, and he accepted the role of General Partner of Revenue via DocuSign the same day.

67.     As part of his employment, Colón also signed an Agreement Regarding Competition and Protection of Proprietary Interests ("CPPI Agreement"). A true and correct copy of the CPPI Agreement is attached hereto as Exhibit "D."

10

68.     The CPPI Agreement required, as relevant for this Complaint, the following:

**Non-Disclosure and Return of Property Upon Termination.** After termination of my employment, I will not use or disclose any Confidential Information for any purpose. Immediately upon my termination, I will return to the Company all tangible Confidential Information and copies thereof (regardless how such Confidential Information or copies are maintained), and I will deliver to the Company any property of the Company which may be in my possession, including, but not limited to, notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, PDAs, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in my possession, custody or control (whether prepared by myself or others). If any Confidential Information has been saved or transferred to any device not owned by the Company, I will immediately notify the Company, and make such device available to the Company so that it may remove any Confidential Information from the device.

[Exh. D, § 1(c).]

69.     The CPPI Agreement also defined Confidential Information to mean:

[C]onfidential and proprietary information of the Company (including its subsidiaries, parents, affiliates, successors and assigns), whether in written, oral, electronic or other form, including but not limited to, information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to me or the Company; provided that, Confidential Information will not include information that is in the public domain other than through any fault or act by me.

[Exh. D, § 1(a).]

11

70. The CPPI Agreement also required a Duty of Loyalty from Colón, including an agreement to "act in good faith and in a manner that I reasonably believe to be in the best interests of the Company in carrying out my responsibilities." [Exh. D, § 1(e).]

71. The CPPI Agreement was signed by Colón and countersigned on behalf of the Company by Defendant Metcalf. [Exh. D.]

72. Each of the Defendants, during their employment with the Company, was issued Company-owned equipment for use in performing their job duties, including a Company laptop computer and a Plaud AI recording device.

73. These devices were purchased by or issued through the Company and constituted Company property.

74. The laptops issued to Defendants were configured with the Company's systems, including mobile device management software that allowed the Company to monitor, manage, and secure the devices and Company data stored on them.

75. Defendants were provided with unique, password-protected credentials to access Company-owned devices, applications, software, and systems, including email, cloud-based platforms, and internal tools.

76. Through these credentials, Defendants could access Company systems only following authentication and were required to use passwords and other access controls to gain such access.

77. The Company also utilized single sign-on authentication protocols such that Defendants' access to multiple Company systems and applications was centrally managed and monitored through their Company-issued credentials.

78.    Defendants' access to Company devices, applications, and data was governed by these authentication and security controls and was limited to authorized use in connection with their job responsibilities.

79.    Defendants understood that their credentials, and the access those credentials provided, were intended solely for Company business and were subject to Company policies governing confidentiality, security, and acceptable use.

80.    The Plaud devices issued to Defendants were used in connection with their roles at the Company and were capable of recording and storing audio content, including conversations and meetings occurring during the course of Defendants' employment.

81.    The Company retained ownership over all such devices and any data created, stored, or maintained on them in the course of Defendants' employment.

82.    Defendants understood that the hardware and software provided to them—including their Company-issued laptops and Plaud devices—remained Company property and were to be used solely for Company business and returned upon termination of their employment.

83.    Together, as the Company's leadership team, Defendants were responsible for the execution of OH.io's vision. That is, they were responsible for attracting new enterprises that OH.io could help develop and scale.

### Defendants Blow Through the Company's Money While Bringing in None

84.    At its launch, there was substantial financial backing for OH.io. The Company was initially funded by Ratmir Timashev and entities related to him. Timashev is an entrepreneur and graduate of the Ohio State University, who has a deep belief in the City of Columbus's potential to become a major national tech hub.

85. As a result, Defendants had substantial resources to develop a team, develop a pipeline for potential AI-enterprise partners, and develop a physical presence here in the city.

86. After several months, however, Defendants had managed to bring on exactly zero new enterprises to OH.io, other than those which were affiliated with Timashev.

87. Indeed, after the first three months, Defendants had brought on zero new enterprises, while burning through $8 million of the Company's funding.

88. And in early April, Schumann sent the Company's investors a 2026 budget that projected an additional $3 million in losses in the second quarter of 2026.

89. The Company's investors became concerned with the high amount of losses in a very short time and began to look at Defendants' expenditures for the Company.

**<u>Defendants' Wasteful and Self-Serving Spending</u>**

90. Upon review of the Company's finances, the Company found that Defendants had entered into high-value contracts with various consultants that they knew from previous jobs. Those consultants, charging tens of thousands of dollars apiece, did – upon information and belief – approximately nothing.

91. Defendants hired "GTM Consultants" – i.e., Go-to-Market Consultants – to help develop a sales and marketing playbook for OH.io. To compensate these consultants, Defendants spent $458,557.

92. This was problematic for two reasons. First, Go-to-Market expertise was expertise that Defendants had led the Company to believe they already possessed. There should not have been any need to hire such consultants, based on Defendants' representations to the Company prior to being hired. Defendants hired these consultants, that Defendants had worked with previously, to perform 'work' that Defendants themselves should have been able to do.

14

93.     Second, the work the consultants performed was worthless. The Company reviewed the consultants' work product and found that it contained little to no work product of value.

94.     In fact, one consultant was so careless that it didn't even bother to remove another company's watermark from its presentations to the Company.

95.     It was not just entering into worthless contracts that worried the Company. The Company also found examples of Defendants' reckless spending on luxury items with the Company's money.

96.     For example, Schumann spent $6,217 on hotel stays at the Waldorf Astoria hotel in New York for two separate trips in January and February of 2026. The Company has no records of Schumann having meetings with the Company in New York on these dates.

97.     As another example, Schumann expensed a $1,500 helicopter ride for five from Manhattan's west side to Westchester's County Airport – a ride duration of 12 minutes.

98.     And as *another* example, Defendants spent $1,580.87 at Astra Rooftop on Park Street – an amount spent on three bottles of Dom Perignon and one bottle of Casamigos Reposado tequila.

99.     Defendants purchased unnecessary and inappropriate gifts, purchased country club memberships for themselves, and failed to include receipts or invoices for thousands of dollars' worth of spending.

100.    Defendants also made reckless hiring decisions without justification, need, or approval from the Company.

101.    As a chief example, Schumann hired someone in the role of Partner, Ecosystem, with an annual salary of *$375,000*.

102.    The Company never approved such hiring.

15

103. Moreover, after Defendants' terminations, the Company's investigation uncovered that Defendants had hired numerous individuals without having work to support their hiring. The Company learned multiple employees hired by Defendants spent their days reading for pleasure, without meaningful assignments or productive responsibilities.

### The Company Terminates Defendants' At-Will Employment

104. The Company's investigation demonstrated it needed new leadership.

105. While the Company was investigating, however, Defendants began making demands of the Company, claiming that the Company's attempt to right-size OH.io's financial expenditures would destroy the Company's financial viability.

106. The Defendants each sent emails and/or letters on April 10 and April 13, 2026 claiming that the Company was not fulfilling its "promises" to them, and demanding actions that – in their view – would "honor the commitments" made to them.

107. Schumann sent his letter on April 10 at 4:28 PM. On April 13, 2026, the Company let Schumann know his employment was being terminated at 1:10 PM via email.  Company counsel sent a formal termination letter to Schumann via email to him at 2:10 PM. In the letter, the Company instructed Schumann to immediately return all Company property and means of access to the Company data and systems.

108. Metcalf sent his letter at 10:30 PM on April 13, 2026. The Company terminated his employment in an email to him at 10:45 PM.  In the letter, the Company instructed Metcalf to immediately return all Company property and means of access to the Company data and systems.

109. Colón sent his letter at 10:24 PM on April 13, 2026. The Company terminated his employment via letter attached to an email to him at 10:38 PM. In the letter, the Company instructed

16

Colón to immediately return all Company property and means of access to the Company data and systems.

110. Clearly, Defendants coordinated the preparation and transmission of these letters, and upon information and belief, Metcalf played a role in shaping or facilitating those communications.

111. Upon information and belief, Metcalf drafted these and other communications for Schumann and Colón and sought to influence their responses to management and Board-level issues as part of an effort to exert control over Company operations indirectly.

112. Upon information and belief, Metcalf had previously engaged in similar conduct at QED Technologies, where he allegedly sought to orchestrate contracts with members of the Ohio State Teachers Retirement System Board through instructing Board members on their communications.

### Defendants Spoliate and Destroy Property

113. Schumann was terminated at 2:10 PM on April 13, though he learned of his impending termination at 1:10 PM.

114. The Company attempted to reach Colón and Metcalf on April 13 after Schumann's termination, but neither returned management's calls or messages.

115. Neither Colón nor Metcalf was copied on the email in which Schumann was terminated or the email letting him know of his impending termination.

116. Another employee learned of Schumann's termination, and messaged Colón at 1:47 PM to ask how to respond to management's request for him to disable Schumann's access to Company systems.

117.    The two had a brief call, after which Colón messaged the employee to say that Schumann's "access is being turned off right now."

118.    Upon information and belief, Colón and/or Schumann called Metcalf, and the three decided to have Schumann's computer erased entirely, rather than have Schumann's access locked.

119.    Before Schumann, it had been the Company's practice to lock terminated employees' access; it had never been the Company's practice to erase terminated employees' devices.

120.    Metcalf knew the Company's typical and appropriate process upon an employee's termination was to deactivate or lock the discharged employee's Company computer upon termination – not erase the Company computer.

121.    Metcalf had, prior to Schumann's termination of employment, remotely deactivated or locked a discharged employee's computer, pursuant to that process.

122.    Despite refusing to respond to management's calls or messages, Metcalf proceeded to erase Schumann's Company computer later that same day.

123.    At 2:37 PM, Metcalf remotely erased Schumann's computer in its entirety.

124.    Metcalf did not have authority to erase Schumann's – the former CEO's – computer.

125.    Metcalf was not instructed to erase Schumann's computer.

126.    Metcalf did not inform the Company before or after he erased Schumann's computer that he took such action.

127.    The contents of that computer are not recoverable.

128.    Similarly, when a Company employee went to remotely deactivate Metcalf's devices following his termination of employment, the devices were no longer on the mobile device

18

management system – they had already been removed.  Upon information and belief, Metcalf removed his devices from the mobile device management system.

129.    Further, Metcalf's and Colón's user profiles, too, were fully erased shortly after their termination, and upon information and belief, at one or more of the Defendants' actions or direction.

### Defendants File Suit

130.    At 3:54 PM on April 13 -  less than three hours after Schumann's termination - Abby Chin of the law firm Cooper Elliott sent an email to the Company alerting it that Cooper Elliott represented Mr. Schumann. In that email, she indicated Schumann's intent to return any company property in his possession.

131.    On behalf of all Defendants, Cooper Elliott filed a Complaint (the "Franklin County Complaint") at 2:57 PM on April 14, 2026 – less than a day after announcing it represented Mr. Schumann, and approximately 16 hours after Colón and Metcalf's termination.

132.    The Franklin County Complaint generally alleges breaches of Defendants' employment contracts and alleges causes of action against the Company and individuals and entities associated with it. In addition to breaches of the employment contracts, the Complaint also asserts causes of action for fraud, civil conspiracy, promissory estoppel, unjust enrichment, and breach of fiduciary duty. The defendants in the Franklin County Action have moved to dismiss the Franklin County Complaint.

133.    Given the timing of the terminations and the Complaint, it is clear that Defendants had been coordinating with counsel for some time, meaning that Defendants plainly anticipated litigation as of the morning of April 13, 2026.

134. This timing is further important because of Defendant Metcalf's intentional destruction of all files on Defendant Schumann's computer 28 minutes after Schumann's termination, and just a day prior to all Defendants filing their Complaint.

**<u>Defendants Retain and Withhold Company Property</u>**

135. Counsel for Defendants and the Company met to discuss the Franklin County Action on May 6, 2026.

136. On May 6, 2026, Defendants' counsel indicated that Defendants possess, are collecting, and are reviewing an unknown number of recordings of conversations made in the course of their employment as Company employees with the Company owner, management team, and other employees. Defendants' counsel indicated that Defendants recorded nearly all of their conversations from the inception of their employment with the Company – including Company meetings and phone calls.

137. Upon information and belief, many of these recordings were made through Company-owned Plaud devices and Company-owned Plaud subscriptions.

138. On May 7, 2026, Plaintiff's counsel sent a demand letter to Defendants' counsel asserting that Defendants had improperly retained, accessed, and were continuing to use Company property and confidential information following termination, including but not limited to the recordings containing confidential company information and trade secrets, as well as other physical property. [Exh. A.]

139. Through counsel, the Company demanded the immediate return of all Company property, including the recordings and that the former employees and their counsel immediately cease any review, access, copying, dissemination, or use of recordings or transcripts created during

the course of their employment, including recordings of internal Company meetings and communications.

140. Through counsel, the Company required that all such recordings, transcripts, and related data be preserved in their original form and returned to the Company.

141. On May 8, 2026, Defendants' counsel issued a written response to the Company's demands. [Exh. B.]

142. In that response, Defendants' counsel acknowledged the Company's request for return of tangible property and indicated that certain items remained in the possession of the former employees, including a Plaud device and other equipment, and requested instructions regarding return logistics.

143. Defendants' counsel represented that Jeff Schumann possessed certain items, including a Jabra conference speaker and a Plaud device, and that Kevin Colón possessed an unopened Plaud device.

144. With respect to recordings and transcripts, Defendants' counsel acknowledged that the former employees possessed recordings and transcripts of meetings and conversations in which they participated.

145. Defendants' counsel declined the Company's demand that such recordings not be reviewed, stating that their clients would continue to review the recordings and share them with counsel. Defendants claimed the recordings are "not materially different than a person telling their counsel about a conversation they remember or a person reviewing their notes of a conversation or sharing them with counsel." [Exh. B.]

146. Defendants' counsel stated that the recordings and transcripts would be preserved and that copies would be provided.

147. Defendants' counsel did not agree to return the recordings, and in doing so, both Defendants and their counsel are retaining Company confidential information and trade secrets to which they have no entitlement.

### The Company Takes Steps to Protect the Confidentiality of its Confidential Information and/or Trade Secrets

148. The Company takes reasonable and substantial measures to protect the confidentiality and security of its proprietary information, trade secrets, and other confidential business information.

149. The Company requires employees to use unique, password-protected credentials and utilizes single sign-on authentication protocols to control and monitor access to its email accounts, applications, and computer networks.

150. Access to Company systems and information is restricted based on role and job responsibilities and limited to authorized users with a legitimate business need.

151. The Company employs mobile device management software to manage, monitor, and secure Company-issued devices and to control access to Company data on such devices.

152. Administrative access to the Company's systems, including its mobile device management platform and other critical infrastructure, is restricted to a limited number of authorized personnel.

153. The Company maintains physical security measures at its offices, including controlled access to Company premises.

154. The Company maintains policies and procedures governing the use, access, and protection of its confidential information and systems.

155. As a condition of employment, the Company requires employees to enter into written agreements imposing confidentiality and non-disclosure obligations that continue both during and after employment.

156. The Company's confidential information includes, among other things, internal communications, business strategies, financial and operational data, proprietary technology, and other sensitive information not available to the public.

157. The Company implements technical, administrative, and physical safeguards designed to prevent unauthorized access to, disclosure of, and use of its confidential information and trade secrets.

158. Through these measures, the Company takes reasonable steps to maintain the secrecy of its confidential information and trade secrets.

159. The Company's confidential information and trade secrets are not generally known to the public or to competitors and derive independent economic value from not being generally known.

160. The secrecy of this information provides the Company with a competitive advantage, including by enabling it to operate its business, make strategic decisions, and develop and deploy its services in a manner not readily replicable by competitors.

161. The Company does not disclose its confidential information and trade secrets outside the Company except under circumstances designed to maintain their secrecy.

162. Defendants had access to the Company's confidential information and trade secrets by virtue of their senior roles within the Company and were entrusted with highly sensitive Company information.

23

163. As a condition of their employment, Defendants Schumann and Colón entered into written agreements imposing confidentiality, non-disclosure, and related obligations with respect to the Company's confidential information and agreed to use such information solely for legitimate Company business purposes.

164. Defendant Metcalf was presented with the Agreement Regarding Competition and Protection of Proprietary Interests, but did not execute the agreement.

165. Defendant Metcalf was, nonetheless, aware of the Company's requirements with respect to Confidential Information as he countersigned the CPPI Agreement on behalf of the Company. [Exh. D.]

166. Defendants were aware of the Company's security measures and understood that such measures were intended to protect the Company's confidential information and trade secrets.

167. Defendants' access to Company systems, applications, and data was limited to that necessary to perform their job duties and was subject to Company policies governing confidentiality and acceptable use.

168. By virtue of their roles, agreements, and access to Company systems and information, Defendants knew or reasonably should have known that the Company took reasonable measures to protect its confidential information and trade secrets and that such information was not to be used or disclosed outside the scope of their employment.

### COUNT I – BREACH OF CONTRACT (CNNI)
**(Against Schumann)**
**(Injunctive Relief Sought)**

169. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

170. Schumann and the Company entered into the CNNI.

171. The CNNI is a binding and valid contract.

24

172. The Company has performed its obligations under the CNNI.

173. Under the terms of the CNNI, Schumann agreed he would return all "Confidential Information" and all copies thereof to the Company at the termination of his affiliation with the Company.

174. He specifically agreed to return:

notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, PDAs, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in [his] possession, custody or control (whether prepared by [him] or others).

[Exh. C., § 2.1.]

175. Schumann also specifically agreed that "Confidential Information" would include

information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to [Schumann] or the Company.

[Exh. C, § 1.1.4.]

176. Counsel for Defendants have admitted possessing recorded communications from Schumann's time as CEO of the Company.

177. Any recording and/or transcript that Schumann obtained while in his role as CEO for the Company constitutes "Confidential Information" under the CNNI.

178. Schumann agreed to "return to the Company" and/or "deliver to the Company" such information.

179. He has expressly refused to return that information to the Company, and indeed, his counsel has asserted they will continue to review it in violation of the CNNI. [Exh. B.]

180. The CNNI provides that such retention has caused the Company damage. Schumann agreed:

> Employee hereby expressly acknowledges that any breach or threatened breach of any of the terms and/or conditions set forth in Section 1, 2, or 3 of this Agreement will result in substantial, continuing, and irreparable injury to the Company. Therefore Employee acknowledges and agrees that in addition to any other remedy that may be available to the Company, the Company will be entitled to injunctive or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of Section 1, 2, or 3 of this Agreement. In addition, in the event that the Company brings any action to enforce the terms of this Agreement in a court of competent jurisdiction, the Company shall be entitled, in addition to any other relief which may be awarded, to recover from Employee its reasonable attorneys' fees, together with such other costs and reasonable expenses incurred in connection with such litigation.

[Exh. C, § 6.13.]

181. As a result, the Company has been damaged in an amount to be determined at trial, and is entitled to the immediate return of all Confidential Information in Schumann's possession, along with its reasonable attorneys' fees incurred in seeking injunctive relief.

### COUNT II – BREACH OF CONTRACT (CPPI Agreement)
**(Against Colón)**
**(Injunctive Relief Sought)**

182. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

183. Colón and the Company entered into the CPPI Agreement.

184. The CPPI Agreement is a binding and valid contract.

185. The Company has performed its obligations under the CPPI Agreement.

186.    Under the terms of the CPPI Agreement, Colón agreed he would return all "Confidential Information" and all copies thereof to the Company at the termination of his affiliation with the Company.

187.    Colón specifically agreed to return:

> to the Company all tangible Confidential Information and copies thereof (regardless how such Confidential Information or copies are maintained), and I will deliver to the Company any property of the Company which may be in my possession, including, but not limited to, notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, PDAs, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in my possession, custody or control (whether prepared by myself or others). If any Confidential Information has been saved or transferred to any device not owned by the Company, I will immediately notify the Company, and make such device available to the Company so that it may remove any Confidential Information from the device.

[Exh. D., § 1(c).]

188.    Colón also specifically agreed that "Confidential Information" includes

> [C]onfidential and proprietary information of the Company (including its subsidiaries, parents, affiliates, successors and assigns), whether in written, oral, electronic or other form, including but not limited to, information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to me or the Company; provided that, Confidential Information will not include information that is in the public domain other than through any fault or act by me.

[Exh. D, § 1(a).]

27

189. Counsel for Defendants have admitted possessing recorded communications from Colón's time as General Partner of Revenue of the Company.

190. Any recording and/or transcript that Colón obtained while in his role as General Partner of Revenue for the Company constitutes "Confidential Information" under the CPPI Agreement.

191. Colón agreed to "return to the Company" and/or "deliver to the Company" such Confidential Information.

192. He has expressly refused to return that information to the Company, and indeed, his counsel has asserted they will continue to review it in violation of the CPPI Agreement. [Exhs. B, D.]

193. As a result, Colón has breached the CPPI Agreement.

194. Colón also agreed to "act in good faith and in a manner that I reasonably believe to be in the best interests of the Company in carrying out my responsibilities."

195. As set forth above, Colón engaged in conduct contrary to the Company's interests and inconsistent with his contractual duty to act in good faith and in a manner he reasonably believed to be in the best interests of the Company, including by participating in and benefiting from the Company's excessive, unjustified, and wasteful spending of Company funds; participating in or facilitating the unauthorized wiping of Schumann's Company-issued computer; refusing to respond to management; retaining Company property following termination; and continuing to withhold recordings and transcripts containing Company confidential information after demand for their return.

196. As a result, Colón has further breached the CPPI Agreement.

197. The CPPI Agreement further provides that if Colón breached the CPPI Agreement, "The Company will be irreparably harmed and entitled to an injunction restraining any further breach, in addition to any other rights to which [the Company] is entitled."  [Exh. D, § 8.]

198. As a result, the Company has been damaged in an amount to be determined at trial, and is entitled to the immediate return of all Confidential Information in Colón's possession**.**

**COUNT III – VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831)**
**AND OHIO UNIFORM TRADE SECRETS ACT (R.C. § 1333.61(D))**
**(Against all Defendants)**
**(Injunctive Relief Sought)**

199. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

200. Defendants, through counsel, asserted that the recordings are of conversations from the inception of Defendants' employment of nearly all conversations with other employees, the owner, the management company, and member(s) of the Board of Directors of OH.io and were made in the course of their employment with OH.io.

201. If Defendants' counsel representation is true, these recordings would include confidential conversations regarding Company finances, profitability, pricing, margins, attorney-client communications, contract negotiations, business forecasting strategy, information about and with clients and vendors, information about existing and prospective clients, strategic business planning, and more.

202. The recordings in Defendants' possession constitute trade secrets under the DTSA and/or OUTSA.

203. The Company took reasonable measures to keep the information contained in the recordings confidential.

29

204.     The information contained in the recordings, which the Company understands to include records of board meetings and other meetings pertaining to the Company's business strategies, has independent economic value to the Company, particularly given the destruction of the information contained on Defendants' computers, including Defendant Schumann's computer, which Defendant Metcalf wiped without authorization.

205.     Defendants have refused to return the recordings upon demand.

206.     Defendants have disclosed and/or used the recordings' contents without authorization.

207.     As a result, the Company has been damaged in an amount to be determined at trial, and is entitled to the immediate return of the recordings in Defendants' possession.

### COUNT IV – CONVERSION
### (Against all Defendants)
### (Injunctive Relief Sought)

208.     The Company restates and realleges the foregoing paragraphs as though fully restated herein.

209.     Defendants have admitted to possessing transcripts properly belonging to the Company in addition to recordings. [Exh. B.]

210.     Any transcript of a meeting or communication Defendants had while employed by the Company in their capacity as employees from the Company is properly property belonging to the Company.

211.     The Company has demanded its property back, including any transcripts of such meetings or communications.

212.     Defendants have refused to return the property, including any transcripts of such meetings or communications.

30

213. As a result, Defendants are wrongfully exercising dominion or control over the Company's property.

214. The Company is entitled to the immediate return of its property, including transcripts of such meetings or communications, along with damages in an amount to be proven at trial.

**COUNT V – VIOLATION OF 18 U.S.C. § 1030(a)(5)(B)**
**COMPUTER FRAUD AND ABUSE ACT[1]**
**(Against Metcalf)**

215. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

216. At all relevant times, the laptop computer issued to and used by Defendant Schumann was owned by the Company and constituted a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2)(B), because it was used in and affected interstate commerce and communication.

217. Metcalf used his Company-issued computer in the course of his employment to access, send, and receive electronic communications, including email and Slack messages, through internet-based systems.

218. Those communications included exchanges with individuals located outside the State of Ohio, including Company employees, consultants, and business partners in other states.

219. Metcalf routinely used his Company-issued computer and related systems to conduct Company business across state lines, including communicating with stakeholders located in multiple jurisdictions.

---

[1] The Company specifically notes that it anticipates a future amendment to this Complaint once it has fully completed its investigation of its potential claims, particularly as to those claims for which it is not seeking injunctive relief. The Company files this Complaint now, however, given the emergent concerns of Counts I-IV.

220. Metcalf further used his computer and communication platforms in connection with negotiating, entering into, and performing contracts and other business relationships involving entities and individuals located outside Ohio.

221. The Company's email systems, Slack platform, and other cloud-based applications accessed by Metcalf operate through interstate networks and servers, including servers located outside the State of Ohio.

222. Through his use of these systems, Metcalf transmitted and received data, communications, and files across state lines in the ordinary course of the Company's business.

223. Accordingly, the computer used by Metcalf was an instrumentality of interstate commerce and was used in and affected interstate commerce and communication. On April 13, 2026, approximately twenty-eight minutes after Defendant Schumann was informed that his employment with the Company was terminated, Defendant Metcalf intentionally accessed the protected computer assigned to Schumann.

224. Defendant Metcalf's access to Schumann's computer was without authorization, as Metcalf was never given permission, authority, or consent by the Company to access, much less wipe, destroy, or otherwise delete the contents the Company laptop formerly assigned to Defendant Schumann.

225. Following Schumann's termination, Schumann himself lacked any authority to direct or authorize any access to, or destruction of data on, the Company-owned computer.

226. Defendant Metcalf knowingly and intentionally wiped the computer's hard drive, thereby destroying all files, data, and information stored on the device.

227.    By wiping the hard drive, Defendant Metcalf recklessly caused damage, as defined by 18 U.S.C. § 1030(e)(8), by rendering data unavailable and permanently destroying electronically stored information belonging to the Company.

228.    Defendant Metcalf's conduct caused "loss" to the Company within the meaning of 18 U.S.C. § 1030(e)(11), including but not limited to costs incurred responding to the offense, assessing the damage, attempting to recover lost data, and addressing business interruption.

229.    Defendant Metcalf's unauthorized wiping of Company-issued devices and destruction of Company data caused "loss" to the Company within the meaning of 18 U.S.C. § 1030(e)(11), including, without limitation: (a) costs incurred to investigate the scope of the data destruction; (b) costs incurred in attempting to recover, reconstruct, or replace lost data and system information; (c) costs associated with securing and re-stabilizing Company systems and devices; and (d) losses attributable to the interruption of the Company's ability to access and use its data and systems in the ordinary course of business.

230.    The aggregate amount of loss caused by Defendant Metcalf's actions exceeded $5,000 during a one-year period, as required by 18 U.S.C. § 1030(c)(4)(A)(i)(I).

231.    As a direct and proximate result of Defendant Metcalf's violation of 18 U.S.C. § 1030(a)(5)(B), the Company has suffered and will continue to suffer damages in an amount to be proven at trial.

### COUNT VI – VIOLATION OF 18 U.S.C. § 1030(a)(5)(C)
### COMPUTER FRAUD AND ABUSE ACT
#### (Against Metcalf)

232.    The Company restates and realleges the foregoing paragraphs as though fully restated herein.

233. The laptop computer assigned to Schumann was a "protected computer" as defined under 18 U.S.C. § 1030(e)(2)(B) because it was owned by the Company and used in and affecting interstate commerce and communication.

234. Metcalf's access to Schumann's computer was without authorization, as Metcalf was never given permission, authority, or consent by the Company to access, much less wipe, destroy, or otherwise delete the contents the Company laptop formerly assigned to Defendant Schumann.

235. Metcalf intentionally accessed the protected computer without authorization when he wiped the computer's hard drive immediately following Schumann's termination.

236. Metcalf knew, or should have known, that wiping the hard drive would impair the integrity and availability of the Company's data, including corporate records, communications, and other critical information.

237. As a result of Metcalf's unauthorized access, he caused damage to a protected computer within the meaning of 18 U.S.C. § 1030(e)(8) by destroying data and rendering the information unavailable.

238. Metcalf's actions were undertaken intentionally and without privilege, and directly resulted in harm to the Company by permanently depriving it of access to its own electronic information.

239. As a direct and proximate result of Metcalf's violation of 18 U.S.C. § 1030(a)(5)(C), the Company has suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT VII – BREACH OF FIDUCIARY DUTY
### (Against all Defendants)

240. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

34

241. At all relevant times, Schumann served as the Chief Executive Officer of OH.io, Metcalf served as General Partner, Global Operations of OH.io, and Colón served as General Partner, Revenue of OH.io. Each Defendant occupied a position of trust and confidence within the Company.

242. By virtue of their positions, Defendants owed fiduciary duties to the Company, including duties of loyalty, honesty, good faith, and the obligation to act in the best interests of the Company.

243. While employed by OH.io and owing fiduciary duties thereto, Defendants breached those duties by engaging in conduct that was contrary to the interests of the Company and designed to harm the Company.

244. Specifically, prior to and immediately following Schumann's termination, Schumann, Metcalf, and Colón acted in concert to cause the wiping of the hard drive of the Company-owned laptop assigned to Schumann, thereby destroying corporate files, data, and information belonging to the Company.

245. At the time of these actions, Defendants were aware of the probability of litigation involving the Company, having threatened legal action against the company. Defendants sued the Company one day after their termination, and counsel for Defendants appeared within hours of Schumann's termination.

246. Defendants thus knew that destruction of corporate data would significantly impair the Company's operations and legal interests.

247. The intentional destruction of the Company's data was undertaken for the improper purpose of concealing information, avoiding personal liability, and undermining the Company's ability to protect its legal and business interests.

35

248.    By engaging in this conduct, Defendants placed their own personal interests ahead of those of the Company and acted disloyally, in bad faith, and in violation of their fiduciary obligations.

249.    As a direct and proximate result of Defendants' breaches of fiduciary duty, the Company has suffered damages, including but not limited to loss of critical data, business disruption, investigative and remediation costs, and impairment of its ability to pursue and defend legal claims.

250.    The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT VIII – VIOLATION OF R.C. 2913.04**
**UNAUTHORIZED USE OF COMPUTER PROPERTY**
**(Against all Defendants)**

251.    The Company restates and realleges the foregoing paragraphs as though fully restated herein.

252.    Ohio law prohibits a person from knowingly gaining access to, attempting to gain access to, or causing access to be gained to any computer without the consent of or beyond the scope of the express or implied consent of the owner of the computer or another person who is authorized to give consent. R.C. 2913.04(B).

253.    At all relevant times, the laptop computer issued to and used by Schumann was owned by the Company.

254.    Schumann was not the owner of the computer and did not possess authority to use, operate, access, or cause access to be gained to the computer following his termination.

255. Metcalf was not the owner of the computer and did not possess the authority to use, operate, access, or cause access to be gained to the computer for the purpose of erasing the data thereon.

256. Colón was not the owner of the computer and did not possess the authority to use, operate, access, or cause access to be gained to the computer for the purpose of erasing the data thereon.

257. On April 13, 2026, approximately twenty-eight minutes after Schumann was informed that his employment with OH.io was terminated, Schumann and/or Colón caused Metcalf to access and operate the Company-owned laptop formerly assigned to Schumann.

258. Metcalf's access and operation of the computer were without the consent of the Company, as Metcalf was never given permission, authority, or consent by the Company to wipe, destroy, or otherwise delete the contents the Company laptop formerly assigned to Schumann.

259. Schumann and/or Colón knowingly caused the laptop to be accessed to intentionally wipe its hard drive, destroying all files, data, and electronically stored information contained on the device.

260. By wiping the hard drive, the Company's data was rendered unavailable and the wiping impaired the functioning and integrity of the computer system, causing loss and damage to the Company.

261. Defendants' conduct constitutes unauthorized use and access to computer property in violation of Ohio Revised Code § 2913.04(B).

262. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages, including but not limited to loss of data, business interruption, investigative expenses, remediation costs, and other economic losses.

37

263.    Pursuant to Ohio Rev. Code § 2307.60(A)(1), the Company is entitled to recover full damages in a civil action for injuries to property caused by Defendants' criminal acts, regardless of whether a criminal conviction is obtained.

264.    Plaintiff has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT IX – VIOLATION OF R.C. 2909.07(A)(6)(a)**
**CRIMINAL MISCHIEF**
**(Against all Defendants)**

265.    The Company restates and realleges the foregoing paragraphs as though fully restated herein.

266.    At all relevant times, the laptop computer issued to and used by Schumann was owned by the Company and constituted a computer and computer system within the meaning of Ohio Revised Code § 2909.07.

267.    Metcalf, without privilege to do so and without the knowledge or consent of the Company, knowingly accessed the Company-owned laptop assigned to Schumann and wiped its hard drive, destroying all files, data, and electronically stored information contained on the device.

268.    Schumann and/or Colón, without privilege to do so and with knowledge that Schumann's authority had terminated, knowingly caused, directed, encouraged, or conspired with Metcalf to bring about the wiping of the hard drive of Schumann's Company-owned laptop.

269.    Defendants collectively acted with the intent to impair the functioning of the computer, computer system, and data contained therein by rendering the Company's electronically stored information permanently unavailable.

270.    By altering, damaging, and destroying the data contained on the laptop, Defendants impaired the integrity and availability of the Company's computer system and data.

271.    As a direct and proximate result of Defendants' criminal acts, the Company has suffered damages, including loss of data, business interruption, investigative and remediation costs, and impairment of the Company's legal and operational functions.

272.    Pursuant to Ohio Revised Code § 2307.60(A)(1), the Company is entitled to recover full damages in a civil action for injuries to property caused by Defendants' criminal acts, regardless of whether a criminal conviction is obtained.

273.    The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

<u>**COUNT X – VIOLATION OF R.C. § 2913.42**</u>
<u>**TAMPERING WITH RECORDS**</u>
**(Against all Defendants)**

274.    The Company restates and realleges the foregoing paragraphs as though fully restated herein.

275.    At all relevant times, the Company-owned laptop issued to Schumann contained electronic records, including documents, communications, and digitally stored information, constituting "records" within the meaning of Ohio Revised Code § 2913.42.

276.    Metcalf, without privilege to do so and without the consent or authorization of OH.io, knowingly altered, destroyed, removed, concealed, or otherwise impaired the availability of those records by wiping the hard drive of the OH.io-owned laptop assigned to Schumann.

277.    Schumann and/or Colón, knowing that Schumann's authority over the Company's property had terminated, knowingly caused, directed, encouraged, or conspired with Metcalf to alter, destroy, remove, conceal, or impair the availability of the Company's records by causing the laptop's hard drive to be wiped.

278.    Defendants acted knowingly and intentionally, and with purpose to impair the availability and integrity of the Company's records.

279.     Defendants' conduct constitutes tampering with records in violation of Ohio Revised Code § 2913.42.

280.     As a direct and proximate result of Defendants' criminal acts, the Company has suffered damages, including loss of corporate records, business disruption, investigative and remediation costs, and impairment of the Company's legal and operational interests.

281.     Pursuant to Ohio Revised Code § 2307.60(A)(1), the Company is entitled to recover full damages in a civil action for injuries to property caused by Defendants' criminal acts, regardless of whether a criminal conviction is obtained.

282.     The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

### COUNT XI – VIOLATION OF R.C. § 2921.12
### TAMPERING WITH EVIDENCE
#### (Against all Defendants)

283.     The Company restates and realleges the foregoing paragraphs as though fully restated herein.

284.     Prior to his termination, Schumann threatened to initiate legal action against OH.io, placing him on notice that an official proceeding or investigation was pending or likely.

285.     Upon information and belief, all Defendants had engaged counsel before April 13, 2026. This belief is supported by counsel's email to the Company within three hours of Schumann's termination, and the filing of a 120-paragraph Complaint on behalf of Schumann,  Metcalf, and Colón within 25 hours of Schumann's termination, and within approximately 16 hours of Metcalf and Colón's termination.

286.     Thus, all Defendants knew or should have known that litigation between them and the Company was pending or reasonably foreseeable and that the information contained on Schumann's Company-owned laptop constituted evidence relevant to such proceedings.

287. With knowledge of a pending or reasonably foreseeable official proceeding or investigation, Defendants knowingly altered, destroyed, concealed, or removed evidence, or caused such evidence to be altered, destroyed, concealed, or removed, by wiping the hard drive of the Company-owned laptop assigned to Schumann.

288. Defendants acted with purpose to impair the value or availability of evidence for use in an official proceeding or investigation.

289. Defendants' conduct constitutes tampering with evidence in violation of Ohio Revised Code § 2921.12.

290. As a direct and proximate result of Defendants' actions, the Company has suffered damages, including increased litigation and investigative costs, loss of critical evidentiary materials, and impairment of OH.io's ability to pursue and defend legal claims.

291. Pursuant to Ohio Revised Code § 2307.60(A)(1), the Company is entitled to recover full damages in a civil action for injuries caused by Defendants' criminal acts, regardless of whether a criminal conviction is obtained.

292. As a result, the Company has suffered and will continue to suffer damages in an amount to be determined at trial.

### COUNT XII – SPOLIATION OF EVIDENCE
#### (Against all Defendants)

293. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

294. Prior to his termination, Defendant Schumann threatened to initiate legal action against OH.io, placing him on notice that an official proceeding or investigation was pending or likely.

295.    Upon information and belief, all Defendants had engaged counsel before April 13, 2026. This belief is supported by counsel's email to the Company within three hours of Schumann's termination, and the filing of a 120-paragraph Complaint on behalf of Schumann,  Metcalf, and Colón within twenty five hours of Schumann's termination, and within approximately sixteen hours of Metcalf and Colón's terminations.

296.    With knowledge of probable litigation, Defendants willfully destroyed evidence, or caused evidence to be destroyed, by wiping the hard drive of the Company-owned laptop assigned to Schumann.

297.    The destruction of the data was intentional and designed to disrupt the Company's ability to investigate claims, assess defenses, and pursue or defend litigation arising from Defendants' conduct.

298.    As a result of Defendants' willful destruction of evidence, the Company has been deprived of access to documents, communications, records, and other electronically stored information necessary to establish the full scope of its claims and defenses.

299.    Defendants' spoliation of evidence has disrupted the Company's ability to pursue legal claims and has caused actual prejudice to the Company.

300.    As a direct and proximate result of Defendants' spoliation of evidence, the Company has suffered damages, including increased litigation costs, investigative expenses, loss of evidentiary support for claims, and impairment of its legal rights.

301.    The Company has suffered and will continue to suffer damages in an amount to be determined at trial, and is further entitled to an adverse inference instruction as to Defendants' spoliation at trial.

## COUNT XIII – GROSS NEGLIGENCE
### (Against all Defendants)

302.    The Company restates and realleges the foregoing paragraphs as though fully restated herein.

303.    At all relevant times, Defendants owed duties to the Company to act with reasonable care, to safeguard the Company's property and electronic data, and to refrain from conduct creating an unreasonable risk of harm to the company.

304.    Defendants breached those duties by engaging in an extreme departure from the ordinary standard of care, including but not limited to knowingly causing or effecting the irreversible destruction of the Company's electronically stored information immediately following Schumann's termination.

305.    Defendants' conduct demonstrated a conscious disregard and indifference to a known or obvious risk that substantial harm would result to the Company, including loss of critical data, disruption of business operations, and impairment of the Company's legal rights.

306.    The harm resulting from Defendants' conduct was foreseeable, and Defendants knew or should have known that wiping the laptop formerly assigned to Schumann would cause significant and irreparable damage to the Company.

307.    As a direct and proximate result of Defendants' gross negligence, the Company has suffered damages, including loss of data, business interruption, investigative and remediation expenses, increased litigation costs, and other economic and consequential damages.

308.    The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

309.    The Company is entitled to recover all damages proximately caused by Defendants' gross negligence, as well as all other relief the Court deems just and proper.

43

## COUNT XIV – CIVIL CONSPIRACY
### (Against all Defendants)

310. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

311. At all relevant times, Defendants knowingly entered into a common plan, scheme, or agreement to engage in unlawful and tortious conduct directed at the Company.

312. Prior to and immediately following Schumann's termination, Defendants acted in concert to plan, prepare, and execute a coordinated course of action intended to undermine the Company and to avoid their own potential liability by deleting and destroying electronically stored information belonging to the Company.

313. Upon information and belief, Defendants formulated this plan prior to Schumann's termination and executed it within minutes after Schumann was sent his termination letter.

314. In furtherance of the conspiracy, upon information and belief, Schumann contacted Metcalf and Colón immediately following his termination, and the three agreed to have Metcalf wipe Schumann's computer. Metcalf thereafter accessed and wiped the hard drive of the Company-owned computer assigned to Schumann, destroying all files, data, and information stored on the device.

315. The acts undertaken by Defendants were intentional, willful, wanton, and malicious, and were committed pursuant to and in furtherance of their agreement to engage in unlawful conduct, including unauthorized computer access, destruction of property, breach of fiduciary duty, and spoliation of evidence.

316. Defendants each knew the essential nature of the plan and knowingly participated in the conspiracy with the intent to accomplish its unlawful objectives.

317. As a direct and proximate result of Defendants' conspiratorial conduct, the Company has suffered damages, including but not limited to loss of critical data, business disruption, investigative and remediation costs, increased litigation expenses, and impairment of the Company's legal rights.

318. The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

319. The Company is entitled to recover all damages resulting from Defendants' civil conspiracy, as well as all other relief the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff OH.io Ventures Holding, Inc. respectfully requests this Court enter judgment in its favor and against Defendants:

1. Ordering Defendants to immediately return any and all recordings and/or transcripts and any other confidential information belonging to Plaintiff;

2. Ordering Defendants to account for every recording and/or transcript that they gave to any third party, including counsel;

3. Ordering that Defendants' spoliation of evidence merits an adverse inference instruction at trial;

4. Awarding attorneys' fees to Plaintiff and against Schumann for attorneys' fees incurred in pursuing injunctive relief against him, as agreed in the CNNI;

5. Awarding damages to Plaintiff in an amount to be determined at trial, but in no event less than $75,000;

6. Awarding treble damages to Plaintiff as a result of Defendants' spoliation of evidence;

7. Any additional compensatory or other damages, including punitive damages, to be determined at trial;

8. Pre and post judgment interest;

9. Attorneys' fees and costs incurred; and

10. Any other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Anne E. Duprey
Anne E. Duprey (0087798) (Trial Attorney)
Aaron T. Brogdon (0081858)
Zackary L. Stillings (0098136)
FBT GIBBONS LLP
10 West Broad Street, Suite 2300
Columbus, OH  43215-3467
Ph.: (614) 559-7245; Fax: (614) 464-1737
E-mail: aduprey@fbtgibbons.com
E-mail: abrogdon@fbtgibbons.com
E-mail: zstillings@fbtgibbons.com

Jonathan Sack (*Seeking Pro Hac Vice Admission*)
Queenie Paniagua (*Seeking Pro Hac Vice Admission*)
Sack & Sack, LLP
70 East 55th St., 10th Floor
New York, NY 10022
Ph.:  212-702-9000; Fax: 212-702-9702
E-mail: jsack@sackandsack.com
E-mail: qpaniagua@sackandsack.com

*Counsel for Plaintiff OH.io Ventures Holding, Inc.*

/s/ Anne E. Duprey
Anne E. Duprey (0087798)

0164635.0823882   4899-1616-8105v12

46