**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **OH.io Ventures Holding, Inc.,** | : | |
| | : | |
| **Plaintiff,** | : | Case No.: 2:26-cv-00566 |
| | : | |
| **v.** | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| **J. Seth Metcalf,** *et al.***,** | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFF'S OBJECTIONS TO DEFENDANTS' PRIVILEGE LOG AND MOTION TO DECLARE THE ATTORNEY CLIENT PRIVILEGE WAIVED[1]

**[00:27:00] Seth Metcalf: There is no expectation of privacy, though, for any of this work stuff.**

DEF_056870[2] (Metcalf in a discussion about how Atlas, an AI tool, aggregates data, including Company emails and transcripts saved to the Company Google Drive).

**Speaker A: But how much is discoverable? Speaker B: Oh, all of it, dude.**

DEF_049803 (cleaned up) (Schumann in a discussion about how Atlas, an AI tool, aggregates recordings from AI wearables).



---

[1] Pursuant to May 29, 2026 Status Conference, it is Plaintiff's understanding that portions of this brief and exhibits that contain communications Defendants' have asserted are covered by attorney-client privilege, though Plaintiff disputes such assertions, are to be filed publicly. As such, sections of this brief have been redacted and certain exhibits, which have already been provided to opposing counsel and the Court, are not being publicly filed at this time.

[2] Attached hereto as Exhibit 7 are referenced excerpts from Defendants' production.

1

## I.  INTRODUCTION

As stated by Defendants' counsel, ██████████████████████████████

███████████  [See Exhibit 1, at Exhibit C, at 1:38.]  By saving transcripts of conversations with their counsel to a shared company Google Drive, Defendants have waived the attorney client privilege as to nearly all issues related to this litigation. Defendants: (i) knowingly used the Company's property, technology, storage and resources to record their conversations with counsel; (ii) stored vast amounts of information, including those conversations, they now claim is their property on the Company's servers; (iii) disclosed those conversations to multiple third-party and Company-provided artificial intelligence platforms; and (iv) disclosed legal advice to non-attorney third-parties. In light of Defendants' numerous and all-encompassing disclosures, Plaintiff objects to the inclusion of all non-personal items[3] in their Privilege Log.

Indeed, the breadth of Defendants' disclosure and waiver is of a scope nearly unmatched in the case law. During its investigation into this matter, Plaintiff discovered numerous documents, including hours of transcripts with counsel, on its servers. Defendants saved these conversations to the Company's servers, fully knowing that to do so would destroy their confidentiality. Indeed, the transcripts that Defendants saved to the Company's servers contain Defendants' admissions that information saved to the Company's AI tool Atlas – which itself scoured information from those transcripts – would be discoverable. Defendants cannot argue otherwise; Metcalf is an attorney, and Schuman and Colón were senior leaders of cybersecurity and technology companies.

The issues included in these conversations are inextricably linked with the subject matter of this litigation. The conversations discuss Defendants' plans to use their recorded conversations

---

[3] Specifically, Plaintiff objects to items 2-27, 81, and 266-69 included in the Privilege Log. To the extent an item is marked "Personal," Plaintiff still requests that the Court review such items *in camera*. To the extent any allegedly "Personal" documents pertain in any way to this litigation, Plaintiff would also object to Defendants' withholding of them.

for litigation, the legality or propriety of their recorded conversations, the permissibility of accessing other individuals' email accounts, the litigation strategy pertaining to the optics of that access being discovered, and Defendants' general litigation strategy of playing to the media to tell the world, in their words, "their version of the truth." [Exh. 1, at Exh. C.]

As a result, the Court should find first that Defendants waived any claim to attorney-client privilege as to *all* documents that Defendants saved to the Company's servers or created with a Company owned recording or transcription device. This includes the disclosure and return of all non-personal documents identified in the Privilege Log. Second, the Court should find that the scope of such waiver is all-encompassing, as to *any* communications relating to this dispute, given the expansive nature of the information that Defendants knowingly and intentionally saved to systems they knew were not private.

Defendants deliberately set up their Plaud recordings and transcripts to be uploaded and saved to the Company Google Drive. [*See* 03/09-10/2026 Slack Messages, attached hereto as Exhibit 2.] Further, they intentionally set up Company-owned applications and a Company AI tool to read those transcripts and produce outputs based on those transcripts. [*See* 03/11-12/2026 Slack Messages, attached hereto as Exhibit 3.]

Schumann's recorded conversations confirm it. Based on a February 5, 2026, transcript of Schumann meeting with attorney Brian Mannion saved to the Company-owned Google Drive,[4] Schumann was well aware that information and data collected by the Company AI-tool, Atlas, was discoverable:

Speaker A (Schumann): But how much is discoverable?

---

[4] Evidence that this was saved to the Company Google Drive is apparent on the transcript: ""file_path": /Users/jeffschumann/Library/CloudStorage/GoogleDrive-jeff@oh.io/My_Drive/Granola_Transcripts/Breakfast_with_Brian Mannion_ 2026-02-05T08:00:00-05:00.txt" [DEF_049803, page 230.]

Speaker B (Mannion): Oh, *all of it, dude*.

[DEF_049803 (emphasis added).] Defendants knew what they were doing, and knew it was not private. The Court should hold that they have waived the attorney-client privilege.

## II.     FACTS RELEVANT TO ANALYSIS

### A.  Defendants' Production of Disputed Materials.

This Court held a hearing on May 13, 2026, in response to Plaintiff's TRO related to the recordings and transcripts Defendants made during the course of their employment and using Company resources. Specifically, Plaintiff requested that the Court "order Defendants to return all such recordings, transcripts, or other Company property to the Company." [ECF #2, at 1.]

In the Court's LCR 65.1 Conference Order, the Court Ordered Defendants to produce the "Disputed Materials" to Plaintiff, which the Court identified as "the recordings and transcripts discussed during the Rule 65.1 conference." [ECF #9, at 1.] The Court Ordered Defendants to submit a privilege log if they believe there are materials not properly producible. [*Id.*] During that conference, Defendants' counsel indicated they were reviewing numerous recordings and transcripts and would return them to the Company pursuant to Court's Order.

On May 27, 2026, Defendants produced over 62,000 pages of documents as Ordered by the Court. Defendants also submitted a privilege log, asserting 280 documents were not produceable because they were either "personal" or attorney client privileged. [*See* Defendants' May 27 Privilege Log ("Privilege Log").] The Privilege Log includes the following:

- Sixty-seven (67) documents identified as "Granola AI notes related to anticipation of litigation and seeking advice." [Privilege Log, *passim*.]

- Transcripts of a recording between Defendant Schumann and Bob and Joellen Schumann, presumably Schumann's parents, and who, as far as Plaintiff has been able to confirm, are not attorneys. [Privilege Log, No. 27.]

4

- Transcript of a recording between Defendant Schumann and Joon Park, a current employee of OH.io and a defendant in the State Court action. [Privilege Log, No. 10.]

- Eighteen (18) documents identified as recordings of allegedly attorney client privilege communications. [Privilege Log, *passim*.]

It is Plaintiff's understanding – given the production arose out of Plaintiff's request for the return of Company property – that these are all files that were made with or stored using Company resources, including but not limited to Company-owned Plaud devices, Company-owned Granola AI transcription tool, Company-owned email accounts, and the Company-owned Google Drive. Indeed, many of these transcripts and recordings appear to have been downloaded from the Company Google Drive, to Defendant's personal storage devices and cloud-based accounts. Additionally, many of the documents for which Defendants claim to assert privilege were independently discovered by Plaintiff on its own servers during the course of its investigation. Simply by way of example, Entry Nos. 4, 5, 6, 8 and 24 of Defendants' Privilege Log correspond with Exhibits, H, E, G, F, and J in Plaintiff's May 21 Letter to Defendants.

On at least three occasions in the Privilege Log, it appears Defendants shared attorney-client privileged information with individual third parties. For example, on Privilege Log Entry No. 27, in a document whose title includes "Legal Strategy," Defendants claim the attorney-client privilege for a 75-page transcript between Schumann and "Bob and Joellen Schumann" – i.e., not counsel. Two similar entries occur concerning a man named Matt Pasternak. One, entry No. 81, withholds as "personal" a conversation between Mr. Pasternak and Colón, which concerned "anticipation of litigation and seeking attorney advice." But Mr. Pasternak does not appear to be an attorney: he appears to be a friend of Schumann's, as identified in Entry No. 253.[5]

---

[5] Counsel further found no record of Mr. Pasternak's registration as an attorney in Ohio, and will be requesting his status as an attorney in discovery.

### B. Defendants Saved Attorney-Client Communications to Company Servers.

During the time between the Court's Order after the May 13, 2026, conference and Defendants' production on May 27, 2026, Plaintiff continued its investigation into Defendants' theft of Company property. As a result of the investigation, it was discovered, and is undisputed, that Defendants saved numerous transcripts of their communications with counsel and transcripts of them discussing their communications with counsel to the Company's systems. [*E.g.,* Exhs. to Exhibit 1.][6] It is undisputed that numerous other transcripts, including transcripts with counsel and with non-attorney third parties discussing counsel's legal advice, were saved to the Company's computer systems in the months prior to Defendants' terminations. [*E.g.,* Privilege Log.][7]

It defies reason for Defendants to claim privilege over materials they acknowledge are Company property and were ordered by this Court to return, particularly where those materials include communications with non-attorneys. The context of the disclosures is even more striking. Defendants - senior executives who hold themselves out as sophisticated, technologically fluent professionals - made a series of conscious choices to use Company-owned devices, platforms, and AI tools to record, transcribe, store, and even analyze their communications with counsel.

This is not a case of inadvertence or a single lapse in judgment. It is the opposite: a sustained course of conduct demonstrating a clear understanding of the technology they were using

---

[6] These conversations with counsel reveal ████████████████████████████████████████ ████████████████

[7] The Court's May 15, 2026 Interim Protective Order required Defendants to produce all "Disputed Materials," which presumably included all materials taken from the Company's computer servers, given the scope of Plaintiff's claim and the conference was related to Company property in the possession of Defendants. [ECF # 9.] As a result, to the extent an item is logged on the Privilege Log or was otherwise produced by Defendants, it is presumed to have at one time resided on the Company's servers. This assumption is bolstered by the fact that the Privilege Log contains personal emails of Metcalf, relating, for example, to rental properties. [Privilege Log, No. 234.] Metcalf's rental properties are unrelated to this dispute and thus the only logical explanation for its inclusion on the Privilege Log is that it was originally housed on the Company's servers.

and the consequences of using it. Having affirmatively chosen to route their supposed "privileged" communications through Company systems and third-party AI tools, Defendants cannot now retreat to privilege. Their actions effected a sweeping and knowing waiver.

### C. Defendants Recorded Communications with Counsel to Third Party AI Services.

To record these communications, Defendants utilized third-party AI tools, including the recording device Plaud, and the transcription service Granola. As to Plaud, the device is used to record one's conversations throughout the day, and Defendants' Plaud devices were purchased by the Company for use in Defendants' roles at the Company. [*E.g.,* Compl., ¶ 72.] Those recordings were then transcribed by the app 'Granola,' whose subscription was paid for by the Company. [*See* Privilege Log (claiming privilege over "Granola AI Transcripts").] Further, Defendants used additional connector apps, like Zapier, to automatically save the recordings and/or transcripts to the Company Google Drive.  Additionally, Defendants gave a Company AI tool, Atlas, access to the transcripts, which then generated outputs based on the transcripts:

> [00:05:59] Jeff Schumann: […]. Uh, I'm going to open up You have Plod *[sic]* on your computer. You have Granola and we want to get uh G Drive. Downloaded. So, The reason why is we're going to set up a Zapier zap that every time a transcript is created on PLOD*[sic]*  and Granola, it will pull it into your G drive, which is how [Atlas] sees it. [Atlas]can get access to the G drive.

[DEF_056865.]

### D. Defendants Were Executive Employees.

Each of the Defendants was a high-level employee at the Company, who was entrusted to understand the Company's privacy policies with respect to the use of its systems, computers, and devices. Schumann served as the Company's Chief Executive Officer. [Compl., ¶ 241.] Both Metcalf, an attorney himself, and Colón served as General Partners. [*Id*.]

### E. Defendants Were Asked to Approve Company Policies Regarding Computer Use.

In January 2026, Schumann and Metcalf were asked to approve Company written policies regarding use of the Company's systems, including a policy of no expectations of privacy during such use. [*See* May 26 FBT Gibbons Letter, attached hereto as Exhibit 4.] While one Defendant acknowledged he was "aligned with the directions of the policies," none of the Defendants ever formally approved them, and instead they simply failed to respond to the policies. [*See id.*] Those policies, however, were clear: **"Team Members should not expect privacy when using Firm resources;" "If the Firm provides the resources, then the Firm maintains the right to access and read all information contained on those resources or disseminated via those resources."** [*See id.*, Exhibit O at 10-11 (emphasis added).] Further, shortly before his termination of employment, Metcalf was actively involved in reviewing and preparing to implement the Company's internal AI Policy, which also addressed the concerns of using AI tools with attorney-client communications. [*See* 03/31/2026 Slack Message, attached hereto as Exhibit 5.]

### F. Defendants Admit They Should Not Expect Privacy When Using the Company's Resources.

Throughout their employment, Defendants made clear they knew that they could expect no privacy when using the Company's computers. Indeed, Metcalf stated so bluntly to Schumann: "**There is no expectation of privacy, though, for any of this work stuff."** [DEF_056870.] And when put through their AI devices, that raw statement – having been passed through the same AI system that the conversations with counsel passed through – transformed into: **"Seth noted that in a work context there is often 'no expectation of privacy.'"** [DEF_056870.]

Schumann also discussed the discoverability of information saved by virtue of their use of AI devices to record their conversations. He knew, for example, that all information recorded by the devices and read by the AI tool would be discoverable:

> Speaker A: Everyone will have on.

Speaker B: It's what this, this is actually, it's the beneficial piece of AI, correct. Now like everything, there are unintended consequences, there are negatives, there are things that people can do bad with this, and that's all there. My lawyer mind is going in on those.

Speaker A: But how much is discoverable?

Speaker B: *Oh, all of it, dude. . . .*

[. . .]

Speaker A: I feel like you're gonna hate the discoverability of all of it.

Speaker B: Oh, my God. Oh, my God. The legal side of that is frightening.

[DEF_049803 (cleaned up).]

Defendants did not only talk about their knowledge of how documents saved to the Company servers was discoverable; they also required others associated with the Company to formally acknowledge it. Metcalf himself signed, on behalf of the Company, multiple agreements that also demonstrated there would be no privacy when using the Company's systems. For example, when engaging an independent contractor, Metcalf signed agreements in which the contractor acknowledged "no expectation of privacy" on Company systems. [DEF_002334.] And, in a Master Services Agreement with another company, Metcalf himself inserted language so that the other company would "acknowledge[] that all communications, data, and content transmitted, stored, or created on Client [OH.io] Systems are Client [OH.io] property, and [the counterparty] has no expectations of privacy on such systems." [DEF_005911, DEF_008481 (appearing to be redlines adding no expectation of privacy language by Metcalf).]

And, in case there were any doubt, during a call with him as their counsel, ███████

████████████████████████████████████████████████████

██████████████████████████████████ [See Exhibit 1 at Exhibit C, at 1:38.]

**G. Defendants Store Transcripts of Attorney-Client Calls on the Company Server.**

When the Company began reviewing its own Google Drive, it discovered the transcripts with their counsel that are at issue. The nature and extent of the transcripts contained on the Company's servers is widespread and encompasses all aspects of the matter, including Defendants' claims, strategies and weaknesses of the corresponding state court action, issues related to the records and Company property at issue in this litigation, and more specific information such as their downloaded and export of Company documents, expectation of privacy in Company documents, and media involved litigation strategy.

Rather than hold onto the documents in secrecy, Plaintiff's counsel promptly informed Defendants' counsel of the documents discovered on the Company's servers and advised Defendants' counsel that, as a result, it was Plaintiff's position that privilege had been waived.[8]

Critically, many of the transcripts which Plaintiff found on its servers appear to be identified in Defendants' Privilege Log, conclusively demonstrating that such recordings and/or transcripts originated from Plaintiff's servers. [*Compare* Entry Nos. 4, 5, 6, 8 and 24 of Plaintiff's Privilege Log *with* Exhibits, H, E, G. F, and J from Exhibit 1.]

**III.    Defendants have waived the attorney client privilege as to the items on the Privilege Log and to any items saved to the Company servers.**

**A.   General Provisions Regarding the Attorney-Client Privilege**

"The attorney-client privilege is recognized as the oldest privilege relating to confidential communications." *Erickson v. Hocking Tech. College*, No. 2:17-cv-360, 2018 WL 9414018, at *1 (S.D. Ohio Mar. 27, 2018) (internal citation omitted). The privilege "protects against any

---

[8] The letter also addressed additional evidence of theft by Defendants and the discovery that Defendants had spoliated evidence by destroying Company data on the way out the door. [See Exhibit 1, at 6-9.] Because the scope of the Court's Order is specifically related to the Privilege Log and attorney-client privilege issues related to the letter, Plaintiff reserves its right to pursue all remedies available to it related to the spoliation and theft at a later date.

dissemination of information obtained in the confidential relationship" between client and attorney. *LifeBio, Inc. v. Eva Garland Consulting, LLC*, 672 F.Supp.3d 512, 517 (S.D. Ohio 2023) (citing *MA Equip. Leasing I, L.L.C. v. Tilton*, 2012-Ohio-4668, ¶ 19 (Ohio Ct. App. 2012)).

Attorney-client privilege is not absolute, and it is a privilege that is held by the client. *Fausek v. White*, 965 F.2d 126, 132 (6th Cir. 1992). "[I]f a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels – if not crown jewels." *LifeBio, Inc.*, 672 F.Supp.3d at 517 (quoting *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989)). It can be waived by "voluntary disclosure," including the "voluntary disclosure of private communications by an individual or corporation to third parties." *Penland v. Flowers*, No. 2:24-cv-676, 2025 WL 3641152, at *4 (S.D. Ohio Dec. 16, 2025) (quotation omitted).

In the event the attorney-client privilege is challenged, "[t]he burden of establishing the existence of the privilege rests with the person asserting it." *Kushner v. Nationwide Mutual Ins. Co.*, No. 2:17-cv-715, 2018 WL 3454685, at *4 (S.D. Ohio July 18, 2018) (internal quotation omitted). That is, "[t]he burden of showing that the privilege has not been waived also falls upon the person claiming the privilege." *Mainstay High Yield Corporate Bond Fund v. Heartland Indus. Partners, L.P.*, 263 F.R.D. 478,480 (E.D. Mich. 2009). The privilege is narrowly construed. *In re Asia Global Crossing, Ltd.*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005).

### B. Defendants waived the Attorney-Client Privilege By Saving Attorney-Client Communications on Company-Owned Systems.

"Confidential[ity] is an essential element of attorney-client privilege." *Pontikos v. Am. Med. Tech.*, No. 1:20-cv-02163, 2021 WL 634999, at *2 (N.D. Ohio Feb. 18, 2021). An employee's expectation of privacy in his office, desk and files "may be reduced by virtue of actual office practices and procedures," and "whether an employee has a reasonable expectation of privacy must be decided on a case-by-case basis." *O'Connor v. Ortega*, 480 U.S. 709, 710, 717 (1987).

11

As a result, "courts have held that a client waives attorney-client privilege when the client communicates in circumstances where the client could not reasonably believe the communications were confidential." *Id*. (quoting, e.g., *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 258 (Bankr. S.D.N.Y. 2005) ("Thus, the question of privilege comes down to whether the intent to communicate in confidence was objectively reasonable.")); *Pinnacle Surety Servs., Inc. v. Manion Stigger, LLP*, 370 F. Supp. 3d 745, 752–54 (W.D. Ky. 2019); *Mason v. ILS Tech., LLC*, No. 3:04-cv-139-RJC-DCK, 2008 WL 731557, at *4 (W.D.N.C. Feb. 29, 2008); *U.S. v. Finazzo*, No. 10-cr-457 (RPM) (RML), 2013 WL 619572, at *7 (E.D.N.Y. Feb. 19, 2013) ("Finazzo's claim of privilege turns on whether he had a reasonable expectation that the attorney- client communications would remain confidential despite being stored on his employer's servers.") (internal quotations and citations omitted).

There are four factors that courts consider to determine whether a client could reasonably believe that his communications while utilizing hardware owned by his employer are confidential: "(1) whether the company 'maintain[s] a policy banning personal or other objectional use,' (2) whether the company monitors employees' computer or e-mail use, (3) whether 'third parties have a right of access to the computer or e-mails,' and  (4) whether the company notified employees of its use and monitoring policies." *Pontikos*, 2021 WL 634999 at *2.

Here, the Defendants knew that there was no expectation of privacy on documents – even transcripts of attorney-client communications - that they saved on the Company's servers. The Court need go no further than their own words: Metcalf specifically stated to Schumann that "there is no expectation of privacy" for such documents in March – before Defendants had recorded any arguably privileged material to the Company's computer systems. [DEF_056870.]

12

But more than that, it was Schumann and Metcalf who were responsible for *implementing* the Company's computer-use policies: OH.io is a new company, and they were the ones who were supposed to set up the very systems that would have demonstrated the Company's ownership of the relevant documents. [*See* Exhibit 4, at p. 3-5.] It is undisputed that Schumann and Metcalf were shown proposed policies for approval from other employees, and it is undisputed that Schumann even said he was "aligned" with the direction of those policies – policies which clearly stated that employees have no expectation of privacy when using Company computer systems and devices. [*Id.; see also id.,* Exhibit O at 10-11.]

Defendants may not now use their failure to approve formal policies as a shield from their disclosure, when they full well knew – admittedly – that there was no expectation of privacy. It is not remotely plausible that senior employees like Defendants – particularly in the technology and AI sphere – could reasonably believe that the transcripts they saved to the Company's Google Drive would remain private. *See, e.g., Aventa Learning, Inc. v. K12, Inc.*, 830 F.Supp.2d 1083, 1107 (W.D. Wash. 2011) (senior level manager charged with constructive knowledge that there was no expectation of privacy). Indeed, they said otherwise on those very transcripts.

Because the Disputed Materials which Defendants assert are privileged originated and/or were saved to the Company's servers, there is no expectation of privacy in any of them. Indeed, Defendants themselves have admitted as much. [*See* DEF_056870.] The fact that Defendants were actively involved in developing and approving the Company's computer-use policies unequivocally demonstrates that the Defendants knew such documents on Company servers were accessible by the Company. This is further demonstrated by Schumann's access and download of the sent emails of Timashev prior to Schumann's termination – i.e., Schumann knew not only that the Company could access such information, but he even knew how. In light of their statements,

13

active involvement in development of Company computer-use policies, and technological experience, any argument that Defendants had an expectation of privacy in attorney client privileged communications saved on Company servers is wholly unreasonable.

Like the Disputed Materials which Defendants assert are privileged, the same analysis applies equally to numerous transcripts of conversations between Defendants and their counsel, or discussing their counsel's advice, which were saved to Company servers and discovered by the Company during the course of its investigation into the scope of Defendants' theft and misconduct. Defendants' own admissions, coupled with the fact that they were among those that were responsible for implementing the Company's privacy policy makes unreasonable any claim that Defendants expected such transcripts to remain confidential.

Because Defendants saved communications – some of which are with their counsel – to the Company's Google Drive, the privilege is waived as to all attorney-client privileged communications saved on or passing through Company servers, including those on Defendants' Privilege Log and those discovered by Plaintiff on its servers during the course of its investigation.

### C. Defendants Waived the Attorney Client Privilege By Using AI Tools.

Not only did Defendants save these transcripts to the Company's computer systems; they used Company-owned AI devices using Company-owned AI subscriptions to do so.[9] By disclosing the contents of these transcripts to third parties – i.e., Plaud and/or Granola and/or Atlas – Defendants have waived the attorney-client privilege.

While the interplay between AI services and the attorney-client privilege doctrine is relatively new, several guidelines from a recent Southern District of New York decision demonstrate that familiar principles of waiver should also apply in the context of AI tools. *See*

---

[9] These are, of course, additional reasons to find that the use of Company property constitutes a waiver of the attorney-client privilege.

14

*United States v. Heppner*, 820 F.Supp.3d 292, 296 (S.D.N.Y. 2026). In *Heppner*, a defendant used the AI tool "Claude" to outline a possible defense strategy for a criminal case against him. *Id.* at 295. The question before the *Heppner* court was whether the use of Claude waived the attorney-client privilege. *Id.* The court found that it did. *Id.* at 299.

That court noted that there were three elements to a privileged communication: "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *Id*. at 296 (citation omitted). For at least two reasons, the Court found that Heppner's Claude-communications did not meet this criteria. *Id.* at 296-97. Both are applicable here.

The first reason is that the AI app's terms of use demonstrated its use was not "confidential." In the case of Claude, the *Heppner* court noted that "the written privacy policy to which users of Claude consent provides that Anthropic collects data on both users' 'inputs' and Claude's 'outputs,' that it uses such data to 'train' Claude, and that Anthropic reserves the right to disclose such data to a host of 'third parties,' including 'governmental regulatory authorities.'" *Id*. at 296-97. As a result, the court concluded that "Heppner could have had no reasonable expectation of confidentiality in his communications with Claude." *Id*. at 297. This, it concluded, meant the communication with Claude was not privileged. *Id.*

Granola, similarly, has such terms and conditions. It requires the customer to authorize it to obtain "Customer Data," which means "information originating from Customer and entered or uploaded to the Services. . . ." [Granola Terms and Services, Section 1.3; attached hereto as Ex. 6.] With that Customer Data, a user like Defendants "grants to Granola a non-exclusive, royalty-free, worldwide, *sublicensable*, perpetual right and license to access and use Customer Data provided to Granola . . . to generate aggregated and de-identified data derived from Customer Data

15

and use such data to improve, test, train, and operate Granola's products and services." [*Id*., Section 6.2.2.] That is, while Granola says it will not allow other third parties to use Customer Data to train other AI models, Granola is free to sublicense the use of Customer Data. In short, the data given to Granola – one of at least three AI programs to have touched the challenged transcripts – is certainly not confidential.

So too does Plaud have similar terms and conditions. First, the Plaud AI Data usage Transparency Policy notes that it will only use a user's content after obtaining their explicit consent. Plaud AI, AI Data Usage Transparency Policy[10] (accessed on May 31, 2026). The policy indicates that data uploaded to the platform is shared with third-party services providers to deliver the serves of the AI-powered features. *Id.* Even though Plaud puts restrictions on how the data may be used, it is still shared with Plaud and, at times, shared with third party services providers and is thus certainly not confidential.

Additionally, the Court found that Heppner did not communicate with Claude for the purpose of obtaining legal advice. *Heppner*, 820 F.Supp.3d at 297. In other words, counsel did not direct Heppner to use Claude, but instead, he did so of his own volition. "[W]hat matters for the attorney-client privilege is whether Heppner intended to obtain legal advice <u>from Claude</u>, not whether he later shared Claude's outputs with counsel." *Id*. (emphasis in original). Here, Defendants' use of Granola was not at counsel's advice; rather, Defendants' use of AI devices was in their day-to-day business practice, so that the transcripts generated by Granola or recordings heard by Plaud could be used by yet a *third* AI program called Atlas.[11]

---

[10] https://global.plaud.ai/pages/ai-data-usage-transparency-
policy#:~:text=It%20covers%20what%20data%20is%20processed%2C%20how%20it,governs%20all%20personal
%20data%20handling%20across%20our%20Services
[11] Atlas, in turn, was a Company AI tool, and sent daily updates to Defendants telling them about their upcoming day based on conversations and messages it read during the prior days and weeks. [*See* Exhibit 1, at 4.] Neither Plaud nor Granola were used for legal advice; they were used by Atlas to inform the user's to-do list by listening to the conversations he had on a daily basis.

The proof of this disclosure is on the face of the Privilege Log: over 60 entries contain the phrase: "Granola AI notes related to anticipation of litigation and seeking attorney advice." [Privilege Log, *passim*.] The very identification of these transcripts as "Granola AI notes" indicates they were shared with at least one third party – Granola. This destroys the privilege.

Not only is this disclosure apparent in the Privilege Log, but the transcripts saved on the Company servers were also recorded and passed through multiple AI platforms, including Plaud to record the conversations and its integration with Atlas to read the transcripts generated by Granola to create daily updates for Defendants. In effect, the information which was recorded was shared with not less than three separate AI platforms: Plaud to record, Granola to transcribe and take notes, and Atlas to use the recordings and transcriptions for daily updates.

Because Defendants shared attorney client communications with third-party AI companies, the privilege is waived.

### D. Defendants' Disclosures to Third Parties Waives the Attorney Client Privilege.

"It is well-settled that by voluntarily disclosing an attorney's advice to a third party, a client has waived the attorney-client privilege because the disclosure runs counter to the notion of confidentiality." *Baker v. Chevron USA, Inc.*, 2009 WL 10679629, at \*3 (S.D. Ohio 2009) (citations omitted). Here, the Privilege Log demonstrates such disclosures took place: Defendant Schumann, the day he was terminated, apparently had a 75-page-long conversation with his parents. [Privilege Log, No. 27.] This conversation concerned "Legal Strategy."

To be clear, even disclosing legal strategy to one's parents waives any privilege attached to that legal strategy: they are third parties. And such is likely the case for Matt Pasternak, who

17

appears to be a friend of Schumann's – not an attorney.[12] In fact, Defendants even seek to assert privilege over a transcript of a recording between Defendant Schumann and Joon Park, a current employee of OH.io and a defendant in the State Court action.

These are all waivers. Information that perhaps *could* have been deemed privileged – notwithstanding the waiver that occurred by storing such documents and transcripts on Company servers, or the waiver that occurred by passing such information through third-party AI companies – was waived by Defendants' disclosure of such information to (human) third parties. The transcripts of these and other communications were made on Company devices, using Company subscriptions, and saved on Company computers: they are the Company's, and they are not private.

Many of the fundamental questions of whether the attorney client privilege has been waived have already been answered by Defendants and their transcripts:

1. In reference to their AI recordings being read by the Atlas AI tool, how much of it is discoverable? Answer: "All of it, dude." [DEF_049803.]

2. Can employees of OH.io expect any privacy when using Company devices? Answer: "There is no expectation of privacy, though, for any of this work stuff." [DEF_056870.]

3. When you save something to the Company's computers, is it private? Answer: "There is no expectation of privacy." [*See* Exhibit 1, at Exhibit C, at 1:38.]

Defendants *knew* there was no expectation of privacy when they saved transcripts of their communications with counsel on the Company's servers. Their counsel told them there was no expectation of privacy when they saved things to the Company's servers. And Defendants chose to do it anyway, knowingly, and voluntarily. They cannot now claim those documents to be private.

---

[12] Beyond the Privilege Log, transcripts found on the Company's servers also indicate that Defendants were disclosing attorney client privilege information with non-attorney third parties, such as with an individual named "Jenna." [*See* Exhibit 1, at Exhibit B.]

Because Defendants disclosed legal advice to third parties, they have waived the attorney-client privilege as to that advice.

III.     **SUBJECT MATTER WAIVER EXTENDS TO ALL COMMUNICATIONS**

Courts in this Circuit, along with many across the country, recognize the rule that once a party has waived its attorney-client privilege as to a specific subject matter, it is not *just* that communication for which the privilege was waived: it is *all* communications dealing with the same subject matter. *See, e.g., K&S Associates, Inc. v. Am. Ass'n of Physicists in Medicine*, 2011 WL 249361, at *4 (M.D. Tenn. Jan. 26, 2011) (recognizing a Ninth Circuit ruling holding the privilege waived, and stating that "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject.") (quoting *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18 (9th Cir. 1981)); *Dinsmore & Shohl LLP v. Gray*, 2016 WL 7852522, at *9 (S.D. Ohio Jan. 5, 2016) ("voluntary disclosure of privileged communications to a third party waives a claim of privilege with regard to communications on the same subject matter.") (quoting *MA Equip Leasing I, L.L.C. v. Tilton*, 2012-Ohio-4668, 980 N.E.2d 1072 (Ohio App. 2012)); *Mainstay High Yield Corporate Bond Fund v. Heartland Indus. Partners, L.P.*, 263 F.R.D. 478, 481 (E.D. Mich. 2009) (disclosure results in waiver "as to *all* communications involving the same subject matter.").

And while not all of these cases ultimately found a waiver of the attorney-client privilege, they all agree as to the result if they had: *all* communications regarding the subject that has been waived are also waived. *In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 255 (6th Cir. 1996). The *Grand Jury Proceedings* court agreed that *all* communications on the waived subject matter would be waived, but also noted that subject matter waiver "can be defined narrowly or broadly." *Id*. For example, in *Grand Jury*, the disclosure was of a portion of an attorney's advice

19

as to a specific twenty-four point marketing plan. *Id.* at 253. For example, the court could have determined that only communications concerning the specific points of the marketing plan disclosed could be waived, or it could have found that any discussion of the plan was waived.

It ultimately was "persuaded by the line of cases that try to make prudential distinctions between what was revealed and what remains privileged." *Id.* (collecting cases).

As a result of this line of cases, as well as the discussion of waiver included above, two things are clear: (a) *all* documents that Defendants saved to the Company's servers should be considered waived in their entirety for the reasons outlined above, including all non-personal documents from the Privilege Log, and (b) following the return of all such documents to Plaintiff, the Court will need to determine the scope of the waiver, given that "all" documents related to the "same subject matter" as anything included in the waived documents is also waived. Plaintiff recognizes the need for the Court to make "prudential decisions" on the scope of the attorney-client waiver. Plaintiff further recognizes that it is rare that the attorney client privilege is waived on such a scope. The scope of Defendants' waiver in this case, however, is unprecedented.

## IV.    CONCLUSION.

Defendants have waived the attorney client privilege. They recorded and stored communications with their counsel on Company servers where they have no reasonable expectation of privacy. They disclosed such communications to at least three artificial intelligence models. And they disclosed information directly to third parties who are not their counsel. Defendants bear the ultimate burden of demonstrating their many disclosures do not constitute a waiver of the attorney client privilege. In this case, they cannot.

20

Respectfully submitted,


/s/ Anne E. Duprey

Anne E. Duprey (0087798) – Trial Attorney
Aaron T. Brogdon (0081858)
Zackary L. Stillings (0098136)
FBT GIBBONS LLP
10 West Broad Street, Suite 2300
Columbus, OH  43215-3467
Ph.: (614) 559-7245; Fax: (614) 464-1737
E-mail: aduprey@fbtgibbons.com
E-mail: abrogdon@fbtgibbons.com
E-mail: zstillings@fbtgibbons.com

Jonathan Sack (*Pro Hac Vice*)
Queenie Paniagua (*Pro Hac Vice*)
Sasha Pemberton (*Pro Hac Vice*)
SACK & SACK, LLP
70 East 55th St., 10th Floor
New York, NY 10022
Ph.: 212-702-9000; Fax: 212-702-9702
E-mail: jsack@sackandsack.com
E-mail: qpaniagua@sackandsack.com
E-mail: spemberton@sackandsack.com

*Counsel for Plaintiff OH.io Ventures Holding, Inc.*

21

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed electronically and served electronically on the following counsel of records on this 1st day of June 2026:

Rex H. Elliott (0054054)
Abigail F. Chin (0097928)
Barton R. Keyes (0083979)
Spencer J. Hattemer (0102663)
COOPER ELLIOTT
305 West Nationwide Boulevard
Columbus, Ohio 43215
rexe@cooperelliott.com
abbyc@cooperelliott.com
bartk@cooperelliott.com
spencerh@cooperelliott.com

*Attorneys for Defendants*
*Kevin Colón, J. Seth Metcalf,*
*and Jeff Schumann*

/s/ Anne E. Duprey
Anne E. Duprey (0087798)

0164635.0823882  4900-4481-2465v6

22