**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OH.io Ventures Holding, Inc. | : | |
| c/o FBT Gibbons | : | |
| 10 West Broad Street | : | Case No. 2:26-cv-566 |
| Columbus, Ohio 43215, | : | |
| | : | |
| Plaintiff, | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| v. | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| J. Seth Metcalf | : | |
| 1050 Glendale Ave | : | **FIRST AMENDED COMPLAINT** |
| Columbus, OH 43212 | : | |
| and | : | |
| | : | |
| Jeff Schumann | : | |
| 797 N Wall St, Apt 600 | : | |
| Columbus, OH 43215 | : | |
| and | : | |
| | : | |
| Kevin Colón | : | |
| 501 Harbor Gate Way | : | |
| Longboat Key, FL 34228 | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

For its First Amended Complaint against Defendants Jeff Schumann ("Schumann"), Seth

Metcalf ("Metcalf"), and Kevin Colón ("Colón," and with Schumann and Metcalf, "Defendants"),

Plaintiff OH.io Ventures Holding, Inc. ("OH.io" or the "Company"), states as follows:

**NATURE OF ACTION**

1.     This is a case about Defendants' admitted corporate theft, calculated exploitation,

and a coordinated effort by senior executives to turn a company they were entrusted to build into a

vehicle for their own enrichment, and, when that effort failed, to leverage stolen information in an attempt to extract value from the very company they harmed.

2.      From the outset, Defendants did not behave as fiduciaries. They treated the Company not as an enterprise to steward, but as a resource to consume. They openly acknowledged that spending was spiraling and they were "burning money" - from hundreds of thousands of dollars per month, to "a million," and then toward "$2 million a month" - all while conceding that questions about revenue and sustainability were inevitable. Yet even as they anticipated that scrutiny, they accelerated their wanton and reckless spending, acting as if accountability did not apply to them and as if the Company's capital were effectively theirs to deploy without constraint.

3.      At the same time, Defendants positioned themselves to insulate that conduct from meaningful oversight. Rather than operate within ordinary governance structures, they leveraged their access to the Company's founder and control over internal systems to create a one-sided dynamic in which they extracted resources while resisting transparency. When scrutiny inevitably increased, that dynamic began to collapse—and Defendants responded not with cooperation, but with escalation.

4.      What followed was not an isolated lapse in judgment. It was a coordinated course of conduct. Within days, Defendants exported and downloaded massive quantities of Company data, including entire Google Workspace accounts, internal communications, and the Company owner's emails - information to which they had no legitimate claim. At the same time, they used Company-provided, AI-enabled recording tools to systematically record, transcribe, and store virtually every internal conversation, creating a comprehensive repository of confidential Company information that they then downloaded and took with them when their employment was terminated.

2

5. Those recordings are now central to this case. Defendants documented, in their own words, their spending, their decision-making, and their conduct. They recorded the very conversations that evidence their breaches of fiduciary duty, their coordinated actions, and their misuse of Company resources. The record they created leaves no ambiguity about what they did.

6. And the conduct did not stop with the taking of Company property. After securing that information, Defendants took deliberate steps to conceal their actions by erasing computer data, deleting Slack histories, deleting text messages, shifting communications to encrypted platforms, and attempting to eliminate records of their data exports. These are not the actions of executives acting in good faith. They are the actions of individuals attempting to secure leverage while eliminating evidence.

7. That leverage was not incidental. Defendants' conduct formed part of a broader effort to use the Company's own information against it. Having taken thousands of confidential files, and having recorded the internal workings of the Company in extraordinary detail, Defendants positioned themselves to attempt to extract value from OH.io and its founder through threatened use of that information.

8. Defendants now attempt to cast themselves as victims. The record they created, much of it in their own recordings, tells a very different story. This is a case about three executives who were entrusted with millions of dollars and a mandate to build a business, but who instead burned through more than $8 million without generating meaningful results, while simultaneously siphoning Company resources for their own benefit.

9. It is also a case about what happened when that conduct was exposed. Within minutes of termination, Defendants caused the destruction of critical Company data, downloaded additional confidential materials on their way out the door, and retained a vast trove of Company

3

information—including recordings of nearly every internal conversation. To date, Defendants have been compelled to return more than 30,000 Company files. That production, coming after representations that all Company property had already been returned, is itself evidence of the scope of what they took and withheld.

10. The evidence here is not speculative. It is documented, preserved, and, in many instances, recorded by Defendants themselves. Their own actions and their own words demonstrate a coordinated effort to misuse Company resources, appropriate confidential information, and then retain and leverage that information after their termination.

11. The irony is unmistakable. Defendants portray themselves as sophisticated technology leaders operating at the forefront of artificial intelligence. Yet they used those very tools to facilitate the misappropriation of confidential information, to document their own misconduct, and to attempt to convert Company property into personal leverage. This action seeks to hold them accountable for that conduct.

**EMERGENCY RELIEF**

12. This Complaint is brought in conjunction with an Amended Motion for Temporary Restraining Order and Motion for Preliminary Injunction in light of Defendants' mass export and download of Company data in the days leading up to their termination, their continued possession of thousands of Company data files, and the urgent need for forensic preservation of their personal devices and accounts given their unauthorized downloads and destruction of Company information

13. Pursuant to the Court's May 13, 2026 Order, Defendants returned over 30,000 Company files, including recordings and transcripts of confidential Company meetings, numerous emails from Defendant Metcalf's Company email. Upon information and belief, Defendants have additional confidential, proprietary, and/or trade secret information in their possession.

4

14. This information consists of, upon information and belief, communications regarding future business strategy, potential customers, and financial planning for the Company.

15. As set forth in more detail below, Defendants exported and downloaded their entire Company-owned Google Workspace – including their emails, Drive documents, calendars, and more; Defendant Schumann exported and downloaded all Company emails sent between April 10-April 12, 2026; and Defendant Schumann exported and downloaded all emails sent by the Company owner between December 1, 2024 – April 13, 2026.

16. Defendants, through counsel, asserted that Defendants are not in possession of the Company owner's emails, acknowledging that they were downloaded onto a Company computer. However, because Defendant Metcalf erased Defendant Schmann's Company computer within 28 minutes of Defendant Schumann's termination of employment, such statement cannot be verified.

17. The Company seeks emergency injunctive relief in the form of a Temporary Restraining Order to prevent further misuse and spoliation of its confidential information and trade secrets. Specifically, the Company requests that the Court (a) order the immediate forensic preservation of all Defendants' personally owned devices and accounts used to access, store, or transmit Company information; (b) require a neutral, court-approved forensic analysis of those devices and accounts to identify, inventory, and trace all Company data exported, downloaded, or retained by Defendants; and (c) upon completion of that forensic review, order the prompt return and certified destruction of all Company documents, recordings, transcripts, and other confidential information in the possession, custody, or control of Defendants and their counsel. Defendants should not be permitted to retain or use misappropriated Company property under the guise of litigation.

## PARTIES, JURISDICTION, AND VENUE

18.     Plaintiff OH.io Ventures Holding, Inc., is a for-profit corporation incorporated in Ohio with its principal place of business in Franklin County, Ohio.

19.     Upon information and belief, Defendant Jeff Schumann is an individual and resident of Ohio.

20.     Upon information and belief, Defendant Seth Metcalf is an individual and resident of Ohio.

21.     Upon information and belief, Defendant Kevin Colón is an individual and resident of Florida.

22.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the cause of action arises under the laws of the United States.

23.     The Court has personal jurisdiction over Schumann because, upon information and belief, he is a resident of this District and has caused injury by act or omission in this District.

24.     The Court has personal jurisdiction over Metcalf because, upon information and belief, he is a resident of this District and has caused injury by act or omission in this District.

25.     The Court has personal jurisdiction over Colón because he has caused injury by act or omission in this District. Colón further contractually agreed to submit himself to this jurisdiction in connection with his Agreement Regarding Competition and Protection of Proprietary Interests. ("CPPI Agreement".)  [Doc No. 1-4, PAGEID # 64.]

26.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS
### OH.io

27.     OH.io is an AI-native performance venture platform founded with the mission of identifying up-and-coming AI enterprises from around the world, and helping them scale their businesses in a way they would not be able to achieve on their own.

28.     The Company's business model includes multiple steps. First, OH.io identifies and partners with new AI enterprises, with the goal of partnering with such enterprises from OH.io's base here in Columbus.

29.     Once a new enterprise is onboarded, OH.io assigns the enterprise a dedicated team to understand the enterprise's business model and growth strategy.

30.     The OH.io team dedicated to the new enterprise then continues to support the enterprise in sales, marketing, and demand generation, among other functions.

31.     With the team fully in place, OH.io then assists the enterprise by developing a pipeline for its business to increase its revenue.

32.     Once scaled, OH.io then prepares to hand off the scaled-up enterprise back to its founders, complete with clear procedures and a Go-to-Market plan in place for continued future development.

33.     Through this process, OH.io hopes to bring numerous new AI-based businesses to Columbus and Central Ohio, and in doing so, develop Columbus into a new hub for American technological development and innovation.

### **OH.io Hires Defendants**

34.     In the spring of 2025, OH.io began to search for a leadership team to execute the company's vision and spearhead the development of a pipeline of new AI enterprises to bring on to the OH.io platform.

35.     The Company contacted Defendant Schumann, who had previously led a startup in Columbus that was eventually sold to Mimecast.

36.     The Company sent Schumann an offer letter to serve as its Chief Executive Officer on July 7, 2025, with an anticipated start date for his employment of August 16, 2025.

37.     Schumann executed that offer letter on July 10, 2025.

38.     Also on that day, Schumann executed a Confidentiality, Non-Competition, Non-Solicitation and Inventions Assignment Agreement (the "CNNI Agreement"). [Doc. No. 1-3.]

39.     The CNNI Agreement required, as relevant for this Complaint, the following:

Upon the termination of Employee's affiliation with the Company for any reason or for no reason, or if the Company otherwise requests, (a) Employee *will return to the Company* all tangible Confidential Information and copies thereof (regardless how such Confidential Information or copies are maintained), and (b) Employee will deliver to the Company any property of the Company which may be in Employee's possession, including, but not limited to, notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, PDAs, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in Employee's possession, custody or control (whether prepared by Employee or others).

[Doc. No. 1-3, § 2.1.]

40.     The CNNI Agreement further defined "Confidential Information" as:

[C]onfidential and proprietary information of the Company (including its subsidiaries, parents, affiliates, successors and assigns), whether in written, oral, electronic or other form, including but not limited to, information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to Employee or the Company . . . The phrase, "trade secrets," as used in this Agreement, will be given its broadest

possible interpretation under the law of the state of Ohio and the Defend Trade Secrets Act of 2016 ("DTSA") and will include, without limitation, anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records any secret scientific, technical, merchandising, production or management information, or any design, process, procedure, formula, invention, improvement or other confidential or proprietary information or documents.

[Doc No. 1-3, PAGEID # 52.]

41.     Also in the spring of 2025, the Company began to engage with Defendant Metcalf, whom Schumann recruited and brought to the Company.

42.     Metcalf had previously served as the Deputy Treasurer of Ohio, as appointed by then-Treasurer Josh Mandel. He was later part of the leadership of a company called QED Technologies.

43.     At some time during August 2025, Metcalf accepted an offer of employment as a General Partner of Global Operations.

44.     Upon joining OH.io, Metcalf effectively appointed himself to oversee the Company's information technology functions, despite not being assigned or qualified for those responsibilities.

45.     Unbeknownst to the Company, Metcalf used that control to centralize access to key Company systems and information in himself, including by restricting others' visibility into the Company's reimbursement systems, payroll-related information, and other technology platforms.

46.     Upon information and belief, through these actions, Metcalf exercised outsized control over Company operations beyond the scope of his formal role.

47.     With Schumann and Metcalf in place, the Company then sought out Colón to join the leadership team.

48.     The Company issued Colón his offer letter on September 8, 2025, and he accepted the role of General Partner of Revenue via DocuSign the same day.

9

49. As part of his employment, Colón also signed an Agreement Regarding Competition and Protection of Proprietary Interests ("CPPI Agreement"). [Doc. No. 1-4.]

50. The CPPI Agreement required, as relevant for this Complaint, the following:

**Non-Disclosure and Return of Property Upon Termination.** After termination of my employment, I will not use or disclose any Confidential Information for any purpose. Immediately upon my termination, I will return to the Company all tangible Confidential Information and copies thereof (regardless how such Confidential Information or copies are maintained), and I will deliver to the Company any property of the Company which may be in my possession, including, but not limited to, notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, PDAs, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in my possession, custody or control (whether prepared by myself or others). If any Confidential Information has been saved or transferred to any device not owned by the Company, I will immediately notify the Company, and make such device available to the Company so that it may remove any
Confidential Information from the device.

[Doc No. 1-4, PageID # 60.]

51. The CPPI Agreement also defined Confidential Information to mean:

[C]onfidential and proprietary information of the Company (including its subsidiaries, parents, affiliates, successors and assigns), whether in written, oral, electronic or other form, including but not limited to, information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to me or the Company; provided that, Confidential Information will not include information that is in the public domain other than through any fault or act by me.

[Doc. No. 1-4, PageID # 60.]

10

52.     The CPPI Agreement also required a Duty of Loyalty from Colón, including an agreement to "act in good faith and in a manner that I reasonably believe to be in the best interests of the Company in carrying out my responsibilities." [Doc. No. 1-4, § 1(e).]

53.     The CPPI Agreement was signed by Colón and countersigned on behalf of the Company by Defendant Metcalf. [Doc. No. 1-4.]

54.     Each of the Defendants, during their employment with the Company, was issued Company-owned equipment for use in performing their job duties, including a Company laptop computer and a Plaud AI recording device.

55.     These devices were purchased by or issued through the Company and constituted Company property.

56.     The laptops issued to Defendants were configured with the Company's systems, including mobile device management software that allowed the Company to monitor, manage, and secure the devices and Company data stored on them.

57.     Defendants were provided with unique, password-protected credentials to access Company-owned devices, applications, software, and systems, including email, cloud-based platforms, and internal tools.

58.     Through these credentials, Defendants could access Company systems only following authentication and were required to use passwords and other access controls to gain such access.

59.     The Company also utilized single sign-on authentication protocols such that Defendants' access to multiple Company systems and applications was centrally managed and monitored through their Company-issued credentials.

11

60. Defendants' access to Company devices, applications, and data was governed by these authentication and security controls and was limited to authorized use in connection with their job responsibilities.

61. Defendants understood that their credentials, and the access those credentials provided, were intended solely for Company business and were subject to Company policies governing confidentiality, security, and acceptable use.

62. The Plaud devices issued to Defendants were used in connection with their roles at the Company and were capable of recording and storing audio content, including conversations and meetings occurring during the course of Defendants' employment.

63. The Company retained ownership over all such devices and any data created, stored, or maintained on them in the course of Defendants' employment.

64. Defendants understood that the hardware and software provided to them—including their Company-issued laptops and Plaud devices—remained Company property and were to be used solely for Company business and returned upon termination of their employment.

**Defendants Blow Through the Company's Money While Bringing in None**

65. At its launch, there was substantial financial backing for OH.io. The Company was initially funded by Timashev and entities related to him. Timashev is an entrepreneur and graduate of the Ohio State University, who has a deep belief in the City of Columbus's potential to become a major national tech hub.

66. Together, as the Company's leadership team, Defendants were responsible for the execution of OH.io's vision. That is, they were responsible for attracting new enterprises that OH.io could help develop and scale.

67.     Defendants were hired as executives in a new business venture – OH.io – created to bring next-generation artificial intelligence companies to Columbus and position Central Ohio as a leading technology hub.  Rather than working to build up the Company, however, they used their positions to enrich themselves, in violation of their fiduciary and contractual obligations.

68.     In public, and to the Company's investors, those executives – Defendants, here – portrayed themselves as committed leaders dedicated to making Columbus one of the "greatest tech capitals in America."

69.     In reality, Defendants used the Company's resources for their own benefit and engaged in extraordinary and unjustified spending. Defendants caused the Company to incur substantial and unsustainable costs by hiring employees at inflated compensation levels and expanding operations at a rate that far outpaced the Company's growth, without regard to reasonable business practices, financial realities, or the Company's strategic objectives.  In short, they squandered the Company funds entrusted to them.

70.     Defendant Schumann boasted that he had become the Company owner, Ratimr Timashev's, personal confidant and strategic partner. He further claimed he built trust quickly with Timashev by prioritizing his relationships with Timashev's family members and building a rapport with them.

71.     Defendant Schumann valued the status his relationship with Timashev brought him and wanted to use it to his advantage. As he stated, "I now have publicity, I now have storytelling."

72.     Defendants had substantial resources to develop a team, develop a pipeline for potential AI-enterprise partners, and develop a physical presence here in the city.

73.     After several months, however, Defendants had managed to bring on exactly zero new enterprises to OH.io, other than those which were affiliated with Timashev.

74. Indeed, after the first three months, Defendants had brought on zero new enterprises, while burning through $8 million of the Company's funding.

75. And in early April, Schumann sent the Company's investors a 2026 budget that projected an additional $3 million in losses in the second quarter of 2026.

76. Company management became concerned with the high amount of losses in a very short time and began to look at Defendants' expenditures for the Company.

### Defendants' Wasteful and Self-Serving Spending

77. Upon review of the Company's finances, the Company found that Defendants had entered into high-value contracts with various consultants that they knew from previous jobs. Those consultants, charging tens of thousands of dollars apiece, did – upon information and belief – approximately nothing.

78. Defendants hired "GTM Consultants" – i.e., Go-to-Market Consultants – to help develop a sales and marketing playbook for OH.io. To compensate these consultants, Defendants spent $458,557.

79. This was problematic for two reasons. First, Go-to-Market expertise was expertise that Defendants had led the Company to believe they already possessed. There should not have been any need to hire such consultants, based on Defendants' representations to the Company prior to being hired. Defendants hired these consultants, that Defendants had worked with previously, to perform 'work' that Defendants themselves should have been able to do.

80. Second, the work the consultants performed was worthless. The Company reviewed the consultants' work product and found that it contained little to no work product of value.

81. In fact, one consultant was so careless that it didn't even bother to remove another company's watermark from its presentations to the Company.

14

82. These expenditures were not isolated errors in business judgment; they reflected a pattern of self-dealing, favoritism toward prior professional contacts, and conscious disregard for cost controls and corporate oversight.

83. It was not just entering into worthless contracts that worried the Company. The Company also found examples of Defendants' reckless spending on luxury items with the Company's money.

84. For example, Schumann spent $6,217 on hotel stays at the Waldorf Astoria hotel in New York for two separate trips in January and February of 2026. The Company has no records of Schumann having meetings with the Company in New York on these dates.

85. As another example, Schumann expensed a $1,500 helicopter ride for five from Manhattan's west side to Westchester's County Airport – a ride duration of 12 minutes.

86. Defendants purchased unnecessary and inappropriate gifts, purchased country club memberships for themselves, and failed to include receipts or invoices for thousands of dollars' worth of spending.

87. Defendants also made reckless hiring decisions without justification, need, or approval from the Company.

88. As a chief example, Schumann hired someone in the role of Partner, Ecosystem, with an annual salary of *$375,000*.

89. Company management never approved such hiring.

90. Moreover, after Defendants' terminations, the Company's investigation uncovered that Defendants had hired numerous individuals without having work to support their hiring. The Company learned multiple employees hired by Defendants spent their days reading for pleasure, without meaningful assignments or productive responsibilities.

91.     Defendants' own recorded statements confirm that they were aware their spending was rapidly escalating and unsustainable. In one internal conversation, a Defendant acknowledged that the Company was "burning money," while simultaneously describing a hiring strategy focused on rapidly building out a large go-to-market team without corresponding revenue generation.

92.     In that same exchange, Defendants discussed that the Company had grown to approximately 37 employees, primarily in go-to-market roles, despite the absence of demonstrated revenue or a proven business model to support such expansion.

93.     Defendants further acknowledged that Company spending had increased from approximately $500,000 per month, to $1 million per month, and was projected to reach as much as $2 million per month, all while the Company had not yet generated revenue sufficient to validate or sustain those expenditures.

94.     Defendants also discussed additional significant expenditures, including a separate $5 million commitment for a Company-sponsored event, further demonstrating the scale of financial obligations they were incurring on behalf of the Company without corresponding revenue.

95.     Notably, Defendants recognized that these escalating expenditures would inevitably draw scrutiny, including questions from stakeholders regarding "when revenue [was] coming" to justify the Company's spending and business model.

96.     Despite that awareness, Defendants continued to accelerate hiring and spending, while expressing the belief that "money is not the issue" for the Company's principal investor, thereby evidencing a conscious disregard for financial discipline and their fiduciary obligation to steward Company resources responsibly.

97.     These admissions demonstrate that Defendants were not merely negligent in their management of Company resources; they were fully aware of the pace and magnitude of the

16

Company's spending, the absence of supporting revenue, and the likelihood of scrutiny, yet chose to continue their course of conduct regardless.

**The Company Terminates Defendants' At-Will Employment**

98.     The Company's investigation demonstrated it needed new leadership.

99.     While the Company was investigating, however, Defendants began making demands of the Company, claiming that the Company's attempt to right-size OH.io's financial expenditures would destroy the Company's financial viability.

100.    The Defendants each sent emails and/or letters on April 10 and April 13, 2026 claiming that the Company was not fulfilling its "promises" to them, and demanding actions that – in their view – would "honor the commitments" made to them.

101.    Schumann sent his letter on April 10 at 4:28 PM. On April 13, 2026, at 1:10 PM, the Company let Schumann know via email that his employment was being terminated.  Company counsel sent a formal termination letter to Schumann via email to him at 2:11 PM. In the letter, the Company instructed Schumann to immediately return all Company property and means of access to the Company data and systems.

102.    Metcalf sent his letter at 10:30 PM on April 13, 2026. The Company terminated his employment in an email to him at 11:42 PM.  In the letter, the Company instructed Metcalf to immediately return all Company property and means of access to the Company data and systems.

103.    Colón sent his letter at 10:24 PM on April 13, 2026. The Company terminated his employment via letter attached to an email to him at 11:41 PM. In the letter, the Company instructed Colón to immediately return all Company property and means of access to the Company data and systems.

17

104. Clearly, Defendants coordinated the preparation and transmission of these letters, and upon information and belief, Metcalf played a role in shaping or facilitating those communications.

105. Upon information and belief, Metcalf drafted these and other communications for Schumann and Colón and sought to influence their responses to management and Board-level issues as part of an effort to exert control over Company operations indirectly.

106. Upon information and belief, Metcalf had previously engaged in similar conduct at QED Technologies, where he allegedly sought to orchestrate contracts with members of the Ohio State Teachers Retirement System Board through instructing Board members on their communications.

**Defendants Spoliate, Destroy, and Take Company Property**

107. On April 8, 2026, shortly after Defendants had communicated with counsel about engaging in litigation with the Company, Defendants conducted a comprehensive export of data from the Company's Google-based systems using Google's "Takeout" functionality. This process enabled Defendants to archive and download large volumes of data associated with their Company-issued and maintained Google accounts.

108. The data exported through this process included the contents of numerous Google services utilized in the Company's operations, including but not limited to Gmail, Google Calendar, Contacts, Google Chat, Google Cloud, Google Account data, Google Wallet, Google Finance, Messages, and other associated applications.

109. Defendant Metcalf repeated the Google Takeout export of Company data again on April 9, 2026 and April 12, 2026.

110. Defendants undertook this mass export of Company data without authorization and for purposes unrelated to legitimate Company business. Instead, upon information and belief, this export of Company data was conducted in anticipation of litigation, which Defendants were already contemplating.

111. Metcalf and Colón engaged in conversations about exporting this wealth of Company information to their personal devices, knowing that if they were terminated they would lose access to the information.

112. In addition, in the days leading up to their departure from OH.io, Defendants took steps to delete potentially relevant evidence – even after meeting with counsel.

113. On April 10, after meeting with counsel, Metcalf deleted messages between him and the AI tool, Argus, and asked how to bulk delete messages in a Slack channel.  Metcalf wrote: "can you delete the history in my argus channel?," and "I am a slack admin. How do I bulk delete messages in a channel?" The AI tool told him how to delete the channel entirely, to which he responded "OK."

114. Discussing certain text messages on April 12, Defendants discussed the need to "[d]elete and block" the conversation with a particular person, such that it would "be deleted from all of [their] devices."

115. On April 10, 2026, from 11:38 through 11:39 AM and 1:07 PM, Defendant Metcalf deleted over 1,000 Company documents. Beginning at 1:07 through 1:08 PM that same day, Defendant Metcalf then proceeded to restore the same amount of Company documents from the server's trash.

116. On or about April 12, 2026, Defendant Schumann exported and downloaded electronic communications from the Company's servers, including all emails in the Company's system sent between April 10, 2026 and April 12, 2026.

117. Schumann had no authorization to conduct this export and download.

118. Schumann had no legitimate business purpose to conduct this export and download.

119. That same day, Schumann also exported and downloaded every email sent from Timashev's Company email account between December 1, 2025, and April 13, 2026.

120. Schumann had no authorization to conduct this export and download.

121. Schumann had no legitimate business purpose to conduct this export and download.

122. Schumann then deleted both export files in an effort to cover his tracks.

123. On April 12, 2026, Metcalf and Schumann discussed deleting messages between them and other coworkers even though they were already anticipating litigation.

124. Defendants further utilized Company-issued AI-enabled recording and transcription tools to systematically capture and store conversations, including internal deliberations and sensitive communications, which they retained and later accessed outside the scope of their employment.

125. Schumann was terminated at 2:11 PM on April 13, though he learned of his impending termination at 1:10 PM.

126. The Company attempted to reach Colón and Metcalf on April 13 after Schumann's termination, but neither returned management's calls or messages.

127. Neither Colón nor Metcalf was copied on the email in which Schumann was terminated or the email letting him know of his impending termination.

20

128. Another employee learned of Schumann's termination, and messaged Colón at 1:47 PM to ask how to respond to management's request for him to disable Schumann's access to Company systems.

129. The two had a brief call, after which Colón messaged the employee to say that Schumann's "access is being turned off right now."

130. Upon information and belief, Colón and/or Schumann called Metcalf, and the three decided to have Schumann's computer erased entirely, rather than have Schumann's access locked.

131. Before Schumann, it had been the Company's practice to lock terminated employees' access; it had never been the Company's practice to erase terminated employees' devices.

132. Metcalf knew the Company's typical and appropriate process upon an employee's termination was to deactivate or lock the discharged employee's Company computer upon termination – not erase the Company computer.

133. Metcalf had, prior to Schumann's termination of employment, remotely deactivated or locked a discharged employee's computer, pursuant to that process.

134. Despite refusing to respond to management's calls or messages, Metcalf proceeded to erase Schumann's Company computer later that same day.

135. At 2:37 PM, Metcalf remotely erased Schumann's computer in its entirety.

136. Metcalf did not have authority to erase Schumann's – the former CEO's – computer.

137. Metcalf was not instructed to erase Schumann's computer.

138. Metcalf had no legitimate business reason to erase Schumann's computer.

139. Metcalf did not inform the Company before or after he erased Schumann's computer that he took such action.

21

140. The contents of that computer are not recoverable.

141. Similarly, when a Company employee went to remotely deactivate Metcalf's devices following his termination of employment, the devices were no longer on the mobile device management system – they had already been removed. Upon information and belief, Metcalf removed his devices from the mobile device management system.

142. Further, Metcalf's and Colón's user profiles, too, were fully erased shortly after their termination, and upon information and belief, at one or more of the Defendants' actions or direction.

143. Beginning at 2:38pm and continuing until 6:32 pm, Colón downloaded 6 more documents from his Company slack account, one of which contained PowerPoint slides on the Company's 2026 budget.

144. Metcalf was terminated on April 13, 2026, at 11:42 pm.

145. Colón was terminated April 13, 2026, at 11:41 pm.

146. After he was terminated at 11:42 PM, and thereby after any authorization he may have had to access or download Company documents had ceased, Metcalf nonetheless accessed and downloaded a number of Company-owned documents containing Company confidential and trade secret information, such as insurance, financial, and banking access information.

147. The confidential and/or trade secret information accessed and/or downloaded by Metcalf includes, but is not limited to: Company insurance policies, documents containing the account and routing numbers for a Company bank account, the Company Federal EIN number, and the Company's 2025 NY Department of Corporate Tax Extension Voucher.

148. After his termination, on April 14, 2026, and beginning at 1:56 am, Metcalf downloaded three documents from his Company Slack account.

149. After his termination, on the morning of April 14, 2026, Metcalf was active on the Company's Slack channel.

**Defendants File Suit**

150. At 3:54 PM on April 13 - less than three hours after Schumann's termination - Abby Chin of the law firm Cooper Elliott sent an email to the Company alerting it that Cooper Elliott represented Mr. Schumann. In that email, she indicated Schumann's intent to return any company property in his possession.

151. On behalf of all Defendants, Cooper Elliott filed a Complaint (the "Franklin County Complaint") at 2:57 PM on April 14, 2026 – less than a day after announcing it represented Mr. Schumann, and approximately 16 hours after Colón and Metcalf's termination.

152. The Franklin County Complaint generally alleges breaches of Defendants' employment contracts and alleges causes of action against the Company and individuals and entities associated with it. In addition to breaches of the employment contracts, the Complaint also asserts causes of action for fraud, civil conspiracy, promissory estoppel, unjust enrichment, and breach of fiduciary duty. The defendants in the Franklin County Action have moved to dismiss the Franklin County Complaint.

153. Given the timing of the terminations and the Complaint, it is clear that Defendants had been coordinating with counsel for some time, meaning that Defendants plainly anticipated litigation as of the morning of April 13, 2026.

154. This timing is further important because Defendant Metcalf's intentional destruction of all files on Defendant Schumann's computer occurred 28 minutes after Schumann's termination, and his download of Company documents post-termination occurred just a day prior to all Defendants filing their Complaint.

23

155.    Further, although he had already initiated legal proceedings against Plaintiffs in state court, and although this action was already pending, Colón continued to download Company documents when, on May 19, 2026, he downloaded at least two additional Company documents that Metcalf had shared to Colón 's personal Gmail account.

**Defendants Retain and Withhold Company Property**

156.    Counsel for Defendants and the Company met to discuss the Franklin County Action on May 6, 2026.

157.    On May 6, 2026, Defendants' counsel indicated that Defendants possess, are collecting, and are reviewing an unknown number of recordings of conversations made in the course of their employment as Company employees with the Company owner, management team, and other employees.   Defendants' counsel indicated that Defendants recorded nearly all of their conversations from the inception of their employment with the Company – including Company meetings and phone calls.

158.    Those recordings were made through Company-owned Plaud devices and Company-owned Plaud subscriptions and transcribed using Company-owned subscriptions to third-party transcription applications.

159.    On May 7, 2026, Plaintiff's counsel sent a demand letter to Defendants' counsel asserting that Defendants had improperly retained, accessed, and were continuing to use Company property and confidential information following termination, including but not limited to the recordings containing confidential company information and trade secrets, as well as other physical property. [Doc No. 1-1.]

160.    Through counsel, the Company demanded the immediate return of all Company property, including the recordings and that the former employees and their counsel immediately

24

cease any review, access, copying, dissemination, or use of recordings or transcripts created during the course of their employment, including recordings of internal Company meetings and communications.

161. Through counsel, the Company required that all such recordings, transcripts, and related data be preserved in their original form and returned to the Company.

162. On May 8, 2026, Defendants' counsel issued a written response to the Company's demands. [Doc No. 1-2.]

163. In that response, Defendants' counsel acknowledged the Company's request for return of tangible property and indicated that certain items remained in the possession of the former employees, including a Plaud device and other equipment, and requested instructions regarding return logistics.

164. Defendants' counsel represented that Jeff Schumann possessed certain items, including a Jabra conference speaker and a Plaud device, and that Kevin Colón possessed an unopened Plaud device.

165. With respect to recordings and transcripts, Defendants' counsel initially acknowledged that the former employees possessed recordings and transcripts of meetings and conversations in which they participated.

166. Defendants' counsel declined the Company's demand that such recordings not be reviewed, stating that their clients would continue to review the recordings and share them with counsel. Defendants claimed the recordings are "not materially different than a person telling their counsel about a conversation they remember or a person reviewing their notes of a conversation or sharing them with counsel." [Doc No. 1-2.]

25

167.    Defendants' counsel stated that the recordings and transcripts would be preserved and that copies would be provided.

168.    Defendants' counsel did not agree to return the recordings, and as a result, Plaintiff filed the Complaint and Motion for a Temporary Restraining Order. [*See* Doc Nos. 1, 2.]

169.    The Court held a Loc. R. 65 informal conference following the filing of the Motion for a Temporary Restraining Order.  As a result of that conference, the Court issued an Order requiring Defendants to disclose all recordings, transcripts, and other "Disputed Materials" to the Company by May 27, 2026. [Doc No. 9, PAGEID #102-103.]

170.    On May 27, 2026, Defendants produced over 30,000 files of undisputed Company property Defendants took from OH.io, including recordings, transcripts, and emails from Metcalf's OH.io account.

171.    Defendants remain in possession of this vast amount of Company property as well as, upon information and belief, other Company property, subject to the Court's interim protective order.

## The Company Takes Steps to Protect the Confidentiality of its Confidential Information and/or Trade Secrets

172.    The Company takes reasonable and substantial measures to protect the confidentiality and security of its proprietary information, trade secrets, and other confidential business information.

173.    The Company requires employees to use unique, password-protected credentials and utilizes single sign-on authentication protocols to control and monitor access to its email accounts, applications, and computer networks.

174.    Access to Company systems and information is restricted based on role and job responsibilities and limited to authorized users with a legitimate business need.

175. The Company employs mobile device management software to manage, monitor, and secure Company-issued devices and to control access to Company data on such devices.

176. Administrative access to the Company's systems, including its mobile device management platform and other critical infrastructure, is restricted to a limited number of authorized personnel.

177. The Company maintains physical security measures at its offices, including controlled access to Company premises.

178. The Company maintains policies and procedures governing the use, access, and protection of its confidential information and systems.

179. Defendants Schumann and Metcalf were responsible for reviewing and approving such policies.

180. As a condition of employment, the Company requires employees to enter into written agreements imposing confidentiality and non-disclosure obligations that continue both during and after employment.

181. The Company's confidential information includes, among other things, internal communications, business strategies, financial and operational data, proprietary technology, and other sensitive information not available to the public.

182. The Company implements technical, administrative, and physical safeguards designed to prevent unauthorized access to, disclosure of, and use of its confidential information and trade secrets.

183. Through these measures, the Company takes reasonable steps to maintain the secrecy of its confidential information and trade secrets.

184.     The Company's confidential information and trade secrets are not generally known to the public or to competitors and derive independent economic value from not being generally known.

185.     The secrecy of this information provides the Company with a competitive advantage, including by enabling it to operate its business, make strategic decisions, and develop and deploy its services in a manner not readily replicable by competitors.

186.     The Company does not disclose its confidential information and trade secrets outside the Company except under circumstances designed to maintain their secrecy.

187.     Defendants had access to the Company's confidential information and trade secrets by virtue of their senior roles within the Company and were entrusted with highly sensitive Company information.

188.     As a condition of their employment, Defendants Schumann and Colón entered into written agreements imposing confidentiality, non-disclosure, and related obligations with respect to the Company's confidential information and agreed to use such information solely for legitimate Company business purposes.

189.     Defendant Metcalf was presented with the Agreement Regarding Competition and Protection of Proprietary Interests, but did not execute the agreement.

190.     Defendant Metcalf was, nonetheless, aware of the Company's requirements with respect to Confidential Information as he countersigned the CPPI Agreement on behalf of the Company. [Doc No. 1-4.]

191.     Defendants were aware of the Company's security measures and understood that such measures were intended to protect the Company's confidential information and trade secrets.

192.    Defendants' access to Company systems, applications, and data was limited to that necessary to perform their job duties and was subject to Company policies governing confidentiality and acceptable use.

193.    By virtue of their roles, agreements, and access to Company systems and information, Defendants knew or reasonably should have known that the Company took reasonable measures to protect its confidential information and trade secrets and that such information was not to be used or disclosed outside the scope of their employment.

## COUNT I – BREACH OF CONTRACT (CNNI)
### (Against Schumann)
### (Injunctive Relief Sought)

194.    The Company restates and realleges the foregoing paragraphs as though fully restated herein.

195.    Schumann and the Company entered into the CNNI.

196.    The CNNI is a binding and valid contract.

197.    The Company has performed its obligations under the CNNI.

198.    Under the terms of the CNNI, Schumann agreed he would return all "Confidential Information" and all copies thereof to the Company at the termination of his affiliation with the Company.

199.    He specifically agreed to return:

notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, PDAs, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in [his] possession, custody or control (whether prepared by [him] or others).

[Doc No. 1-3, PAGEID # 53-54.]

29

200.    Schumann also specifically agreed that "Confidential Information" would include

information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to [Schumann] or the Company.

[Doc No. 1-3, PAGEID # 52.]

201.    As reflected in the over 30,000 Company files returned by Defendants, Schumann took and did not return Company property following his termination of employment.

202.    Upon information and belief, Schumann is still in possession of Company property that has not been returned.

203.    Schumann conducted a Google "Takeout" of his OH.io owned Google account, including his emails, Drive, and other data, on April 8, 2026.  This Company property has not been accounted for or returned.

204.    Moreover, Schumann exported and downloaded other Confidential Information including but not limited to the contents of his Company-issued and maintained Google accounts, emails sent between April 10 and April 12, 2026 from every Company employee email account, and emails sent between December 1, 2025 and April 13, 2026 from Timashev's Company email account. This Company property has not been accounted for or returned.

205.    Further, Schumann, through the AI tool Argus (also referred to as Atlas), aggregated Company data across multiple systems into a centralized repository, including but not limited Google Drive, Slack, and emails.  Schumann has not returned the Argus / Atlas AI tool or its data, all of which constitute Company property.

206.     Any recording and/or transcript that Schumann obtained while in his role as CEO for the Company, as well as information obtained from Company Google accounts and the emails of Company employees and its founder constitutes "Confidential Information" under the CNNI.

207.     Schumann agreed to "return to the Company" and/or "deliver to the Company" such information.

208.     Schumann has not returned that information to the Company. The CNNI provides that such retention has caused the Company damage. Schumann agreed:

> Employee hereby expressly acknowledges that any breach or threatened breach of any of the terms and/or conditions set forth in Section 1, 2, or 3 of this Agreement will result in substantial, continuing, and irreparable injury to the Company. Therefore Employee acknowledges and agrees that in addition to any other remedy that may be available to the Company, the Company will be entitled to injunctive or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of Section 1, 2, or 3 of this Agreement. In addition, in the event that the Company brings any action to enforce the terms of this Agreement in a court of competent jurisdiction, the Company shall be entitled, in addition to any other relief which may be awarded, to recover from Employee its reasonable attorneys' fees, together with such other costs and reasonable expenses incurred in connection with such litigation.

 [Doc No. 1-3, PAGEID # 57.]

209.     As a result, the Company has been damaged in an amount to be determined at trial, and is entitled to the immediate return of all Confidential Information in Schumann's possession, as well as all copies thereof, along with its reasonable attorneys' fees incurred in seeking injunctive relief.

### <u>COUNT II – BREACH OF CONTRACT (CPPI Agreement)</u>
**(Against Colón)**
**(Injunctive Relief Sought)**

210.     The Company restates and realleges the foregoing paragraphs as though fully restated herein.

211.     Colón and the Company entered into the CPPI Agreement.

31

212.    The CPPI Agreement is a binding and valid contract.

213.    The Company has performed its obligations under the CPPI Agreement.

214.    Under the terms of the CPPI Agreement, Colón agreed he would return all "Confidential Information" and all copies thereof to the Company at the termination of his affiliation with the Company.

215.    Colón specifically agreed to return:

> to the Company all tangible Confidential Information and copies thereof (regardless how such Confidential Information or copies are maintained), and I will deliver to the Company any property of the Company which may be in my possession, including, but not limited to, notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, PDAs, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in my possession, custody or control (whether prepared by myself or others). If any Confidential Information has been saved or transferred to any device not owned by the Company, I will immediately notify the Company, and make such device available to the Company so that it may remove any Confidential Information from the device.

[Doc No. 1-4, PAGEID # 60.]

216.    Colón also specifically agreed that "Confidential Information" includes

> [C]onfidential and proprietary information of the Company (including its subsidiaries, parents, affiliates, successors and assigns), whether in written, oral, electronic or other form, including but not limited to, information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to me or the Company; provided that, Confidential Information will not include

32

information that is in the public domain other than through any fault or act by me.

[Doc No. 1-4, PAGEID # 60.]

217. As reflected in the over 30,000 Company files returned by Defendants, Colón took and did not return Company property following his termination of employment.

218. Upon information and belief, Colón is still in possession of Company property that has not been returned.

219. Colón conducted a Google "Takeout" of his OH.io owned Google account, including his emails, Drive, and other data, on April 8, 2026. This Company property has not been accounted for or returned.

220. Moreover, Colón has exported and downloaded other Confidential Information, including but not limited to the contents of his Company-issued and maintained Google accounts.

221. Any recording and/or transcript that Colón obtained while in his role as General Partner of Revenue for the Company, and any information obtained from Company Google accounts constitutes "Confidential Information" under the CPPI Agreement.

222. Colón agreed to "return to the Company" and/or "deliver to the Company" such Confidential Information.

223. He has failed to return that information to the Company.

224. As a result, Colón has breached the CPPI Agreement.

225. Colón also agreed to "act in good faith and in a manner that I reasonably believe to be in the best interests of the Company in carrying out my responsibilities."

226. As set forth above, Colón engaged in conduct contrary to the Company's interests and inconsistent with his contractual duty to act in good faith and in a manner he reasonably believed to be in the best interests of the Company, including by participating in and benefiting

from the Company's excessive, unjustified, and wasteful spending of Company funds; participating in or facilitating the unauthorized wiping of Schumann's Company-issued computer; refusing to respond to management; retaining Company property following termination; improperly downloading and retaining Confidential Information from Company Google accounts; and continuing to withhold recordings, documents, and transcripts containing Company Confidential Information after demand for their return.

227. As a result, Colón has further breached the CPPI Agreement.

228. The CPPI Agreement further provides that if Colón breached the CPPI Agreement, "The Company will be irreparably harmed and entitled to an injunction restraining any further breach, in addition to any other rights to which [the Company] is entitled."  [Doc. No. 1-4.]

229. As a result, the Company has been damaged in an amount to be determined at trial, and is entitled to the immediate return of all Confidential Information in Colón's possession, including all copies thereof.

**COUNT III – VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831) AND OHIO UNIFORM TRADE SECRETS ACT (R.C. § 1333.61(D))**
**(Against all Defendants)**
**(Injunctive Relief Sought)**

230. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

231. Defendants retained over 30,000 files of Company property, which included hundreds of recordings are of conversations from the inception of Defendants' employment of nearly all conversations with other employees, the owner, the management company, prospective clients, clients, and member(s) of the Board of Directors of OH.io and were made in the course of their employment with OH.io.

232. These recordings include confidential conversations regarding Company finances, profitability, pricing, margins, contract negotiations, business forecasting strategy, information about and with clients and vendors, information about existing and prospective clients, strategic business planning, and more.

233. In addition, prior to and following their terminations, Defendants downloaded the entirety of their Company Google accounts including but not limited to Gmail, Google Calendar, Contacts, Google Chat, Google Cloud, Google Account data, Google Wallet, Google Finance, Messages, and other associated applications.

234. Moreover, prior to his termination, Defendant Schumann exported and downloaded all Company emails sent between April 10 and April 12, 2026 and exported and downloaded emails sent between December 1, 2025 and April 13, 2026 from Timashev's Company email account.

235. The recordings, Company documents, and emails in Defendants' possession constitute trade secrets under the DTSA and/or OUTSA.

236. Upon information and belief, Defendants acted in concert to wrongfully obtain the Company recordings, documents, and emails.

237. The Company took reasonable measures to keep the information contained in the recordings, documents, and emails confidential.

238. The information contained in the recordings, documents, and emails which the Company understands to include records of board meetings and other meetings pertaining to the Company's business strategies has independent economic value to the Company, particularly given the destruction of the information contained on Defendants' computers, including Defendant Schumann's computer, which Defendant Metcalf wiped without authorization as well as the

attempted destruction of evidence showing that Defendants had wrongfully taken Company property.

239. Defendants have refused to return the recordings and other Company documents and information upon demand.

240. Defendants have disclosed and/or used the recordings, documents, and emails' contents without authorization.

241. As a result, the Company has been damaged in an amount to be determined at trial, and is entitled to the immediate return of the recordings in Defendants' possession.

**COUNT IV – CONVERSION**
**(Against all Defendants)**
**(Injunctive Relief Sought)**

242. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

243. Defendants have admitted to possessing transcripts properly belonging to the Company in addition to recordings.

244. There is substantial evidence that Defendants possess additional documents and information belonging to the Company.

245. Any transcript of a meeting or communication Defendants had while employed by the Company in their capacity as employees from the Company is property properly belonging to the Company.

246. Any document, Company email, or other information in Company issued and maintained Google accounts is property properly belonging to the Company.

247. The Company has demanded its property back.

248. Defendants have refused to return, preserve for destruction, and destroy the property.

249. As a result, Defendants are wrongfully exercising dominion or control over the Company's property.

250. The Company is entitled to the immediate return of its property along with damages in an amount to be proven at trial.

## COUNT V – VIOLATION OF 18 U.S.C. § 1030(a)(5)(B)
## COMPUTER FRAUD AND ABUSE ACT
### (Against Metcalf)

251. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

252. At all relevant times, the laptop computer issued to and used by Defendant Schumann was owned by the Company and constituted a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2)(B), because it was used in and affected interstate commerce and communication.

253. Metcalf used his Company-issued computer in the course of his employment to access, send, and receive electronic communications, including email and Slack messages, through internet-based systems.

254. Those communications included exchanges with individuals located outside the State of Ohio, including Company employees, consultants, and business partners in other states.

255. Metcalf routinely used his Company-issued computer and related systems to conduct Company business across state lines, including communicating with stakeholders located in multiple jurisdictions.

256. Metcalf further used his computer and communication platforms in connection with negotiating, entering into, and performing contracts and other business relationships involving entities and individuals located outside Ohio.

257. The Company's email systems, Slack platform, and other cloud-based applications accessed by Metcalf operate through interstate networks and servers, including servers located outside the State of Ohio.

258. Through his use of these systems, Metcalf transmitted and received data, communications, and files across state lines in the ordinary course of the Company's business.

259. Accordingly, the computer used by Metcalf was an instrumentality of interstate commerce and was used in and affected interstate commerce and communication. On April 13, 2026, approximately twenty-eight minutes after Defendant Schumann was informed that his employment with the Company was terminated, Defendant Metcalf intentionally accessed the protected computer assigned to Schumann.

260. Defendant Metcalf's access to Schumann's computer was without authorization, as Metcalf was never given permission, authority, or consent by the Company to access, much less wipe, destroy, or otherwise delete the contents the Company laptop formerly assigned to Defendant Schumann.

261. Following Schumann's termination, Schumann himself lacked any authority to direct or authorize any access to, or destruction of data on, the Company-owned computer.

262. Defendant Metcalf knowingly and intentionally wiped the computer's hard drive, thereby destroying all files, data, and information stored on the device.

263. By wiping the hard drive, Defendant Metcalf recklessly caused damage, as defined by 18 U.S.C. § 1030(e)(8), by rendering data unavailable and permanently destroying electronically stored information belonging to the Company.

38

264. Defendant Metcalf's conduct caused "loss" to the Company within the meaning of 18 U.S.C. § 1030(e)(11), including but not limited to costs incurred responding to the offense, assessing the damage, attempting to recover lost data, and addressing business interruption.

265. Defendant Metcalf's unauthorized wiping of Company-issued devices and destruction of Company data caused "loss" to the Company within the meaning of 18 U.S.C. § 1030(e)(11), including, without limitation: (a) costs incurred to investigate the scope of the data destruction; (b) costs incurred in attempting to recover, reconstruct, or replace lost data and system information; (c) costs associated with securing and re-stabilizing Company systems and devices; and (d) losses attributable to the interruption of the Company's ability to access and use its data and systems in the ordinary course of business.

266. The aggregate amount of loss caused by Defendant Metcalf's actions exceeded $5,000 during a one-year period, as required by 18 U.S.C. § 1030(c)(4)(A)(i)(I).

267. As a direct and proximate result of Defendant Metcalf's violation of 18 U.S.C. § 1030(a)(5)(B), the Company has suffered and will continue to suffer damages in an amount to be proven at trial.

### COUNT VI – VIOLATION OF 18 U.S.C. § 1030(a)(5)(C)
### COMPUTER FRAUD AND ABUSE ACT
### (Against Metcalf)

268. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

269. The laptop computer assigned to Schumann was a "protected computer" as defined under 18 U.S.C. § 1030(e)(2)(B) because it was owned by the Company and used in and affecting interstate commerce and communication.

39

270.     Metcalf's access to Schumann's computer was without authorization, as Metcalf was never given permission, authority, or consent by the Company to access, much less wipe, destroy, or otherwise delete the contents the Company laptop formerly assigned to Defendant Schumann.

271.     Metcalf intentionally accessed the protected computer without authorization when he wiped the computer's hard drive immediately following Schumann's termination.

272.     Metcalf knew, or should have known, that wiping the hard drive would impair the integrity and availability of the Company's data, including corporate records, communications, and other critical information.

273.     As a result of Metcalf's unauthorized access, he caused damage to a protected computer within the meaning of 18 U.S.C. § 1030(e)(8) by destroying data and rendering the information unavailable.

274.     Metcalf's actions were undertaken intentionally and without privilege, and directly resulted in harm to the Company by permanently depriving it of access to its own electronic information.

275.     As a direct and proximate result of Metcalf's violation of 18 U.S.C. § 1030(a)(5)(C), the Company has suffered and will continue to suffer damages in an amount to be proven at trial.

**COUNT VII – VIOLATION OF 18 U.S.C. § 1030(a)(2)**
**COMPUTER FRAUD AND ABUSE ACT**
**(Against all Defendants)**

276.     The Company restates and realleges the foregoing paragraphs as though fully set forth herein.

277.     At all relevant times, the computers issued to and used by Defendants, including Company-owned laptop computers and associated systems, were owned by the Company and constituted "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B) in that they were used in and affected interstate commerce and communication.

278.    Defendants used these Company-issued computers and systems in the course of their employment to access and transmit electronic communications and data, including through the Company's email platform, Slack, Google systems, and other internet-based applications. These systems operated through interstate networks and servers, including servers located outside the State of Ohio, and were routinely used to communicate and transact business with individuals and entities located in multiple states.

279.    Through such use, Defendants transmitted and received electronic communications, files, and data across state lines in the ordinary course of the Company's business. Accordingly, the Company's computer systems and the devices issued to Defendants were instrumentalities of interstate commerce and communication and were used in and affected interstate commerce.

280.    At various times between at least April 8, 2026 and April 25, 2026, Defendants intentionally accessed Company computers and computer systems without authorization, and/or exceeded their authorized access to those systems. In doing so, Defendants obtained information from protected computers within the meaning of 18 U.S.C. § 1030(a)(2).

281.    Among other things, prior to their termination, Defendant Schumann accessed and obtained information beyond the scope of his authorized access, including by accessing, exporting, and downloading Company emails of other employees and the Company's founder, without permission or legitimate business purpose.

282.    Following the termination of their employment, Defendants no longer had any authorization to access the Company's computers, networks, or systems for any purpose. Notwithstanding that lack of authorization, Defendants Metcalf and Colón continued to access, or caused access to be made to, Company systems and accounts and obtained Company documents, financial, tax, and insurance information from those systems without authorization.

41

283. Both prior to and following their terminations, Defendants acted knowingly and intentionally in accessing the Company's protected computers without authorization and/or in excess of authorized access, and in obtaining information from those computers.

284. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1030(a)(2), the Company has suffered and will continue to suffer damages and loss, including but not limited to costs incurred in investigating Defendants' conduct, responding to the unauthorized access, assessing the scope of compromised data, and addressing resulting business and operational impacts, in an amount to be determined at trial.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
### (Against all Defendants)

285. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

286. At all relevant times, Schumann served as the Chief Executive Officer of OH.io, Metcalf served as General Partner, Global Operations of OH.io, and Colón served as General Partner, Revenue of OH.io. Each Defendant occupied a position of trust and confidence within the Company.

287. By virtue of their positions, Defendants owed fiduciary duties to the Company, including duties of loyalty, honesty, good faith, and the obligation to act in the best interests of the Company.

288. While employed by OH.io and owing fiduciary duties thereto, Defendants breached those duties by engaging in conduct that was contrary to the interests of the Company and designed to harm the Company.

289. Specifically, prior to their terminations, Schumann, Metcalf, and Colón acted in concert to wrongfully export and download Confidential Information belonging to the Company,

42

including the emails of the Company's founder, cause the wiping of the hard drive of the Company-owned laptop assigned to Schumann, thereby destroying corporate files, data, and information belonging to the Company, and attempted to delete evidence of their wrongful acts in direct contravention of the Company's interests.

290. At the time of these actions, Defendants were aware of the probability of litigation involving the Company, having threatened legal action against the company. Defendants sued the Company one day after their termination, and counsel for Defendants appeared within hours of Schumann's termination.

291. Defendants thus knew that the theft and destruction of corporate data would significantly impair the Company's operations and legal interests.

292. The theft and intentional destruction of the Company's data was undertaken for the improper purpose of wrongfully retaining confidential Company property, concealing information, avoiding personal liability, and undermining the Company's ability to protect its legal and business interests.

293. Defendants further breached their fiduciary duties by engaging in excessive, unjustified, and self-interested spending of Company funds, including the retention of high-cost consultants with whom they had prior relationships, approval of unnecessary luxury expenditures, and expansion of Company payroll without revenue support, all while consciously disregarding the Company's financial condition and obligations to its stakeholders.

294. By engaging in this conduct, Defendants placed their own personal interests ahead of those of the Company and acted disloyally, in bad faith, and in violation of their fiduciary obligations.

295.    As a direct and proximate result of Defendants' breaches of fiduciary duty, the Company has suffered damages, including but not limited to loss of critical data, business disruption, investigative and remediation costs, and impairment of its ability to pursue and defend legal claims.

296.    The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT IX – VIOLATION OF R.C. 2913.04**
**UNAUTHORIZED USE OF COMPUTER PROPERTY**
**(Against all Defendants)**

297.    The Company restates and realleges the foregoing paragraphs as though fully restated herein.

298.    Ohio law prohibits a person from knowingly gaining access to, attempting to gain access to, or causing access to be gained to any computer without the consent of or beyond the scope of the express or implied consent of the owner of the computer or another person who is authorized to give consent. R.C. 2913.04(B).

299.    At all relevant times, the laptop computer issued to and used by Schumann was owned by the Company.

300.    Schumann was not the owner of the computer and did not possess authority to use, operate, access, or cause access to be gained to the computer following his termination.

301.    Metcalf was not the owner of the computer and did not possess the authority to use, operate, access, or cause access to be gained to the computer for the purpose of erasing the data thereon.

302. Colón was not the owner of the computer and did not possess the authority to use, operate, access, or cause access to be gained to the computer for the purpose of erasing the data thereon.

303. On April 13, 2026, approximately twenty-eight minutes after Schumann was informed that his employment with OH.io was terminated, Schumann and/or Colón caused Metcalf to access and operate the Company-owned laptop formerly assigned to Schumann.

304. Metcalf's access and operation of the computer were without the consent of the Company, as Metcalf was never given permission, authority, or consent by the Company to wipe, destroy, or otherwise delete the contents the Company laptop formerly assigned to Schumann.

305. Schumann and/or Colón knowingly caused the laptop to be accessed to intentionally wipe its hard drive, destroying all files, data, and electronically stored information contained on the device.

306. By wiping the hard drive, the Company's data was rendered unavailable and the wiping impaired the functioning and integrity of the computer system, causing loss and damage to the Company.

307. Following their termination, Defendants Metcalf and Colón continued to access Company systems and download files through Google Drive, Slack, and related platforms, further exceeding any authorized access and compounding their unauthorized use of Company computer property.

308. Defendants' conduct constitutes unauthorized use and access to computer property in violation of Ohio Revised Code § 2913.04(B).

309.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages, including but not limited to loss of data, business interruption, investigative expenses, remediation costs, and other economic losses.

310.     Pursuant to Ohio Rev. Code § 2307.60(A)(1), the Company is entitled to recover full damages in a civil action for injuries to property caused by Defendants' criminal acts, regardless of whether a criminal conviction is obtained.

311.     Plaintiff has suffered and will continue to suffer damages in an amount to be determined at trial.

<u>**COUNT X – VIOLATION OF R.C. 2909.07(A)(6)(a)**</u>
<u>**CRIMINAL MISCHIEF**</u>
**(Against all Defendants)**

312.     The Company restates and realleges the foregoing paragraphs as though fully restated herein.

313.     At all relevant times, the laptop computer issued to and used by Schumann was owned by the Company and constituted a computer and computer system within the meaning of Ohio Revised Code § 2909.07.

314.     Metcalf, without privilege to do so and without the knowledge or consent of the Company, knowingly accessed the Company-owned laptop assigned to Schumann and wiped its hard drive, destroying all files, data, and electronically stored information contained on the device.

315.     Schumann and/or Colón, without privilege to do so and with knowledge that Schumann's authority had terminated, knowingly caused, directed, encouraged, or conspired with Metcalf to bring about the wiping of the hard drive of Schumann's Company-owned laptop.

316.     Following their termination, Defendants Metcalf and Colón continued to access Company systems and download files through Google Drive, Slack, and related platforms, further

46

exceeding any authorized access and compounding their unauthorized use of Company computer property.

317.    Defendants collectively acted with the intent to impair the functioning of the computer, computer system, and data contained therein by rendering the Company's electronically stored information permanently unavailable.

318.    By altering, damaging, and destroying the data contained on the laptop, Defendants impaired the integrity and availability of the Company's computer system and data.

319.    As a direct and proximate result of Defendants' criminal acts, the Company has suffered damages, including loss of data, business interruption, investigative and remediation costs, and impairment of the Company's legal and operational functions.

320.    Pursuant to Ohio Revised Code § 2307.60(A)(1), the Company is entitled to recover full damages in a civil action for injuries to property caused by Defendants' criminal acts, regardless of whether a criminal conviction is obtained.

321.    The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT XI – VIOLATION OF R.C. § 2913.42**
**TAMPERING WITH RECORDS**
**(Against all Defendants)**

322.    The Company restates and realleges the foregoing paragraphs as though fully restated herein.

323.    At all relevant times, the Company-owned laptop issued to Schumann contained electronic records, including documents, communications, and digitally stored information, constituting "records" within the meaning of Ohio Revised Code § 2913.42.

47

324.    Metcalf, without privilege to do so and without the consent or authorization of OH.io, knowingly altered, destroyed, removed, concealed, or otherwise impaired the availability of those records by wiping the hard drive of the OH.io-owned laptop assigned to Schumann.

325.    Schumann and/or Colón, knowing that Schumann's authority over the Company's property had terminated, knowingly caused, directed, encouraged, or conspired with Metcalf to alter, destroy, remove, conceal, or impair the availability of the Company's records by causing the laptop's hard drive to be wiped.

326.    Following their termination, Defendants Metcalf and Colón continued to access Company systems and download files through Google Drive, Slack, and related platforms, further exceeding any authorized access and compounding their unauthorized use of Company computer property

327.    Prior to their terminations of employment, Defendants knowingly deleted text messages and Slack messages on Company systems and relating to Company business.

328.    Defendants acted knowingly and intentionally, and with purpose to impair the availability and integrity of the Company's records.

329.    Defendants' conduct constitutes tampering with records in violation of Ohio Revised Code § 2913.42.

330.    As a direct and proximate result of Defendants' criminal acts, the Company has suffered damages, including loss of corporate records, business disruption, investigative and remediation costs, and impairment of the Company's legal and operational interests.

331.    Pursuant to Ohio Revised Code § 2307.60(A)(1), the Company is entitled to recover full damages in a civil action for injuries to property caused by Defendants' criminal acts, regardless of whether a criminal conviction is obtained.

48

332. The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT XII – VIOLATION OF R.C. § 2921.12**
**TAMPERING WITH EVIDENCE**
**(Against all Defendants)**

333. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

334. Prior to his termination, Schumann threatened to initiate legal action against OH.io, placing him on notice that an official proceeding or investigation was pending or likely.

335. Defendants had engaged counsel before April 13, 2026. This belief is supported by counsel's email to the Company within three hours of Schumann's termination, and the filing of a 120-paragraph Complaint on behalf of Schumann, Metcalf, and Colón within 25 hours of Schumann's termination, and within approximately 16 hours of Metcalf and Colón's termination and Company documents evidencing meetings with counsel before that date.

336. Thus, all Defendants knew or should have known that litigation between them and the Company was pending or reasonably foreseeable and that the information contained on Schumann's Company-owned laptop, Company Slack messages, business-related text messages, and documents and communications on the Company Google Drive and email system constituted evidence relevant to such proceedings.

337. With knowledge of a pending or reasonably foreseeable official proceeding or investigation, Defendants knowingly altered, destroyed, concealed, or removed evidence, or caused such evidence to be altered, destroyed, concealed, or removed, by wiping the hard drive of the Company-owned laptop assigned to Schumann and deleting Company Slack messages, business-related text messages, and documents and communications on the Company Google Drive and email system.

49

338. Defendants acted with purpose to impair the value or availability of evidence for use in an official proceeding or investigation.

339. Defendants' conduct constitutes tampering with evidence in violation of Ohio Revised Code § 2921.12.

340. As a direct and proximate result of Defendants' actions, the Company has suffered damages, including increased litigation and investigative costs, loss of critical evidentiary materials, and impairment of OH.io's ability to pursue and defend legal claims.

341. Pursuant to Ohio Revised Code § 2307.60(A)(1), the Company is entitled to recover full damages in a civil action for injuries caused by Defendants' criminal acts, regardless of whether a criminal conviction is obtained.

342. As a result, the Company has suffered and will continue to suffer damages in an amount to be determined at trial.

## COUNT XIII – SPOLIATION OF EVIDENCE
### (Against all Defendants)

343. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

344. Prior to his termination, Defendant Schumann threatened to initiate legal action against OH.io, placing him on notice that an official proceeding or investigation was pending or likely.

345. Defendants had engaged counsel before April 13, 2026. This belief is supported by counsel's email to the Company within three hours of Schumann's termination, and the filing of a 120-paragraph Complaint on behalf of Schumann, Metcalf, and Colón within 25 hours of Schumann's termination, and within approximately 16 hours of Metcalf and Colón's termination and Company documents evidencing meetings with counsel before that date.

50

346.     With knowledge of probable litigation, Defendants willfully destroyed evidence, or caused evidence to be destroyed, by wiping the hard drive of the Company-owned laptop assigned to Schumann, directing or attempting to direct the deletion of Slack messages, deleting text messages, deleting or attempting to delete communications and documents, and taking steps to eliminate records of data exports and internal communications.

347.     The destruction of the data was intentional and designed to disrupt the Company's ability to investigate claims, assess defenses, and pursue or defend litigation arising from Defendants' conduct.

348.     As a result of Defendants' willful destruction of evidence, the Company has been deprived of access to documents, communications, records, and other electronically stored information necessary to establish the full scope of its claims and defenses.

349.     Defendants' spoliation of evidence has disrupted the Company's ability to pursue legal claims and has caused actual prejudice to the Company.

350.     As a direct and proximate result of Defendants' spoliation of evidence, the Company has suffered damages, including increased litigation costs, investigative expenses, loss of evidentiary support for claims, and impairment of its legal rights.

351.     The Company has suffered and will continue to suffer damages in an amount to be determined at trial, and is further entitled to an adverse inference instruction as to Defendants' spoliation at trial.

## COUNT XIV – GROSS NEGLIGENCE
### (Against all Defendants)

352.     The Company restates and realleges the foregoing paragraphs as though fully restated herein.

353. At all relevant times, Defendants owed duties to the Company to act with reasonable care, to safeguard the Company's property and electronic data, and to refrain from conduct creating an unreasonable risk of harm to the company.

354. Defendants breached those duties by engaging in an extreme departure from the ordinary standard of care, including but not limited to knowingly causing or effecting the irreversible destruction of the Company's electronically stored information immediately following Schumann's termination.

355. Defendants' conduct demonstrated a conscious disregard and indifference to a known or obvious risk that substantial harm would result to the Company, including loss of critical data, disruption of business operations, and impairment of the Company's legal rights.

356. The harm resulting from Defendants' conduct was foreseeable, and Defendants knew or should have known that wiping the laptop formerly assigned to Schumann, deleting or attempting to delete Slack messages, deleting or attempting to delete other Company communications and documents, and deleting Company-related text messages would cause significant and irreparable damage to the Company.

357. As a direct and proximate result of Defendants' gross negligence, the Company has suffered damages, including loss of data, business interruption, investigative and remediation expenses, increased litigation costs, and other economic and consequential damages.

358. The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

359. The Company is entitled to recover all damages proximately caused by Defendants' gross negligence, as well as all other relief the Court deems just and proper.

**COUNT XV – CIVIL CONSPIRACY**
**(Against all Defendants)**

52

360. The Company restates and realleges the foregoing paragraphs as though fully restated herein.

361. At all relevant times, Defendants knowingly entered into a common plan, scheme, or agreement to engage in unlawful and tortious conduct directed at the Company.

362. Prior to and immediately following their terminations, Defendants acted in concert to plan, prepare, and execute a coordinated course of action intended to undermine the Company and to avoid their own potential liability by wrongfully obtaining Company information, including the emails of Company employees and its founder, as well as Company financial, tax, and insurance information, and then deleting and destroying electronically stored information belonging to the Company.

363. Upon information and belief, Defendants formulated this plan prior to their terminations and began to execute it as soon as they became aware that their terminations were impending.

364. In furtherance of the conspiracy, upon information and belief, Schumann contacted Metcalf and Colón immediately following his termination, and the three agreed to have Metcalf wipe Schumann's computer. Metcalf thereafter accessed and wiped the hard drive of the Company-owned computer assigned to Schumann, destroying all files, data, and information stored on the device.

365. In furtherance of the conspiracy, upon information and belief, Defendants worked together to export, download, and retain vast quantities of Confidential Information, trade secret information, and other Company property.

366. The acts undertaken by Defendants were intentional, willful, wanton, and malicious, and were committed pursuant to and in furtherance of their agreement to engage in unlawful

53

conduct, including unauthorized computer access, destruction of property, breach of fiduciary duty, and spoliation of evidence.

367. Defendants each knew the essential nature of the plan and knowingly participated in the conspiracy with the intent to accomplish its unlawful objectives.

368. As a direct and proximate result of Defendants' conspiratorial conduct, the Company has suffered damages, including but not limited to loss of critical data, business disruption, investigative and remediation costs, increased litigation expenses, and impairment of the Company's legal rights.

369. The Company has suffered and will continue to suffer damages in an amount to be determined at trial.

370. The Company is entitled to recover all damages resulting from Defendants' civil conspiracy, as well as all other relief the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff OH.io Ventures Holding, Inc. respectfully requests this Court enter judgment in its favor and against Defendants:

1. Ordering Defendants to immediately return any and all remaining Company property, including but limited to emails, documents, recordings and/or transcripts, and any other data belonging to Plaintiff;

2. Ordering the return, preservation, and post-preservation destruction of Timashev's emails by Defendants, as well as any other Company e-mails that any Defendant downloaded prior to or after their departure, and any other Company documents downloaded or taken from the Company by the Defendants;

54

3. Ordering Defendants to identify, account for, and disclose all recordings, transcripts, and Company property provided to any third party, including counsel;

4. Ordering Defendants to identify and account for all Company property in their possession, custody, or control, including any materials that have been destroyed, deleted, or otherwise lost since July 1, 2025;

5. Ordering that Defendants' spoliation of evidence merits an adverse inference instruction at trial;

6. Awarding attorneys' fees to Plaintiff and against Schumann for attorneys' fees incurred in pursuing injunctive relief against him, as agreed in the CNNI;

7. Awarding damages to Plaintiff in an amount to be determined at trial, but in no event less than $75,000;

8. Awarding treble damages to Plaintiff as a result of Defendants' spoliation of evidence;

9. Any additional compensatory or other damages, including punitive damages, to be determined at trial;

10. Pre and post judgment interest;

11. Attorneys' fees and costs incurred; and

12. Any other relief that the Court deems just and proper.

Respectfully submitted,

*/s/ Anne E. Duprey*
Anne E. Duprey (0087798) (Trial Attorney)
Aaron T. Brogdon (0081858)
Zackary L. Stillings (0098136)
FBT GIBBONS LLP
10 West Broad Street, Suite 2300
Columbus, OH 43215-3467
Ph.: (614) 559-7245; Fax: (614) 464-1737
E-mail: aduprey@fbtgibbons.com
E-mail: abrogdon@fbtgibbons.com

55

E-mail: zstillings@fbtgibbons.com

Jonathan Sack (*Pro Hac Vice*)
Queenie Paniagua (*Pro Hac Vice*)
Sasha Pemberton (*Pro Hac Vice*)
Sack & Sack, LLP
70 East 55th St., 10th Floor
New York, NY 10022
Ph.:  212-702-9000; Fax: 212-702-9702
E-mail: jsack@sackandsack.com
E-mail: qpaniagua@sackandsack.com
E-mail: spemberton@sackandsack.com

*Counsel for Plaintiff OH.io Ventures Holding, Inc.*

56

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed electronically and served

electronically on the following counsel of record on this 1st day of June 2026:

Rex H. Elliott (0054054)
Abigail F. Chin (0097928)
Barton R. Keyes (0083979)
Spencer J. Hattemer (0102663)
Cooper Elliott
305 West Nationwide Boulevard
Columbus, Ohio 43215
rexe@cooperelliott.com
abbyc@cooperelliott.com
bartk@cooperelliott.com
spencerh@cooperelliott.com


*Attorneys for Defendants*
*Kevin Colón, J. Seth Metcalf,*
*and Jeff Schumann*


*/s/ Anne E. Duprey*
Anne E. Duprey (0087798)

0164635.0823882  4933-9985-6817v8