**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **OH.io Ventures Holding, Inc.,** | : | |
| | : | |
| **Plaintiff,** | : | Case No.: 2:26-cv-00566 |
| | : | |
| **v.** | : | |
| | : | Judge Edmund A. Sargus, Jr. |
| **J. Seth Metcalf,** *et al.*, | : | |
| | : | Magistrate Judge Vascura |
| **Defendants.** | : | |
| | : | |

---

**PLAINTIFF'S AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff OH.io Venture Holdings, Inc. ("OH.io") by its attorneys, respectfully moves this Court for entry of a temporary restraining order and, after an evidentiary hearing scheduled for a later date, a preliminary injunction against Defendants Seth Metcalf ("Metcalf"), Jeff Schumann ("Schumann"), and Kevin Colón ("Colón ") (collectively, "Defendants").

This is a case about three Defendants who teamed up in a long-planned scheme to engage in corporate theft, which was caught on the Company's own systems. In the days before and after they were fired, the CEO and two General Partners exported and downloaded the Company's most sensitive information—the owner's entire file of sent email, every email sent across the Company over a two-day span, financial reports, bank-account authorization documents, and insurance policies. One of the Defendants even wiped the former CEO's Company laptop clean twenty-eight minutes after the CEO was fired, destroying data that the Company cannot recover. And this theft has not stopped: as recently as May 19, 2026, well after this litigation began, General Partner of Revenue Colón downloaded two draft Master Services Agreements between the Company and its

1

prospective partners. In multiple recorded and transcribed conversations, Defendants discussed how to delete their text messages, erase the history of the Company's AI assistant, and move their communications onto Signal, an application designed to make messages disappear. Moreover, to date, Defendants have not returned the AI program Atlas[1] or any outputs that it may have created following their termination, all of which constitute Company property. The forensic record, and the approximately 30,000 documents that Defendants returned to Plaintiff on May 27 pursuant to the Court's order, are clear: Defendants stole the Company's property.

This represents an amendment of the Motion for Temporary Restraining Order and Preliminary Injunction that Plaintiff filed on May 11, 2026, and is filed to supplement and expand upon the descriptions of Defendants' wrongdoing. It is based on two sets of documents. First, in the intervening three weeks since the Court held the Local Rule 65.1 Conference, Plaintiff has begun to review the Defendants' activities on their Company-owned devices and on Company-owned Google Drive in the days prior to and following their terminations. That investigation has resulted in numerous additional findings of Defendants' breaches of their contracts and violations of the trade secret statutes upon which its Temporary Restraining Order was based.

Second, the Company has reviewed the documents returned to it pursuant to the Court's Interim Protective Order of May 15, 2026. [Doc. No. 13.] In that Order, the Court required Defendants to return to Plaintiff the disputed materials that the Company contended were its property in its TRO and Complaint. [*Id*.] Defendants returned *62,000 pages* of information[2]. This

---

[1] This AI tool is also referred to as Argus.

[2] In fact, the true number of pages is substantially higher. The AI-generated transcripts that Defendants produced in a format called "ASCII Text," which – in the production – reads as a single page, but when opened, contains far more than one single page. By way of example, the document identified as "DEF_049803" is an ASCII Text file, which for the purposes of the production, appears as a single page – the next document in the production is DEF_049804. When opened, however, DEF_049803 contains *1022 pages*. What this means is that while it appears Defendants' production contained around 62,000 pages, the reality is that it was far more.

vast amount of data demonstrates what the Company feared when it filed the TRO – that Defendants had absconded with troves of the Company's proprietary information.

What the Company discovered from both sources demonstrates that Defendants were engaged in a coordinated effort to exfiltrate, retain, and in certain instances destroy Company data. Their actions included, among other things, the following:

a. The export and download from the Company's computer systems the entirety of the Company's owner's sent e-mail from December 1, 2025 through April 13, 2026;[3]

b. The export and download from the Company's computer systems the entirety of e-mails sent from the Company's entire e-mail system from April 10-12, 2026;

c. The wipe of the entirety of Schumann's Company-issued computer drive within twenty-eight minutes after Schumann's termination, which destroyed Company data and obstructed the Company's ability to recover that data;

d. Defendant Metcalf, in the hours following his termination, having accessed and/or downloaded numerous Company documents, including documents pertaining to the Company's Federal EIN number, the Company's bank account authorization, and copies of the Company's insurance policies;

e. Defendant Colón , *as recently as May 19, 2026*, having downloaded and obtained two draft Master Services Agreements between the Company and potential customers or partners of the Company; and

f.  Defendants' continued retention of the Atlas tool, which Schumann developed for the Company's use while employed by the Company, and which is the Company's property under the CNNI.

That is, the Company now has identified specific, trade secret, Company property that Defendants took, and which is now wrongfully in Defendants' possession.

---

[3] The Court held a status conference on May 29, 2026., to discuss the download of these e-mail files, among other topics, and ordered Defendants to identify whether the information remained in their possession. Counsel has since stated that while Defendants downloaded OH.io's owner's e-mails prior to their terminations, such download was done "on a work computer." This is, presumably, the same computers that Defendants had wiped, meaning that the precise contents of what they took are, according to Defendants, impossible to know.

The Company has also discovered transcripts of the Defendants discussing the spoliation of relevant documents prior to their termination. These include the destruction of text messages, as well as chats concerning how to destroy the history of the Company's AI chat assistant. In addition, the Company has discovered Defendants' multiple references to chats on the Signal application, which – as a feature – permits the continual destruction of chats that take place on it. The Company has also discovered these communications took place *after* Defendants met with counsel to plan their own lawsuit against the Company.

These discoveries confirm the allegations in the original version of the TRO: Defendants engaged in a pattern of corporate theft of the Company's trade secret documents, including the wholesale export of their Company Google Drive files and emails, the destruction of Company documents, and the retention of meeting transcripts and recordings taken on Company devices and originally saved to the Company's Google Drive. The fact pattern represents a classic trade secret case. Three former employees, prior to their termination, coordinated to steal the Company's trade secrets, and have continued to do so as recently as May 20, 2026.

As a result, the reasons to grant this Motion are even greater and more urgent now than they were when it was first filed. First, OH.io is likely to succeed on the merits of its claims, including for trade secret misappropriation, breach of contract, and conversion. Defendants' unauthorized mass export and retention of Company data—including trade secrets and confidential business information—is undisputedly documented in OH.io's system logs and forensic evidence, and is proven by the *62,000 pages* of Company materials that Defendants provided back to Plaintiff upon Court order.

Second, OH.io is suffering, and will continue to suffer, irreparable harm absent immediate relief because Defendants retain access to its trade secrets, proprietary business information, and

internal communications, including materials that cannot be un-disclosed once used or disseminated, and including the data contained in and created by Atlas.

Third, OH.io has no adequate remedy at law. Fourth, greater injury will be inflicted upon OH.io by the denial of injunctive relief than would be inflicted upon Defendants by the granting of such relief. And fifth, the public interest favors enforcement of contractual obligations, protection of trade secrets, and preservation of evidence from destruction or spoliation.

**WHEREFORE**, for the reasons set forth more fully in the accompanying Memorandum in Support of its Amended Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiff OH.io Ventures Holding, Inc. respectfully requests that this Court enter a temporary restraining order, pending an evidentiary hearing on Plaintiff's request for a preliminary injunction, and thereafter enter a preliminary injunction, ordering as follows:

1. Defendants shall immediately return to OH.io all Company property in their possession, custody, or control, including but not limited to Atlas, all components and materials necessary to access, operate, or use Atlas, all data stored by or within Atlas, and all OH.io documents, emails, recordings, transcripts, trade secrets, confidential information, and any copies thereof, whether maintained in written, electronic, digital, cloud-based, or other form;

2. Defendants shall immediately cease and desist from accessing, using, reviewing, copying, disclosing, transferring, syncing, operating, or otherwise exercising any control over OH.io's trade secrets, confidential information, Company property, or Atlas and any related data, inputs, outputs, or functionality;

3. Defendants shall preserve all materials relevant to this action, including all Company property, devices, accounts, repositories, applications, messages, metadata, logs, and communications in their possession, custody, or control, and shall be enjoined from deleting, altering, wiping, overwriting, factory-resetting, concealing, transferring, or destroying any such materials. Defendants shall also suspend any disappearing-message, auto-delete, or similar functionality on any application or platform used for communications relating in any way to OH.io;

4. Within a time period set by the Court, each Defendant shall provide a sworn declaration identifying all devices, accounts, applications, repositories, storage

5

locations, cloud platforms, and third parties to whom any OH.io property, confidential information, trade secrets, recordings, transcripts, Atlas-related materials, or other Company data have been disclosed, transferred, synced, or maintained;

5. Defendants shall submit all identified personal devices, accounts, repositories, storage locations, and other sources reasonably believed to contain OH.io data to inspection and forensic imaging by a neutral third-party forensic examiner, and shall fully cooperate in that process, including by providing passwords, credentials, and access necessary to complete the examination;

6. Following the return of all Company property, each Defendant shall provide a sworn certification that he has returned all Company property and copies thereof, has ceased all access to and use of such materials, and does not retain any copies, whether directly or indirectly, except as preserved by the neutral forensic examiner or otherwise ordered by the Court;

7. After preservation and confirmation by the neutral forensic examiner, Defendants shall destroy any remaining Company property or copies thereof still in their possession, custody, or control, and certify such destruction under oath; and

8. Plaintiff shall be granted such other and further relief as the Court deems just and proper, including, to the extent permitted, an award of its attorney fees and costs incurred in bringing and enforcing this Motion.

Defendants' conduct presents precisely the circumstances warranting emergency injunctive relief: the deliberate removal of Company data, its continued retention outside the Company's control, and acts of destruction that threaten the integrity of the evidentiary record. Without immediate Court intervention, OH.io has no ability to recover its property, prevent its misuse, or ensure that critical evidence is preserved.

The specific terms of the relief sought in connection with OH.io's Amended Motion for a Temporary Restraining Order are set forth more fully in the accompanying proposed Order.

Respectfully submitted,

*/s/ Zackary L. Stillings*
Aaron T. Brogdon (0081858)
Anne E. Duprey (0087798) – Trial Attorney
Zackary L. Stillings (0098136)

6

FBT GIBBONS LLP
10 West Broad Street, Suite 2300
Columbus, OH  43215-3467
Ph.: (614) 559-7245; Fax: (614) 464-1737
E-mail: abrogdon@fbtgibbons.com
E-mail: aduprey@fbtgibbons.com
E-mail: zstillings@fbtgibbons.com

Jonathan Sack (*Pro Hac Vice)*
Queenie Paniagua (*Pro Hac Vice*)
Sasha Pemberton (*Pro Hac Vice*)
SACK & SACK, LLP
70 East 55th St., 10th Floor
New York, NY 10022
Ph.: 212-702-9000; Fax: 212-702-9702
E-mail: jsack@sackandsack.com
E-mail: qpaniagua@sackandsack.com
E-mail: spemberton@sackandsack.com
*Counsel for Plaintiff OH.io Ventures Holding, Inc.*

7

**MEMORANDUM IN SUPPORT**

On May 27, 2026, Defendants produced back to Plaintiff *over 30,000 separate documents - over 62,000 pages of information - that they took from Plaintiff's servers*. Defendants gave this property back only in response to the Court's Interim Protective Order. This "massive production"[4] is an admission: the "massive" amount of documents, and the information they contain, confirm that Defendants conspired together to take the Company's property, and use it for their own purposes after planning to be terminated. The production makes it clear – Defendants knowingly stole massive amounts of the Company's property. This Motion seeks to ensure it is all accounted for, returned, and protected.

The Company's review of its own systems, as well as its review of the Company property returned by Defendants, demonstrates the depth of Defendants' unlawful conduct. Defendants, three former executives of the Company, coordinated their efforts to strip the Company of its most valuable data, and then cover their tracks to conceal what they had done. As such, Plaintiff OH.io Ventures Holding, Inc. ("OH.io" or the "Company") respectfully files this Amended Motion for a Temporary Restraining Order and Preliminary Injunction based on this new evidence confirming that, in addition to recordings and transcripts, Defendants engaged in a coordinated effort to export, download, and retain vast quantities of Company data—including emails, documents, and entire Google Workspace repositories—onto personal devices and accounts outside the Company's control (together, the "Disputed Materials"). This conduct occurred before and after Defendants' termination, and in at least one instance, continued even after the initiation of litigation.

The relief now sought is therefore broader than that requested in Plaintiff's initial motion and is necessary to (i) effectuate the return of additional Company property that Defendants

---

[4] E-mail from R. Elliott to Chambers, May 27, 2026, 7:52 AM.

1

wrongfully downloaded and/or retained, (ii) prevent further use, dissemination, or destruction of that property, (iii) ensure full transparency, preservation, and forensic accountability regarding all Company data in Defendants' possession, custody, or control; and (iv) ensure that, after the Company's property is returned to it and preserved, that any remaining copies of that property in Defendants' possession are destroyed.

## I.   <u>RELEVANT FACTS</u>

### A.  Defendants Have Access to Company Confidential Information During The Course of Their Employment

OH.io is an AI-native performance venture platform founded with the mission of identifying up-and-coming AI enterprises from around the world and helping them scale their businesses in a way they would not be able to if acting on their own. [First Amended Complaint ("FAC"), Doc. No. 24, ¶ 27.] Defendants are three former executives of the Company. [FAC, ¶¶ 36, 43, 48.] During their employment, each Defendant was issued Company-owned equipment, including a laptop computer, and a Plaud AI device, which is capable of recording sound. [FAC, ¶ 54.]

As executives of the Company, each Defendant owed the Company fiduciary duties. [FAC, ¶¶ 67, 285-96.]  Schumann had additional contractual obligations to the Company, by virtue of having signed the CNNI. [Doc. No. 1-3.] The CNNI requires the Employee to "*return to the Company* all tangible Confidential Information and copies thereof (regardless how such Confidential Information or copies are maintained)," and return all physical and electronic property. [*Id.*, § 2.1.] "Confidential Information" is defined to include, in relevant part, proprietary information, trade secrets, and written, oral, and electronic information. [*Id.*, § 1.1.4.] Colón also had independent confidentiality obligations, which he agreed to in the CPPI Agreement, which was countersigned by Defendant Metcalf. [Doc. No. 1-4, § 1.] The CPPI Agreement requires

2

Colón to "not use or disclose any Confidential Information for any purposes" and to return all Confidential Information and physical and electronic property. [*Id.*, § 1.c.]

As executives of the Company, each Defendant was present for and participated in meetings during which confidential Company business was discussed, and was otherwise privy to Company confidential information. [*See* FAC, ¶ 187.] Defendants had access to the Company's confidential information and trade secrets by virtue of their senior roles within the Company and were entrusted with highly sensitive information regarding Company planning, operations, and strategy. [*See* FAC, ¶¶ 181, 187.]

Following the termination of their employment, the Company learned that during the course of their employment, and in their capacities as employees of the Company, Defendants recorded almost all conversations and meetings they held with the Company's owner, management team, and other employees. [*See* FAC, ¶ 157.] These recordings and transcripts include highly sensitive and confidential Company information to which Defendants were only privy due to their senior roles within the Company. [*See* FAC, ¶¶ 181, 187.]

### B. The Company Takes Steps to Protect its Confidential Information.

As part of its normal business practices, the Company instituted protections to ensure the confidentiality of its proprietary information and trade secrets. [*See* FAC, ¶¶ 178-193.] The Company limits the number of employees who have administrative access to its systems, and maintains policies and procedures governing the use, access, and protection of its confidential information and systems. [FAC, ¶ 174.] The Company also requires employees to enter into agreements imposing confidentiality agreements, such as the CNNI and the CPPI Agreement, and implements technical, administrative, and physical safeguards designed to prevent unauthorized access to, disclosure of, and use of its confidential information and trade secrets. [FAC, ¶ 182.]

3

By keeping its confidential information confidential, the Company gains a competitive advantage in the market, including by enabling the Company to make strategic decisions and develop and deploy its services in a manner not readily replicable by its competitors. [FAC, ¶¶ 184-85.] The Company does not disclose its confidential information and trade secrets outside the Company except under circumstances designed to maintain their secrecy. [FAC, ¶ 186.]

Defendants were aware of the Company's protections for its confidential information and understood that its protective measures were intended to protect the Company's confidential information and trade secrets. [FAC, ¶¶ 191.] Defendants' access to the Company's systems, applications, and data was limited to only that which is necessary to perform their job duties and was subject to Company policies governing confidentiality and acceptable use. [FAC, ¶ 192.] By virtue of their roles, agreements, and access to Company systems and information, Defendants knew or reasonably should have known that the Company took reasonable measures to protect its confidential information and trade secrets and that such information was not to be used or disclosed outside the scope of their employment. [FAC, ¶ 193.]

### C. Defendants are Terminated and File Suit

Defendants were terminated for cause on April 13, 2026. [FAC, ¶¶ 101-03.] Each Defendant was instructed in his termination letter to immediately return all Company property in his possession. [FAC, ¶¶ 101-03.] Defendants filed suit the day after their termination (the "Franklin County Action"), alleging breaches of their employment contracts, among other allegations. [FAC, ¶ 151.]

### D. The Company Learns of the Recordings

On May 6, 2026, during a call concerning the Franklin County Action, Defendants' counsel confirmed that Defendants possessed, were collecting, and were reviewing a substantial number of recordings and transcripts of Company meetings and conversations. The Company demanded

4

their return and that Defendants cease review, but Defendants refused and stated they would continue reviewing and sharing them with counsel. [FAC, ¶¶ 157-67; Doc. Nos. 1-1, 1-2.]

### E. The Court Orders that Defendants Produce Company Property.

Following the above exchanges, Plaintiff filed its initial Complaint, along with the corresponding TRO that initiated this litigation. [FAC ¶ 168; Doc. Nos. 1, 2.] On May 13, 2026, the Court held a Local Rule 65.1 Status Conference, during which the Court asked the parties to enter into an interim protective order giving Defendants two weeks to produce all Disputed Materials – i.e., recordings, transcripts, and all other Company property – back to the Company, following a review. [Doc. No. 9.] The Defendants were thus ordered to produce the Disputed Materials – but not purge it from their systems – by May 27, 2026.

In the time since the May 13 conference, the Company has started its review if its own internal systems, including e-mails, Slack messages, and documents saved on the Company's Google Drive. This review uncovered numerous additional documents and e-mails that the Defendants stole in the days before, and even after, their terminations.

### F. Defendants Conduct Systematic Exfiltration of Company Data and Continue to Retain and Access It

The forensic evidence the Company has thus far discovered establishes that in the days immediately preceding and following their terminations, Defendants engaged in a deliberate and coordinated effort to export and download substantial portions of OH.io's data.

- Defendants performed Google Takeout exports of their OH.io accounts, enabling them to archive and download large volumes of data associated with their Company-issued and maintained Google accounts. [*See* Google Takeout Events, attached hereto as Exhibit "A."][5]

- Slack communications and AI transcripts reflect that Defendants discussed how to perform these exports and how to retain Company data on personal devices

---

[5] Plaintiff has filed a Motion to file its Exhibits for this Motion under seal, and will file such Exhibits in accordance with the Court's Order pertaining to that Motion.

and personal accounts. Schumann is captured on a recording actively guiding Colón through the Google Takeout process, while Metcalf encourages exports and clearing of AI chat history—all in anticipation of being cut off from company systems. [*See* Transcript re Google Takeout, at 13-14, attached hereto as Exhibit "B"].

- Schumann has been continuously routing company communications (emails, Slack, calendars, meeting transcripts) into Atlas. Per his statement on a recording, Schumann "[has] literally on record every single interaction transcripts, like New York meetings, everything all in an easy to like discover archive" and describes it as "a litigator's dream if they're on your side and a *litigator's nightmare*, if they're on the other side." (emphasis added). Schumann explained in this recording that "every single day, everyone in my network is… It's ingesting all my communications from email to Slack to text messaging in real time." He specifies the "data sources I am pulling in my Google Calendar, Gmail, Slack, iMessaging Apple Calendars." [*See* Schumann Transcript, at 34, attached hereto as Exhibit "C."].

- Schumann exported and downloaded (1) all emails sent from the Company owner's account from December 1, 2025 through April 13, 2026, and (2) all emails sent by any user in the Company's email system from April 10–April 12, 2026; [*See* Google Vault Events, attached hereto as Exhibit "D"].

- Defendant Metcalf, after receiving notice of his termination, downloaded and/or accessed highly sensitive Company information, including the Company's Federal EIN, bank account authorization documents, and insurance policies; [*See* Metcalf Post-Term Downloads Drive, attached hereto as Exhibit "E."]

- On May 19, 2026—after the commencement of litigation—Colón downloaded at least two documents that were synced to his personal Gmail account, demonstrating that Defendants' retention and acquisition of Company data is ongoing; [*See* Colon Downloads, attached hereto as Exhibit "F."]

- OH.io's forensic analysis further confirms that Defendants downloaded and retained transcripts directly from Company systems, confirming that such materials are indisputably Company property. Specifically, forensic analysis demonstrates that Schumann downloaded 41 such transcripts between April 1 and April 14. [*See* J.Schumann Company Downloads, attached hereto as Exhibit "G."]

That Defendants downloaded this data is irrefutable. It is critical that all such Company property

in Defendants' possession be returned immediately.

### G.  The Nature of the Information Downloaded Confirms Its Trade Secret

**and Confidential Status**

The data that Defendants exported, downloaded, and retained includes highly sensitive

confidential and proprietary Company information, including but not limited to:

- Company strategy documents, including documents pertaining to the framing of the Company's mission, vision and messaging. For example, Colón downloaded a PowerPoint slide deck on the Company's 2026 budget from Slack, which contains a detailed analysis of the Company's expected profits, revenues, expenses, and anticipated operational adjustments to address budgetary concerns; a slide deck created by the law firm Ice Miller detailing the Company's proposed tax structure; and a third slide deck detailing the Company's 2026 operating plan. Moreover, Defendants obtained the recordings and transcripts of confidential board and executive meetings reflecting the Company's future business strategy and strategic planning. [*See* Q2-Q4 FY2026 Budget, attached hereto as Exhibit "H"; IM Tax Structure, attached hereto as Exhibit "I"; Operating Plan, attached hereto as Exhibit "J"].

- Company bank account authorization documents, containing the account and routing numbers, Company insurance policies, federal EIN number, and financial reports including the Company's general ledger, monthly income statements, and the Company's fiscal year 2026 budget. By way of example, the documents Metcalf downloaded following his termination — Company insurance policies, documents containing the account and routing numbers for a Company bank account, and the Company's 2025 New York Department of Corporate Tax Extension Voucher — and the 2026 budget projecting an additional $3 million in second-quarter losses that Schumann circulated. [*See* OH.io JP Business Checking Account Information, attached hereto as Exhibit "K"; IRS Federal EIN, attached hereto as Exhibit "L"; OH.io Expense Summary, attached hereto as Exhibit "M"; Exhibit H; Scottsdale Surplus Lines Business and Management Indemnity Policy, attached hereto as Exhibit "N".].

- Confidential proposals and strategy documents between the Company and strategic partners; e.g., information concerning existing and prospective clients, contract negotiations, and communications with clients and vendors reflected in the recordings and transcripts. [*See* Strategic Partners and Attachment, attached hereto as Exhibit "O"].

- Internal communications and executive-level discussions, including for example Company e-mails Schumann exported, which includes all sent mail from April 10–12, 2026, and all mail from the owner's account, Defendants' Google "Takeout" exports of their entire Company Workspaces (April 8, 9, and 12, 2026), and the recordings and transcripts of internal deliberations and executive meetings captured on Company Plaud devices. [*See* Internal Communications Transcripts, attached hereto as Exhibits P, Q, R, S, T, and U.]

7

This information constitutes trade secrets and confidential business information under both the DTSA and OUTSA, as well as under Defendants' contractual obligations. The breadth of the data exported, particularly full email repositories and Google Drive contents, confirms that Defendants did not attempt to limit their conduct to discrete or arguably relevant materials, but instead engaged in wholesale extraction of Company data.

### H. Defendants Engaged in Spoliation of Evidence and Use of Ephemeral Communications to Avoid Preservation

The forensic record also reflects that Defendants engaged in the destruction and attempted concealment of evidence after taking steps to retain counsel and in anticipation of litigation. Contemporaneous Slack communications and recording transcripts confirm that Defendants were actively discussing the deletion of text messages and other communications during the same period in which they were exporting and retaining Company data. [*See, e.g.,* Exhibit M to FBT Gibbons May 21 Letter (asking Argus to delete history), attached hereto as Exhibit "V"]. In addition, forensic evidence indicates that Schumann attempted to delete evidence of his data exports and downloads from Company systems. **[***See*** Exhibit D]**. These actions occurred at a time when Defendants had already retained counsel and were preparing to initiate the State Action, and thus were under a clear duty to preserve relevant evidence.[6] Rather than preserve information, Defendants selectively retained materials they deemed useful while deleting or attempting to delete other evidence—conduct that constitutes classic spoliation.

Evidence further reflects that Defendants were communicating through Signal, an encrypted messaging platform that may include features such as disappearing messages. [*See* References to Signal Communications, attached hereto as Exhibit "W" (referencing a "Strategy Sync" channel including, at least, Schumann and Metcalf on April 12 – a day before their

---

[6] Upon information and belief, Defendants retained their counsel on or around April 10, 2026.

8

terminations).].    At a minimum, Defendants must be required to preserve all Signal communications in their possession and to immediately cease use of any platform that cannot be preserved.

This pattern of conduct - simultaneously exporting Company data for personal retention while deleting or obscuring other communications - demonstrates a deliberate effort to control the evidentiary record. It further underscores the need for immediate injunctive relief, including forensic preservation, inspection, and disclosure of all repositories of Company data and communications, to ensure evidence is identified, secured, and not further altered or destroyed.

## I.    Defendants Again Refuse the Company's Demand to Return Its Property

Plaintiff, through counsel, brought to Defendants' attention the additional data stolen by Defendants and requested an accounting of and return of all such Company property. (*See* Exhibit V). Defendants refused to provide such information or return any additional Company property.

Despite repeated requests, Defendants have refused to identify what Company data they possess, where it resides, or how it is being used, instead representing only—through counsel—that materials have been "preserved," without further detail.

On May 29 the Court held a hearing during which the Court inquired into whether Defendants had copied the "sent folder" of Timashev's email inbox, and ordered Defendants' counsel to correspond with Plaintiffs' counsel regarding such allegation. Following the May 29 hearing, Defendants' counsel informed Plaintiffs' counsel that to the best of Defendants' knowledge, they no longer had access to Timashev's email inbox.

## I.    STANDARD OF REVIEW

When ruling on a motion for a temporary restraining order ("TRO"), Federal Rule of Civil Procedure 65(b) requires courts to examine whether "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the

9

movant" if a TRO is not granted. Fed. R. Civ. P. 65(b)(1)(A). In determining whether to grant a TRO, the Court considers four factors, including (1) the movant's likelihood of success on the merits; (2) whether the movant would likely be permanently harmed absent the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest.[7] *S. Glazer's Distribs. of Ohio v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (citation omitted). While courts consider these as "factors to be balanced, not prerequisites to be met" the likelihood of success factor is of particular significance. *Id*. (citation omitted). Moreover, "to obtain injunctive relief, it is of paramount importance that the party establish immediacy and irreparability of injury." *Hartman v. Acton*, 613 F.Supp.3d 1015, 1022 (S.D. Ohio 2020) (Marbley, D.J.).

## II.    ARGUMENT

This Motion seeks emergency relief to address a broader and more urgent harm than was initially presented to the Court. Defendants are not merely in possession of recordings and transcripts—they have engaged in the wholesale removal and continued retention of Company data, including trade secrets and highly sensitive business information, and are believed to have accessed such data even after the commencement of litigation. The Court's intervention is required not only to secure the return of known materials, but to identify, preserve, and recover the full scope of Company property in Defendants' possession.

### A. OH.io is Likely to Succeed on the Merits of the Claims for which it Seeks Injunctive Relief.

OH.io brings this Motion based upon its claims for (i) Schumann's breach of Section 2.1 of the CNNI; (ii) Colón 's breach of Section 1 of the CPPI Agreement; (iii) Defendants'

---

[7] These factors are the same as those for a preliminary injunction. *See Cretor Constr. Equip. LLC v. Gibson*, 738 F.Supp.3d 950, 959 (S.D. Ohio 2024).

misappropriation of trade secrets under the DTSA and OUTSA; and (iv) conversion. [Compl., ¶¶ 169-181 (Count I); 182-198 (Count II); 199-207 (Count III); 208-214 (Count IV).] OH.io need only show a likelihood of success on one claim to be entitled to injunctive relief. *Planned Parenthood Great Nw., Haw., Alaska, Ind., & Ky., Inc. v. Cameron*, 599 F. Supp. 3d 497, 506 (W.D. Ky. 2022). OH.io can demonstrate that it is likely to succeed on all four.

### B. OH.io is Likely to Succeed on its Breach of Contract Claim Against Schumann.

OH.io is likely to succeed on its breach of contract claim against Schumann. Under Ohio law, to prove a breach of contract, a plaintiff must establish (1) "the existence of a contract," (2) "the failure without legal excuse of the other party to perform when performance is due" (i.e., a breach), and (3) "damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41.

#### 1. Schumann May Not Keep Copies of Company Property He has Taken.

The CNNI contains express provisions requiring Schumann to "deliver to the Company[8] any property of the Company which may be in the Employee's possession including but not limited to … documentation or other materials *of any nature and in any form*, whether written, printed, electronic *or in digital format* or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs." [Doc. No. 1-3, § 2.1(b).] Furthermore, the CNNI requires Schumann to "return to the Company all tangible Confidential Information and copies thereof." [*Id.*, § 2.1(a).]

Recordings of business meetings and conversations held in furtherance of the Company's business constitute confidential information which – by contract – Schumann *must* return. Nor

---

[8] The CNNI defines the Company to be SaaS Innovation Labs ("SaaS"), the parent company of OH.io. For the purposes of this Motion, there is no distinction: neither SaaS nor OH.io have received the recordings at issue.

11

may Schumann argue that he may keep copies of such recordings: he is contractually bound not only to return the Company's property, but "*copies thereof.*" [*Id.*, § 2.1.] Courts routinely enforce contracts that require terminated employees to return information properly belonging to their former employers. *E.g., Mech. Constr. Managers, LLC v. Paschka,* 2022 WL 1591605, at \*7 (S.D. Ohio May 19, 2022) (granting employer's motion for TRO based on former employee's breach of employment agreement post-resignation by failing to return company documents and information); *Post-Browning, Inc. v. Knabe*, 2015 WL 5719580, at \*5 (S.D. Ohio Sept. 30, 2015) (granting employer's motion for TRO and ordering employee to return company property after former employee breached employment agreement by failing to return company property post-resignation); *SKF USA Inc. v. Zarwasch-Weiss*, No. 1:10-cv-1548, 2011 WL 13362617, at \*27 (N.D. Ohio Feb. 3, 2011) (requiring return of company information where employment agreement "prohibited [employee] from . . . copying records . . . and . . . required him . . . to return all documents, records, correspondence, and other items related to the business of the company upon termination.").

It is for this reason that the fact Schumann returned some of the Company's property to it on May 27 is insufficient. Schumann was not only required to return the Company's property to it; he was also required to return all *copies* to the Company. That is, the CNNI does not contemplate Schumann's retention of *any* Company property following his termination. As a result, this Motion seeks not only the return of any remaining Company property in his possession; it also seeks an Order requiring Schumann's certification that he no longer retains any copies of Company property, in accordance with his obligations under the CNNI.

### 2.  Atlas Must Be Returned to the Company.

As part of his obligation to return Company property, Schumann must return the Atlas AI program he created during his employment, together with all data stored by or within it, all inputs and outputs, and any other materials necessary to access, operate, or use it. To the extent Schumann or anyone else has used Atlas since his termination, he must also return all data, inputs, and outputs generated or maintained through that use.

The Company's review of documents that Defendants produced to it demonstrates that Schumann created Atlas while in the Company's employ. [*See* Transcript of Conversation, attached hereto as Exhibit "X"]. As a result, under the CNNI, it constitutes the Company's property. [Doc. No. 1-3, § 3.1.] Indeed, Schumann explicitly assigned it to the Company the CINNI. [*Id.*]

Anything Schumann created during his employment with OH.io, including Atlas, is Company property. He cannot claim Atlas predates his employment, because the CNNI required him to disclose any prior inventions, and Atlas was not listed. [*Id.*, § 3.6; Schedule 1.] Any continued use of Atlas by Schumann or any other Defendant must cease immediately, and all materials necessary to operate it, along with any inputs or outputs generated during or since Defendants' employment, must be returned at once.

### C. OH.io is Likely to Succeed on its Breach of Contract Claim Against Colón.

For nearly identical reasons, OH.io is likely to succeed on its breach of contract claim against Colón. Colón entered into the CPPI Agreement with the Company, which represented a valid and enforceable contract. The Company fulfilled its obligations under the CPPI Agreement. To the extent he has not returned all of the Company's property to it, Colón has breached the CPPI Agreement.

The CPPI Agreement required him to return the Company's party upon his termination. [Doc. No. 1-4, § 1.c.] Like Schumann, the Court should require the return of any Company property remaining in Colón's possession pursuant to the CPPI Agreement's requirements. *E.g.,*

13

*PUI Audio, Inc. v. Van Den Broek,* 2021 WL 4905461, at *8 (S.D. Ohio Oct. 21, 2021) (granting employer's motion for TRO and requiring former employee to return confidential information pursuant to employment agreement); *Minc, LLC v. Stebbins*, No. 22-CV-1655, 2024 WL 4041432, at *12 (N.D. Ohio Sept. 4, 2024). And, like Schumann, it should require that – once all Company property has been returned, and such return is certified – that Colón be required to purge his devices of all Company property.

### D. OH.io is likely to succeed on its DTSA and OUTSA claims.

Both the Company's investigation on its internal systems as well as Defendants' production of Company property in their possession demonstrate that Plaintiff is likely to succeed on its Defense of Trade Secrets Act ("DTSA") and Ohio Uniform Trade Secrets Act ("OUTSA") claims. The DTSA creates a cause of action for "[a]n owner of a trade secret that is misappropriated." 18 U.S.C. § 1836. OUTSA provides a parallel state-law claim. *See* O.R.C. § 1333.62(A). "Courts consider these state and federal law claims together because the definition and requirements of the OUTSA and DTSA are essentially the same." *Equity Resources, Inc. v. Thoman*, 682 F.Supp.3d 707, 726 (S.D. Ohio 2023).

Under the DTSA, a "trade secret" is information that the owner has taken "reasonable measures" to keep secret and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). The OUTSA has a similar definition. *Equity Resources*, 682 F.Supp.3d at 726.

Under the OUTSA, a "trade secret" includes "any business information or plans, financial information, or listing of names, addresses, or telephone numbers." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 675 (6th Cir. 2024) (citing Ohio Rev. Code § 1333.61(D)). The DTSA definition of "trade secret" is similar, and likewise encompasses "financial, business, scientific, technical,

14

economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." *Id.* (citing 18 U.S.C. § 1839(3)). "[U]nder both statutes, the information must have independent economic value, and the company must take reasonable steps to keep it secret." *Id.*

Misappropriation of trade secrets under the DTSA and OUTSA includes any of the following: (1) acquisition of a trade secret by improper means, (2) unauthorized disclosure of a trade secret, or (3) unauthorized use of a trade secret. 18 U.S.C. § 1839(5); O.R.C. 1333.61(B). "Improper means" includes theft as well as "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A). Injunctive relief is available under the DTSA and OUTSA for both actual and threatened misappropriation. 18 U.S.C. § 1836(b)(3)(A)(i); *Avery Dennison Corp. v. Kitsonas*, 118 F.Supp.2d 848, 854 (S.D. Ohio 2000) (citing O.R.C. §1333.62(A)).

### i. OH.io's Trade Secrets are protected under the DTSA and the OUTSA.

Defendants have already disclosed over 30,000 files they stole from the Company. These documents, recordings, transcripts, and communications qualify as trade secrets under the DTSA and OUTSA. In addition to the transcripts and recordings that Defendants took with them, they also retained Metcalf's entire Company email account, which included no fewer than 17 different slide decks, many or all of which contained trade secret information, including but not limited to information pertaining to the Company's fund structure, operating plan, and budget. This confidential, proprietary information detailed the Company's expected profits, revenues, expenses, anticipated operational adjustments to address budgetary concerns, and other sensitive financial and strategic data. [*See* Exhibit H; Exhibit J; Attracting AI Companies Slide Deck, attached hereto as Exhibit "Y"]. These constitute trade secrets under both the DTSA and OUTSA.

15

Moreover, OH.io has taken reasonable steps to maintain the trade secrets' confidentiality, which further demonstrates that they are protectable. Those protections include, for example, documents such as the CNNI and the CPPI Agreement, which contractually require employees like Defendants to maintain information confidentiality. They include password protection and limiting access to specific files to specific persons. [FAC, ¶¶ 57-58, 173.] They include maintaining physical security measures at the Company's offices. [FAC, ¶ 177.] And they include the Company's demands – as it has done here – that terminated employees return all confidential information to the Company. [FAC, ¶¶ 107-09.] Under the DTSA and the OUTSA, the recordings constitute trade secrets, and the Company has taken reasonable steps to maintain their confidentiality.

### ii. Defendants misappropriated OH.io's Trade Secrets.

Following their termination, and despite repeated demands that Defendants return all company property, the Defendants breached their contractual and fiduciary duties to maintain the Company's secrecy by refusing to return the recordings and other Company property until required to do so by Court order. As described above, the recordings - which Defendants have represented to include almost all conversations held in the course of their employment – certainly include information concerning OH.io's business strategy, business plans, customer information, and financial planning. Moreover, Schumann and Colón were additionally bound by express contracts to return the recordings but did not, until the Court ordered them to do so. [Doc. No. 1-3, § 2.1.]

Even now, Schumann remains contractually bound to return "all copies" of Company property in his possession. [*Id.*] And yet, Plaintiff understands that Schumann – along with the rest of the Defendants – retains copies of all documents returned to Plaintiff on May 27. Moreover, Schumann is under obligation to return Atlas, which he has not yet done.

16

Additionally, the Defendants' return of certain documents does not elide the improper methods by which they took the information in the first place. Defendants coordinated among themselves to perform mass exports of Company data to their personal devices in the days leading to their terminations, downloaded e-mails from the Company's owner for the prior six months, and downloaded the entire Company's sent e-mails for a two-day period immediately preceding their terminations. Defendant Metcalf, *after being terminated*, downloaded and exported numerous Company documents. And, Defendants did all this with the express purpose of taking the information for their own use in anticipation of their own terminations. Regardless of whether Defendants now promise they have given all of the information back, their theft of over 62,000 pages of Company information - including highly sensitive banking and insurance documents and documents containing personal information - was not done via a proper means. It was simply theft.

### E.  OH.io is likely to succeed on its conversion claim.

In Ohio, "[a] conversion claim is recognized as any exercise of dominion or control wrongfully exerted over the personal property of another in denial of or under a claim inconsistent with his rights." *Equity Resources*, 682 F.Supp.3d at 720 (internal quotations removed). To prove a conversion claim, a plaintiff must show "(1) the plaintiff had ownership or right of possession of the property at the time of conversion; (2) the defendant converted plaintiff's property by a wrongful act or disposition; and (3) resulting damages." *Id.*

Here, Defendants continue to possess property – recordings, transcripts, and ostensibly any physical media on which such recordings reside – that belong to the Company. The Company has ownership or the right of possession to such items; Defendants continue to wrongfully hold that property; and the continued possession of such property will cause damage to the Company.[9]

---

[9] The Company here acknowledges the case law indicating that conversion claims are sometimes preempted by claims under the trade secrets statutes. *See, e.g., Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 413-14 (6th Cir. 2024). "The

17

Thus, whether under the CNNI or the CPPI Agreement, the DTSA and/or OUTSA, or under the Company's conversion claim, the result should be the same: the Company has a substantial likelihood of success on the merits of those claims. This factor weighs in favor of granting the Company the injunctive relief it seeks.

### F. OH.io Will Suffer Irreparable Harm Absent Injunctive Relief.

In considering a motion for a temporary restraining order, the harm faced by a plaintiff is irreparable where it will not be compensable by money damages. *See Hartman*, 613 F.Supp.3d at 1024. The occurs where "the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (citation omitted).

Misappropriation, loss, and threatened disclosure of OH.io's trade secrets are, by themselves, presumed to be irreparable harm. *Allure Jewelers, Inc. v. Ulu*, 2012 WL 367719, \*4 (S.D. Ohio Feb. 3, 2012). Additionally, "the Supreme Court of Ohio has held that injunctive relief is the 'appropriate remedy to restrain the continued and future use, or threatened use, of misappropriated trade secrets.'" *Union Home Mtge. Corp. v. Fratelli*, 2025 WL 639315, \*17 (N.D. Ohio Feb. 27, 2025) (citing *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 N.E.2d 814, 819 (Ohio 1986)).

---

test to determine whether a state law claim is displaced by OUTSA is to determine whether the claims are not more than a restatement of the same operative facts that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Stolle Mach. Co., LLC v. Ram Precision Indus.,* 605 F.App'x 473, 486 (6th Cir. 2015) (citation omitted). Here, Plaintiff has pleaded a conversion claim, given the uncertain nature of the specific property here at issue. For example, to the extent there are any *physical* items that may accompany the information in the recordings, such physical property may require a separate framework than the information contained on or within it. In other words, to the extent that the recordings exist on physical media (for example, drives), or to the extent that the transcripts are on physical paper, such physical documents could properly be the subject of a conversion claim that would not be preempted by the OUTSA. "Where the state-law claim has a factual basis independent from the facts establishing the [OUTSA] claim, the portion of the claim supported by an independent factual basis survives preemption." *Campfield*, 91 F.4th at 414.

The proper remedy here is the forfeiture of Defendants' devices until they can be forensically examined. *See Earthbound Corp. v. MiTek USA, Inc.*, 2016 WL 4418013 (W.D. Wash. Aug. 19, 2016) (granting TRO and ordering employee-defendants to surrender personal devices and passwords to various company accounts for forensic imaging); *Corp. Lodging Consultants, Inc. v. Szafarski*, 2021 WL 3709914 (N.D. Ohio Aug. 20, 2021) (granting TRO and ordering employee-defendants to return to the plaintiff company all its confidential, proprietary, and trade secret information within their possession).

Because misappropriation of trade secrets is presumed to constitute irreparable harm, this factor, too, weighs in favor of granting an injunction.

### G.  An Injunction Will Not Cause Substantial Harm to Third Parties.

The third factor – whether there will be substantial harm should the relief be granted – also favors the Company. Although the substantial harm "factor is generally concerned with harm to third parties, courts also often consider the balance of hardships between the parties if an injunction were to issue." *Cameron*, 599 F. Supp. 3d at 508–09 (citation omitted). Substantial harm does not occur where a court enforces the terms of the parties' lawful agreements, or where a defendant is required only to return and cease inappropriate use of trade secrets or confidential information. *Mgt. Registry, Inc. v. Calvetti*, 2018 WL 1660087, *2 (W.D.Ky. Apr. 5, 2018). And, the injunction sought here would not be harmful to any third parties. This factor, again, favors an injunction.

### H.  The public interest favors injunctive relief.

The public interest factors also favor injunctive relief. The public has an interest in both "seeing valid contracts honored" and "discouraging unfair trade practices such as conversion of trade secrets." *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 785 (6th Cir. 2003). Thus, all four factors favor granting the relief the Company seeks.

### I.  Defendants Are Not Entitled To Self-Help Discovery

19

Defendants posited that OH.io's initial Motion was, in effect, a discovery dispute.  That is not the case.  That Motion and this Amended Motion are about the theft of Company property and the return of that Company property.  Defendants have attempted to claim their unlawful possession of Company property is somehow a legitimate form of discovery.  Defendants' conduct is not legitimate preservation or participation in discovery—it is self-help discovery. Defendants made the unilateral decision to extract vast amounts of Company data prior to and following their termination and now seek to retain and use that data outside the bounds of the Federal Rules. The law does not permit litigants to seize an adversary's documents and then retain them under the guise of potential relevance to future claims or defenses.

As such, *all* Company property must be returned. Defendants' possession of that property must be forensically preserved by a third-party, then destroyed. Defendants' "massive production" of over 30,000 Company documents and over 62,000 pages is an admission of the extent of their theft. They should not be entitled to retain the fruits of that theft during the pendency of this litigation.

## III.    <u>CONCLUSION</u>

For the reasons stated herein, OH.io respectfully request this Court enter a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) and, after notice and a hearing on the preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) grant the relief set forth in Plaintiff's Amended Motion and such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Zackary L. Stillings*
Anne E. Duprey (0087798) – Trial Attorney
Aaron T. Brogdon (0081858)
Zackary L. Stillings (0098136)

20

FBT Gibbons LLP
10 West Broad Street, Suite 2300
Columbus, OH  43215-3467
Ph.: (614) 559-7245; Fax: (614) 464-1737
E-mail: aduprey@fbtgibbons.com
E-mail: abrogdon@fbtgibbons.com
E-mail: zstillings@fbtgibbons.com

Jonathan Sack (*Pro Hac Vice*)
Queenie Paniagua (*Pro Hac Vice*)
Sasha Pemberton (*Pro Hac Vice*)
SACK & SACK, LLP
70 East 55th St., 10th Floor
New York, NY 10022
Ph.: 212-702-9000; Fax: 212-702-9702
E-mail: jsack@sackandsack.com
E-mail: qpaniagua@sackandsack.com
Email: spemberton@sackandsack.com

*Counsel for Plaintiff OH.io Ventures Holding, Inc.*

21

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing was filed electronically and served electronically on the following counsel of record on this 1st day of June 2026:

Rex H. Elliott (0054054)
Abigail F. Chin (0097928)
Barton R. Keyes (0083979)
Spencer J. Hattemer (0102663)
Cooper Elliott
305 West Nationwide Boulevard
Columbus, Ohio 43215
rexe@cooperelliott.com
abbyc@cooperelliott.com
bartk@cooperelliott.com
spencerh@cooperelliott.com

*Attorneys for Defendants*
*Kevin Colón, J. Seth Metcalf,*
*and Jeff Schumann*

*/s/ Zackary L. Stillings*
Zackary L. Stillings (0098136)

0164635.0823882  4928-2906-0273

22