**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **OH.io Ventures Holding, Inc.,** | : | |
| | : | |
| **Plaintiff,** | : | Case No.: 2:26-cv-00566 |
| | : | |
| **v.** | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| **J. Seth Metcalf,** *et al.*, | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| **Defendants.** | : | |
| | : | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION**
**TO DECLARE THE ATTORNEY CLIENT PRIVILEGE WAIVED[1]**

Defendants' arguments to counter this Motion are not serious, and the reasons are legion. In 16 pages of briefing, Defendants do not once address their own admissions – that they *knew* they had no expectation of privacy when saving documents containing attorney-client communications to the Company's servers.

They have no explanation for Mr. Metcalf's admission to Mr. Schumann that "*[t]here is no expectation of privacy … for any of this work stuff.*"[2] They cannot deny Mr. Schumann knew the discoverability of his AI-recorded communications: "*all of it.*"[3] And Defendants do not even attempt to explain why they continued to store transcripts of calls with their counsel on the

---

[1] Pursuant to May 29, 2026, Status Conference, it is Plaintiff's understanding that portions of this brief and exhibits that contain communications Defendants' have asserted are covered by attorney-client privilege, though Plaintiff disputes such assertions, are to be filed publicly. As such, sections of this brief have been redacted and certain exhibits, which have already been provided to opposing counsel and the Court, are not being publicly filed at this time. Plaintiff will file unredacted versions under seal pending the Court's granting of its Motion For Leave To File Plaintiff's Reply In Support Under Seal (Doc. No. 33).

[2] Seth Metcalf, in a recorded conversation between Defendants [Doc. No. 23-5, at DEF_056870].

[3] Conversation between Defendants [Doc. No. 23-5, at DEF_049803 (cleaned up).]

1

Company's systems ███████████████████████████████████████████████

████████████████████████████████████[4]

To be clear, the Opposition simply ignores the most damning evidence of Defendants' waiver.  And yet, this avoidance is only one of the Opposition's principal flaws, though it is a devastating one. Indeed, the Opposition's other principal flaw is that it relies upon demonstrably untrue statements, made under penalty of perjury.

Mr. Schumann declared under penalty of perjury: "I did not monitor employee emails or devices." [Doc. No. 30-4.] This is demonstrably false. [*See, e.g.,* Atlas Brief, 2026-04-13, at 4, attached hereto as Exhibit 8 ████████████████████████████████

██████████████); *see* Doc. No. 23, at Exhibit 1, at Exhibit C, at 1:30 (████████████

█████████████████████████); *See* Doc. No. 23, at Exhibit 1, at Exhibit C, at 3:05 (██████████

█████████████████████████]. It is a declaration Defendants used as material support for their legal arguments. [Opposition, Doc. No. 30, PAGID #893.] And it is a Declaration that the Court should discard entirely.

The Opposition asks the Court to make a ruling based on a fiction. It asks the Court whether a fictional employee could have reasonably expected privacy, if that fictional employee had accidentally saved attorney-client communications to the Company's servers, and if the fictional employee did not know that the Company could review documents saved on its servers.

But courts do not deal in fiction. Defendants *knew* they had no expectation of privacy. They said so. ██████████████████████ Any argument about what the fictional employee's expectation of privacy would be is purely academic, when *these* Defendants admitted they had no such expectation.

---

[4] ████████████████████████████████████████████ [Doc. No. 23-5, at Exhibit C at 1:38.]

The Court should see the Opposition what it is: a studious avoidance of the most devastating admissions Defendants themselves made, supported by demonstrably untrue statements, in support of legal arguments that cannot overcome Defendants' vast, knowing, and intentional waiver of the attorney-client privilege. This Motion should be granted, and the Court should find the attorney-client privilege to have been waived with regard to any and all subject matter addressed in attorney-client communications saved to shared company drives and/or servers.

## ARGUMENT

### A. Mr. Schumann Made Material, False Statements to the Court Under Penalty of Perjury.

Before discussing the *legal* deficiencies of the Opposition, Plaintiff first must address the *factual* deficiencies of a Declaration upon which the Opposition relies. Mr. Schumann declared under penalty of perjury: "I did not monitor employee emails or devices." [Doc. No. 30-4.] Defendants relied upon this statement to support their arguments. [Doc. No. 30, PAGEID # 893.]

The declaration is false, and its falsity is demonstrable.

First, Schumann programmed Atlas, a Company-owned[5] AI tool, to monitor the email accounts of Mr. Timashev and/or others and report back to Schumann on the metadata it read from their emails. An example of this can be seen in the following excerpt of one such Atlas Brief:



---

[5] Atlas was created using Company resources, deployed for Company purposes, that uses Company data, and pursuant to Schumann's CNNI Agreement, is owned by the Company. [Doc. No. 1-3].

[*See* Exhibit 9, at 2].

Second, in a recorded conversation on April 12, 2026 (that is, prior to the date of his sworn declaration), Schumann

[*See* Doc. No. 23, Exhibit 1, at Exhibit C, at 3:05 (emphasis added)].

[*Id.* at 1:38 (emphasis added)].

Third, Schumann accessed, exported, and downloaded all of Mr. Timashev's sent emails from December 1, 2025-April 13, 2025. [*See* Doc. No. # 26 at Exhibit D].

4

And fourth, in subsequent briefings, Atlas – again, a Company-owned tool that reads and pulls data from Schumann's written and verbal communications – ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[Exhibit 8 at 2, 4 (highlighting added)].  As with the other transcripts and Atlas briefs referenced above, these documents were saved to a shared Company drive, knowingly, and intentionally.

This evidence directly belies Schumann's subsequent, sworn statement (made pursuant to 28 U.S.C. § 1746) that he "did not monitor emails or devices."  [Doc. No. 30 at PageID# 945]. Taken together, all of these materials plainly demonstrate that Schumann, and perhaps the other Defendants, ██████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████. [*See* Doc. No. 30 at PageID# 941, 943, 945].

**B. Legal Standard: Defendants Bear the Burden of Showing There Was No Waiver**

Under federal law, the attorney-client privilege "is narrowly construed, because it 'reduces the amount of information discoverable during the course of a lawsuit." *Mainstay High Yield Corporate Bond Fund v. Heartland Indus. Partners, L.P.*, 263 F.R.D. 478, 480 (E.D. Mich. 2009) (citations omitted). Thus, because the privilege serves as an exception to the general rule favoring open discovery, "[t]he burden of establishing the existence of the privilege rests with the person asserting it." *Kushner v. Nationwide Mutual Ins. Co.*, No. 2:17-cv-715, 2018 WL 3454685, at *4 (S.D. Ohio July 18, 2018) (internal quotation marks omitted). In the case of a waiver dispute, "[t]he burden of showing that the privilege has not been waived also falls upon the person claiming the privilege." *Mainstay*, 263 F.R.D. at 480 (citing *United States v. Evans,* 113 F.3d 1457, 1461 (7th Cir. 1997)).

With regard to the scope and extent of a waiver, "it is well-established that 'voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject.'" *Edwards v. Whitaker*, 868 F. Supp. 226, 229 (M.D. Tenn. 1994) (collecting cases). Thus, "[t]he widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter." *Mainstay*, 263 F.R.D. at 480 (quoting *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005)).

**C. Defendants' Own Statements Establish That They Had No Expectation of Privacy**

Defendants spend the entirety of their opposition brief addressing legal standards and tests while making no effort at all to address the elephant in the room: their own admissions that ***they in fact had no expectation of privacy*** over the materials at issue. Defendants did not even assert

6

that they had a reasonable expectation of privacy in their Declarations.[6] Those admissions, ████████████████████████████████████████████, preclude and render moot any subsequent discussion regarding whether such an expectation *would have been reasonable*.  That analysis is entirely academic and theoretical under these factual circumstances.

In the transcribed March 10 conversation between Mr. Schuman and Mr. Metcalf, they concluded a discussion about Atlas / Argus accessing the emails and files of other OH.io employees with the statement that "there is no expectation of privacy … for any of this work stuff."  [Doc. No. 23, at Exhibit 1, at Exhibit D at 27:01].  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ [Doc. No. 23, at Exhibit 1, at Exhibit C at 1:38.]  Despite such admissions having been prominently highlighted in Plaintiff's Objection and Motion [Doc. No. 23], Defendants did not spend even a single word of their opposition brief addressing them.

The reason, of course, is because they cannot.  Defendants generated and saved transcripts of attorney-client conversations to a shared company drive with full knowledge and awareness that doing so would render them discoverable and would remove any potential expectation of privacy. Thus, all Defendants can do at this stage is attempt to divert attention away from that fact and prop up legal arguments and alternative facts (like the absence of a final company policy). None of those efforts can overcome their own admissions.

---

[6] At most, Defendants assert only that they expected certain personal information to remain confidential. But that is not the legal standard. Employees may reasonably expect medical information, banking information, benefits information, or similar personal information to be treated confidentially without having any reasonable expectation that such information, when stored on Company systems, is beyond the Company's access. Defendants omitted any declaration of a reasonable expectation of privacy because they did not have one.

In any event, it should go without saying that discussing the reasonableness of an expectation of privacy is a pointless exercise when the evidence conclusively establishes that no such expectation existed. By Defendants' own admission, that is the case here, and Defendants cannot sidestep the consequences of knowingly saving conversation transcripts to a shared company drive simply by pretending they did not do so.[7]

### D. Defendants' Disclosure of Attorney-Client Communications Was Not Inadvertent

For much the same reason, Defendants' argument regarding inadvertent waiver is wholly misplaced. The waiver at issue here was not inadvertent and did not result from a discovery production or some similar procedure. Rather, the waiver at issue here resulted from the knowing and intentional act of saving all conversation transcripts to a shared company drive without regard to the identities of the participants or the nature of the communications.

Under Federal Rule of Evidence 502(a), an *intentional* waiver of the attorney-client privilege extends to undisclosed communications or information concerning the same subject that a court determines ought in fairness be considered together with the intentionally waived communication or information. *See* Fed. R. Evid. 502(a). Subpart (b) of Rule 502, in turn, addressed inadvertent disclosure and provides that waiver does not result from *inadvertent* disclosures if the disclosing party **both** took reasonable steps to prevent disclosure **and** promptly took reasonable steps to rectify its error. *See* Fed. R. Evid. 502(b).

---

[7] Also unavailing is the Opposition's assumption that the extent of the waiver is limited "to only ten AI-generated transcripts and two documents potentially containing reference to attorney-client communications or work product," and the subsequent assertion that the waiver is not that large because the number "is a small amount compared to the already 30,000+ documents produced in this case." [Doc. No. 30, at PAGEID # 889-90.] The documents referenced are only those that were sent to Defendants when Plaintiffs' counsel alerted them of their clients' waiver. Defendants' attempt to minimize the true extent of the waiver – including via communications with third parties, such as Mr. Schumann's parents, or a contact of Mr. Schumann's named Jenna, or a contact of Mr. Schumann's named Ciara, or a former OH.io employee named Missy – should fail.

As this Court explained in *Irth Solutions, LLC v. Windstream Commc'ns. LLC*, No. 2:16-cv-219, 2017 WL 3276021, at *7 (S.D. Ohio Aug. 2, 2017), "under Rule 502(b), an unintentional disclosure constitutes a waiver unless all three sub-elements are met." *Id.* at *7. That is, to avoid waiver of the privilege, the disclosing party must prove (1) that the disclosure was inadvertent; (2) that the disclosing party took reasonable steps to prevent disclosure; ***and*** (3) that the disclosing party promptly took reasonable steps to rectify the error that resulted in the disclosure. *See id.* at *6; *see also* Fed. R. Evid. 502(b). If a disclosing party cannot establish ***all three*** of those elements, the disclosure constitutes and gives rise to waiver of the attorney-client privilege. *See Irth*, 2017 WL 3276021, at *7.

When a party claims to have inadvertently disclosed privileged information, "it has the burden of proving that the disclosure was truly inadvertent." *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 845, 850 (E.D. Mich. 2010) (citation omitted). This, of course, comports with the privilege holder's overall burden of proving that a waiver has not occurred. *See Mainstay*, 263 F.R.D. at 480. Thus, where a disclosing party fails to address any of the three elements of Rule 502(b), it fails to satisfy its burden of proving that there has been no waiver. *See Irth*, 2017 WL 3276021, at *7; *Sheet Metal Workers*, 722 F. Supp. 2d at 849.

Here, Defendants cannot satisfy their burden of showing that the disclosures at issue were inadvertent (as they were not), and they have made no effort to identify any reasonable steps taken to prevent disclosure (because they did not take any such steps). A failure to establish ***either*** of those two elements under Rule 502(b) would by itself result in waiver, and thus, Defendants' singular focus on the third element—prompt remedial action—is unavailing and insufficient to stave off waiver. *See Irth*, 2017 WL 3276021, at *7 ("Under Rule 502(b), an unintentional

disclosure constitutes a waiver unless all three sub-elements are met." (citing *N. Am. Rescue Prods., Inc. v. Bound Tree Med., LLC*, No. 2:08-cv-101, 2010 WL 1873291, at *9 (S.D. Ohio))).[8]

Defendants' failure to address the first two elements of Rule 502(b) is telling. The facts clearly show that the act of saving attorney-client communications to company drives was not, in fact, inadvertent and was not accompanied by any reasonable steps to prevent disclosure. To the contrary, Defendants, who are self-professed AI and technology experts, knowingly and intentionally generated and saved the transcripts at issue via AI tools and applications, for the express purpose of keeping a record of all third-party communications. The saving of these materials to shared company drives was not the result of any inadvertent action, but rather part of a knowing and voluntary process. *See* DEF_056865 (Jeff Schumann: … "every time a transcript is created on PLOD*[sic]* and Granola, it will pull it into your G drive, which is how [Atlas] sees it. [Atlas]can get access to the G drive."). The purpose and intent by such actions is revealed in transcribed conversations during which Defendants discussed having "literally like everything recorded" and spoke of being "███████████████████████████████████████████████████████████████" [*See* Doc. No. 23, at Exhibit 1, at Exhibit B, at 9:42; Doc. No. 23, at Exhibit 1, at Exhibit C, at 29:19]. In short, Defendants used AI to knowingly and intentionally record virtually

---

[8] While Defendants point to the five-factor balancing test relied upon in *Nilavar v. Mercy Health Sys*., No. 3:99cv6122004 WL 5345311 (S.D. Ohio May 10, 2010), as the basis for determining whether an inadvertent disclosure gives rise to waiver, this Court subsequently clarified the limited purpose and utility of that test after the enactment of Rule 502. In *North American Rescue Products*, the Court explained that "the multi-factor test approved as being consistent with Rule 502(b) in *American Coal Sales* is not mandatory and merely serves to guide a court's analysis when appropriate under the particular circumstances of each case." *N. Am. Rescue Prods.*, 2010 WL 1873291, *9 (referencing *American Coal Sales, Co. v. Nova Scotia Power Inc.*, No. 2:06-cv-94, 2009 WL 467576 (S.D. Ohio Feb. 23, 2009) and noting that the *American Coal Sales* and *Nilavar* decisions both predated Rule 502).

It must also be noted that Defendants' argument erroneously misconstrues and conflates the test for assessing inadvertence, as explained in *Irth*, with the five-factor waiver test set forth in *Nilavar* and *American Coal Sales*. After citing both, Defendants point to the latter as the basis for asserting that the subject disclosure "was inadvertent under the relevant factors." *See* Defs.' Opposition at 6. That assertion is misplaced, as the multi-factor *Nilavar/American Coal Sales* test has nothing to do with determining whether or not a disclosure was inadvertent, but rather may be used by a court to determine whether an inadvertent disclosure gives rise to waiver. *See Nilavar*, 2004 WL 5345311, at *3; *American Coal Sales,* 2009 WL 467576 at *17.

10

all conversations during the course of their employment and then saved transcriptions of those conversations to a shared company drive with fully knowledge that doing so rendered them discoverable and removed any potential expectation of privacy. [*See* Doc. No. 23, at Exhibit 7, at DEF_049803 ("But how much is discoverable?" … "Oh, all of it, dude.")].

Notwithstanding all of the foregoing evidence establishing that Defendants' "disclosure" of attorney-client communications was not inadvertent, a finding of inadvertence still would not preclude waiver. To wit, even if Defendants could establish that such actions were inadvertent (which they cannot do), nowhere in the process of recording and saving such information were any "reasonable steps" taken to prevent disclosure. Defendants do not even attempt to identify any such steps or acknowledge the mandatory element set forth in Rule 502(b)(2), which is independently dispositive of the waiver issue. *See Irth*, 2017 WL 3276021, at *7 ("Under Rule 502(b), an unintentional disclosure constitutes a waiver unless all three sub-elements are met.") (citation omitted).

The reason for Defendants' silence regarding preventative steps, of course, is that they took no such steps. Rather, they knowingly and intentionally used AI tools to record and transcribe third-party conversations throughout their employment, including those with their attorneys, and then knowingly saved the resulting transcripts to a shared company drive. Thus, while Defendants claim to have satisfied subpart (3) of Rule 502(b) (remedial steps) by requesting that Plaintiff stop its review of communications saved to the company drive, they cannot overcome subpart (2) of Rule 502(b). And by not even making any effort to do so, Defendants have effectively conceded that any and all disclosures—*even if they had been inadvertent*—resulted in waiver.

11

**E. Defendants Intentionally and Purposefully Shared Attorney-Client Communications with AI Applications to Generate and Save Guidance Memos and Other Materials**

In reality, Defendants cannot point to any "reasonable steps to prevent disclosure" because they did not take any.  To the contrary, these AI- and tech-savvy individuals used AI to record and save all of their conversations with full knowledge and awareness that doing so would result in the disclosure of such information to the company.  [*See* Doc. No. 23, at Exhibit 7 at DEF_049803 (transcript of a conversation involving Schumann) ("I feel like you're gonna hate the discoverability of all of it.")].

One reason Defendants recorded such communications was so that the resultant recordings – *including* recordings with counsel – could be read and used by Atlas (an AI tool developed by Defendant Schumann) to prepare for attorney meetings, recap legal advice, and provide instruction as to how to follow that legal advice.  Per Schumann's design, Atlas generated briefs that were sent to Schumann via the Company's Slack account and *also* saved on the Company server. [*See e.g.,* 4.9.26 Atlas Brief ECA_CTRL000014140.0001, attached hereto as Exhibit 9 (███████ ███████████████████████]. Many of these Atlas-generated briefings disclosed and referred to attorney-client communications and advice given to Defendants by their current litigation counsel.  Several of these briefings are attached for the Court's review as Exhibits 8 and 9, and some of the more salient examples of Atlas-generated guidance to Schumann include the following:





[*See* Exhibit 8 at 1-2, 4; *See* Exhibit 9 at 1-2, 4].

These Atlas briefs were not used solely for purposes of advising Schumann on legal advice or intended to be confidential or private.  Rather, Atlas routinely incorporated legal advice from opposing counsel alongside Schumann's business-related tasks, summaries, and reminders. *Id.*

But even more crucially, Schumann did not only have these Atlas Briefs containing legal advice sent to him; he also had these same briefs sent ***to other OH.io personnel***, including OH.io's Chief of Staff Colin McGinnis and OH.io assistant, Missy Perdue, which constitutes *yet another* third-party disclosure of the attorney-client communications and advice reflected in the Atlas briefs.  [*See* Colin Slack Schumann Brief 4/9, attached hereto as Exhibit 11; Missy Slack

13

Schumann Brief 4/9, attached hereto as Exhibit 12; Colin Slack Schumann Brief 4/12, attached hereto as Exhibit 13; Missy Slack Schumann Brief 4/12, attached hereto as Exhibit 14; Colin Slack Schumann Brief 4/13, attached hereto as Exhibit 15; Missy Slack Schumann Brief 4/13, attached hereto as Exhibit 16].

Schumann's use of Atlas and the scope of his intentional disclosure of arguably privileged information does not stop there, however.  Documents saved to the company's servers (and shared with Ms. Perdue) over the days and weeks prior to his termination reveal that Schumann used Atlas to create what he called "Project Looking Glass."  As he explained to Ms. Perdue during a meeting that was recorded and transcribed on April 8, 2026, (in which he also shared legal strategy and advice from his counsel), Schumann showed her a document created by Atlas that he said he "would share only with attorneys."  That document, titled "Project Looking Glass," ███████

████████████████████████████████████

████████████████████████ [*See* Missy 1:1 Transcript, at 37:23, attached hereto as Exhibit 17].

Because these documents and communications were not only generated using AI but were shared with third parties (including Ms. Perdue and Mr. McGinnis), Defendant Schumann clearly waived any ability he might have had to assert attorney-client and/or work-product privilege.[9]

**F.  Defendants Do Not Defend Their Claim of Privilege As to Other Third Parties.**

Nowhere in the Opposition do Defendants even try to defend their claim of privilege as to other third parties. The Company specifically objected to Privilege Log Nos. 27 and 81 as identifying topics that were legal in nature, but which included communications with non-

---

[9] While this document is presumably also in Defendants' possession, Defendants neither produced this document nor listed it on their privilege log.

attorneys. [Doc. No. 23, at PAGEID # 150-52.] These included, for example, a 75-page document presumably containing a conversation between Schumann and his parents, which Defendants withheld because it concerned "Legal Strategy." (Log. No. 27) and a nine-page document presumably containing a conversation between Colon and Matt Pasternack, "related to anticipation of litigation seeking attorney advice." (Log No. 81.)

Defendants offer up no legal justification for withholding the document, because there is no such justification. A call between Mr. Schumann and his parents is simply not privileged. Likewise, we have found no record of Mr. Pasternack being an attorney.  Because Defendants did not make any argument as to these Privilege Log entries, their privilege should be deemed waived. *Clark v. Walt Disney Co.*, 642 F.Supp.2d 775, 784 n.4 (S.D. Ohio 2009) (finding failure to respond to particular argument in motion amounted to implied concession); *Hearn v. Dick's Sporting Goods, Inc.*, No. 1:22-CV-329, 2023 WL 7298616, at *3 n.3 (S.D. Ohio Nov. 6, 2023) (deeming an argument forfeited where the defendant failed to raise it); *Bodine Perry, PLLC v. Bodine*, 667 F. Supp. 3d 617, 635 (N.D. Ohio 2023) ("Since [the party] failed to address this argument in its responsive briefs, this claim is waived."); *.AK v. Behav. Health Sys., Inc.*, 382 F.Supp.3d 772, 774 (M.D. Tenn. 2019) ("[W]hen a party fails to respond to an argument, that argument is generally deemed to be unopposed and the proposition conceded."); *Reitz v. Ford Motor Co.*, No. 3:16-CV-00765-CRS, 2019 WL 4675387, at *6 (W.D. Ky. Sept. 25, 2019) ("A non-moving party waives an argument by failing to address the argument in its response brief.").

**G.  Defendants Cannot Hide Behind the Absence of a Final Company Policy**

While Defendants' argument regarding the absence of a final company policy is also nothing more than a diversion given their admissions that they had no expectation of privacy, that argument also fails due to its misleading and disingenuous premise.  That is, even if Defendants

could show that they had an expectation of privacy and that their disclosure of attorney-client communications was inadvertent, their positions and roles would *still* preclude them from pleading ignorance and hiding behind the absence of a finalized and fully implemented company policy.

In *Aventa Learning,* the United States District Court for the Western District of Washington addressed a similar argument by former company executives and held that a "senior level manager" was "fairly charged with constructive knowledge of the company's policies regarding electronic communications." *Aventa Learning, Inc. v. K12, Inc*., 830 F. Supp. 2d 1083, 1107 (W.D. Wash. 2011). Here, Defendants Schumann and Metcalf were not only aware of the policy that the company intended to implement and follow but were in fact instrumental in developing it. Both undisputedly reviewed the draft policy, and though it was never formally approved and put in place, they expressly acknowledged their "align[ment] with the direction of the policies." [*See* Doc. No. 23, at Exhibit 4 at p.4 (including screenshots of relevant communications).] The language of the subject policy—with which Defendants were "aligned"—clearly stated that employees "should not expect privacy when using Firm resources … If the Firm provides the resources, then the Firm maintains the right to access and read all information contained on those resources or disseminated via those resources." [*See id.*, Exhibit O at 10-11 (emphasis added).]. The only reason the policy was not implemented was because they failed to implement the policy after indicating they were aligned with its content.

The bottom line is that Defendants were not low-level employees who had not been made aware of the intended company policy regarding these issues, nor were they ignorant regarding the impact of saving information to shared company drives. To the contrary, as their own recorded statements confirm, Defendants were well aware that there could be no expectation of privacy even

16

independent of a company policy, and their effort to now hide behind the absence of a finalized and instituted policy (of which they were well aware) is disingenuous, at best.

Under these circumstances, the irony of Defendants' position is matched only by its audacity. These were sophisticated technology executives, not laypersons confused by unfamiliar systems or company policies. In addition to expressly acknowledging that there was no expectation of privacy on Company servers, Schumann often boasted of his e-discovery expertise. And Metcalf is not merely a business executive - he is a licensed Ohio attorney, fully capable of understanding the significance of monitoring communications, disclosing privileged material, and making false or misleading representations to a court. Indeed, in recorded conversations between them, Metcalf referred to his legal education in noting and cautioning Schuman on the discoverability of the information they were recording and saving via AI.

By attempting to now hide behind the absence of a final company policy, however, Defendants now attempt to present themselves as naïve to the very technology, infrastructure, and practices they designed, controlled, and exploited. The Court should reject that fiction. And because Defendants' conduct resulted in the deliberate and widespread disclosure of attorney-client communications to third parties, across Company systems, and through AI tools, the only appropriate result is the broadest possible subject-matter waiver of any claimed privilege.

## H. Defendants' Remaining Arguments Are Disingenuous and Unfounded

As with their attempt to rely on the absence of a final company policy, Defendants' argument regarding the claimed "lack of monitoring" is simply misleading.  As described above, Schumann's declaration that he did not monitor other employees' emails is demonstrably false. As a result, Defendants' claim that "OH.io did not monitor emails or other information" cannot be credited, given that it stems from Schumann's untrue declaration.  Thus, as with the absence of a

17

"final" company policy, Defendants cannot hide behind a claimed lack of monitoring even if there had been some actual expectation of privacy (so as to make *Pontikos's* four-factor test relevant).

But, as with the rest of Defendants' arguments, this analysis is academic: as Defendants' own recorded statements establish, Defendants had no such expectation of privacy, which renders any analysis regarding "reasonableness" moot. *See* Doc. No. 23-5 at DEF_056870; Doc. No. 23, at Exhibit 1, at Exhibit C at 1:38 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ "); *see also Pontikos v. Am. Med. Tech.*, No. 1:20-cv-02163, 2021 WL 634999, at *2 (N.D. Ohio Feb. 18, 2021).

Similarly, Defendants' argument that their voluntary disclosure of attorney-client communications through Plaud and Granola is equally unfounded. Defendants' argument fails to recognize the key distinction between their conduct—disclosing attorney-client communications to *Company owned* devices, *Company paid for* subscription services, and *Company owned* cloud storage—as compared to had they disclosed attorney-client communications to their ownbbb accounts.

When Defendants used Company owned devices, Company paid for subscriptions, and Company owned cloud storage to record and store attorney-client communications, they relinquished that data from their own ownership and gave it to the Company, its devices, its subscription services, its cloud storage, and its servers. The question is not whether Defendants subjectively believed those communications remained private, but whether that belief was objectively reasonable under the circumstances. It was not.

Defendants' reliance on *Morgan* and *Warner* does not alter that conclusion. Those nonbinding, factually distinct cases involved limited or pro se uses of AI tools and did not address circumstances where parties affirmatively record, transmit, and process attorney-client

18

communications across multiple third-party systems, as occurred here. *See Morgan v. V2X, Inc.*, No. 25–CV–01991–SKC–MDB, 2026 WL 864223 (D. Colo. Mar. 30, 2026); *Warner v. Bilbardo, Inc.*, 820 F. Supp. 3d 629 (E.D. Mich. 2026). Nor do those cases involve the use of company-owned devices and infrastructure to disseminate privileged communications beyond their control.

Under these circumstances, Defendants cannot plausibly claim that their communications were maintained in confidence. By voluntarily exposing attorney-client communications to Company-controlled systems and multiple third parties and third-party platforms, Defendants waived any claim of privilege.

## CONCLUSION.

For all of the above reasons, the Court should find Defendants to have waived the attorney-client and work product privileges with regard to any and all subjects addressed in materials saved to shared company drives (including all those referenced in their Privilege Log), shared with third parties (including family members and other OH.io employees), uploaded and shared with AI applications, and/or incorporated into AI briefing materials. Defendants have failed to carry their burden of establishing the absence of waiver, inadvertence, and/or any basis for limiting scope. Plaintiff OH.io therefore respectfully requests that the Court grant Plaintiff's motion in its entirety.

Respectfully submitted,

*/s/ Anne E. Duprey*
Anne E. Duprey (0087798) – Trial Attorney
Aaron T. Brogdon (0081858)
Zackary L. Stillings (0098136)
FBT GIBBONS LLP
10 West Broad Street, Suite 2300
Columbus, OH 43215-3467
Ph.: (614) 559-7245; Fax: (614) 464-1737
E-mail: aduprey@fbtgibbons.com
E-mail: abrogdon@fbtgibbons.com
E-mail: zstillings@fbtgibbons.com

19

Jonathan Sack (*Pro Hac Vice*)
Queenie Paniagua (*Pro Hac Vice*)
Sasha Pemberton (*Pro Hac Vice*)
SACK & SACK, LLP
70 East 55th St., 10th Floor
New York, NY 10022
Ph.: 212-702-9000; Fax: 212-702-9702
E-mail: jsack@sackandsack.com
E-mail: qpaniagua@sackandsack.com
E-mail: spemberton@sackandsack.com

*Counsel for Plaintiff OH.io Ventures Holding, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed electronically and served electronically on the following counsel of records on this 12th day of June 2026:

Rex H. Elliott (0054054)
Abigail F. Chin (0097928)
Barton R. Keyes (0083979)
Spencer J. Hattemer (0102663)
COOPER ELLIOTT
305 West Nationwide Boulevard
Columbus, Ohio 43215
rexe@cooperelliott.com
abbyc@cooperelliott.com
bartk@cooperelliott.com
spencerh@cooperelliott.com

*Attorneys for Defendants*
*Kevin Colón, J. Seth Metcalf,*
*and Jeff Schumann*

/s/ Anne E. Duprey
Anne E. Duprey (0087798)

0164635.0823882  4932-7194-4883v9

20